Matthew E. Lee
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mlee@milberg.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NELLY LEONG | ) | Case No. 3:21-cv-01291-VC |
| | ) | |
| Plaintiff, | ) | **PLAINTIFF'S RESPONSE TO** |
| | ) | **DEFENDANT INTERNATIONAL** |
| v. | ) | **BUSINESS MACHINES** |
| | ) | **CORPORATION'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | Honorable Vince Chhabria |
| | ) | |
| | ) | Date:        June 23, 2022 |
| | ) | Time:        9:30 a.m. |
| Defendant. | ) | Courtroom: 5 |
| | ) | |
| | ) | Complaint Filed:   February 23, 2021 |
| | ) | Trial Date: September 6, 2022 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................... 1

II.    STATEMENT OF THE ISSUES.................................................................. 2

III.   FACTUAL BACKGROUND....................................................................... 2

       A.     Ms. Leong was a successful and highly valued IBM employee for 35
              years. ................................................................................................... 2

       B.     In 2019, IBM recognized Ms. Leong for 35 years of service and
              removed her from the accounts she had spent years cultivating........... 4

       C.     Ms. Leong was returned to her prior position in January 2020 but with
              all new accounts to cultivate just as the pandemic hit. .......................... 6

       D.     Mr. Cortez, with Mr. Stacy's backing, targeted Ms. Leong for
              elimination, put her on an unachievable performance plan, and
              terminated her early before the PIP period was even completed........... 8

       E.     IBM rebranded as a youth-oriented tech company and directed
              managers to eliminate older workers to make room for younger
              workers.............................................................................................. 11

       F.     After a challenging job search during the height of the pandemic, Ms.
              Leong accepted a position that uses her skills and has comparable pay.............. 12

IV.    ARGUMENT AND AUTHORITY............................................................. 13

       A.     Genuine issues of material fact exist as to Plaintiff's age discrimination
              claims. ................................................................................................ 13

              1.     Ms. Leong can establish a prima facie case of age
                     discrimination. ......................................................................... 13

              2.     There are triable issues of fact as to whether IBM's asserted
                     justification for Plaintiff's termination is pretext...................... 16

       B.     Genuine issues of material fact exist as to Plaintiff's mitigation of
              damages.............................................................................................. 22

       C.     Genuine issues of material fact exist as to Plaintiff's claim for punitive
              damages.............................................................................................. 24

V.     CONCLUSION......................................................................................... 24

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cassino v. Reichhold Chems., Inc.*,
  817 F.2d 1338 (9th Cir. 1987) .............................................. 22

*Chuang v. Univ. of Cal. Davis*,
  225 F.3d 1115 (9th Cir. 2000) .............................................. 13

*Chuang v. Univ. of Cal. Davis, Bd. of Trustees*,
  225 F.3d 1115 (9th Cir. 2000) .............................................. 19

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) .......................................... 18, 19

*Decker v. Barrick Goldstrike Mines, Inc.*,
  645 F. App'x 565 (9th Cir. 2016) .......................................... 15

*Diaz v. Eagle Produce Ltd. P'ship*,
  521 F.3d 1201 (9th Cir. 2008) .............................. 13, 15, 16, 21

*Earl v. Nielsen Media Research, Inc.*,
  658 F.3d 1108 (9th Cir. 2011) ................................. 13, 16, 21

*Evers v. Alliant Techsystems, Inc.*,
  241 F.3d 948 (8th Cir. 2001) .............................................. 18

*Flanagan v. City of Richmond*,
  No. 14-cv-02714-EMC, 2015 WL 5964881 (N.D. Cal. Oct. 13, 2015) ................... 14

*France v. Johnson*,
  795 F.3d 1170 (9th Cir. 2015) ............................... 12, 13, 16, 17

*Gardner v. City of Berkeley*,
  No. 18-CV-07784-VC, 2020 WL 7388074 (N.D. Cal. Dec. 16, 2020) ................... 17

*Goudeau v. Nat'l Oilwell Varco, L.P.*,
  793 F.3d 470 (5th Cir. 2015) .............................................. 21

*Hauprich v. Fireman's Fund Ins. Co.*,
  No. 13-cv-01609-JCS, 2014 WL 3366736 (N.D. Cal. June 26, 2014) ................... 14

*Heyne v. Caruso*,
  69 F.3d 1475 (9th Cir. 1995) .............................................. 21

*Jackson v. Shell Oil. Co.*,
   702 F.2d 197 (9th Cir. 1983) ............................................................... 22

*Lynn v. Regents of the Univ. of Cal.*,
   656 F.2d 1337 (9th Cir. 1981) ............................................................. 14

*Lyons v. England*,
   307 F.3d 1092 (9th Cir. 2002) ............................................... 13, 16, 17

*Mangold v. Cal. Public Util. Comm'n*,
   67 F.3d 1470 (9th Cir. 1995) ............................................................... 19

*Martinez v. Costco Wholesale Corp.*,
   481 F. Supp. 3d 1076 (S.D. Cal. 2020) .............................................. 24

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ..................................................................... 12, 13

*Merrick v. Farmers Ins. Group*,
   892 F.2d 1434 (9th Cir. 1990) ............................................................. 19

*Mullin v. Temco Machinery, Inc.*,
   732 F.3d 772 (7th Cir. 2013) ......................................................... 19, 20

*Nidds v. Schindler Elevator Corp.*,
   113 F.3d 912 (9th Cir. 1966) ............................................................... 19

*Parker v. Twentieth Century-Fox Film Corp.*,
   3 Cal.3d 176, 474 P.2d 689 (1970) ..................................................... 22

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)....................................................................... 17, 19

*Reid v. Google*,
   50 Cal.4th 512, 113 Cal. Rptr. 3d 327 (2010)..................................... 19

*Sandell v. Taylor-Listug, Inc.*,
   188 Cal. App. 4th 297, 115 Cal. Rptr. 3d 453 (2010)......................... 15

*Teutscher v. Woodson,* .............................................................................

835 F.3d 936 (9th Cir. 2016) ..................................................... 22

*Villalobos v. TWC Admin. LLC*,
   720 F. App'x 839 (9th Cir. 2017) ................................................ 15, 19

iii

**Statutes**

29 U.S.C. § 623(a)(1)..............................................................................................12

29 U.S.C. § 626(b)................................................................................................24

Cal. Gov't Code § 12940(a)................................................................................12

Cal. Gov't Code § 12926(b)................................................................................12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   **INTRODUCTION**

Nelly Leong was a successful and respected IBM employee for 35 years. She was known for her customer service, having established solid relationships with some of IBM's largest accounts and, in 2018, was named "Best of IBM." In January 2020, she was assigned to all new accounts that were soon hit hard by the economic effects of the pandemic. On June 18, Ms. Leong was surprised to be given a "Performance Improvement Plan," or PIP, by her new manager, Robert Cortez. The PIP identified six unrealistic targets for Ms. Leong to hit, including a requirement that she have at least five in person customer meetings per week (at a time that stay-home orders were in place and customers weren't meeting in person due to the pandemic), and that she close $300,000 in revenue by June 30, a mere 12 days later. She was also required to close $760,000 in revenue and build a $4.23 million pipeline by July 22. Mr. Cortez and Todd Stacy, Ms. Leong's second-line manager, did not even wait until July 22 to fire Ms. Leong. Mr. Cortez told her on June 30, "You're out," and officially terminated her on July 16. Ms. Leong was 59 years old. Mr. Cortez hired someone who graduated from college in 2016 and had only a few years of sales experienced to replace Ms. Leong.

A month after Ms. Leong's termination, the Equal Employment Opportunity Commission formally announced that after an expansive, two-year investigation it had "uncovered top-down messaging from (IBM's) highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for" younger workers. The EEOC's determination followed IBM's reinvention to rebrand itself in the age of the Millennial, an effort that IBM's CEO boasted in 2017 had transformed the company's workforce to more than half Millennials. Mr. Cortez's participation in IBM's transformation is evidenced by remarks he made to Ms. Leong and other older team members and his targeting of Ms. Leong and her 64-year-old colleague for removal from his team. Mr. Cortez, with Mr. Stacy's backing, was so determined to get rid of Ms. Leong that he set unachievable goals in her PIP, ignored IBM's PIP policies, and terminated her before the PIP deadlines.

IBM's motion for summary judgment should be denied. An employee's burden for overcoming an employer's summary judgment motion is minimal because of the recognized difficulty in proving discriminatory motive and the jury's critical role of making credibility determinations and assessing disputed facts. In this case, the full record, viewed in the light most favorable to Ms. Leong, shows that there is more than sufficient circumstantial evidence that Ms. Leong was terminated because of her age. IBM's argument that Ms. Leong should not recover back pay also fails as it depends on an unreliable expert report that fails to satisfy IBM's burden of proving Ms. Leong failed to mitigate her damages. In fact, Ms. Leong was able to secure a new position using skills developed over her long and successful career at IBM with a comparable salary within seven months of her termination, despite the challenges of job hunting in the midst of a pandemic. Finally, it is premature to dismiss Ms. Leong's request for punitive damages. Ms. Leong respectfully requests that the Court deny IBM's motion in its entirety.

## II.   STATEMENT OF THE ISSUES

1.   Whether genuine issues of material fact preclude summary judgment of Ms. Leong's age discrimination claims?

2.   Whether IBM failed to meet its burden of proving that Ms. Leong failed to mitigate her damages by relying on a dubious expert report and ignoring that she obtained a new position with comparable pay in less than seven months?

3.   Whether it is premature to dismiss Ms. Leong's claim for punitive damages when she has proffered sufficient evidence to overcome IBM's motion for summary judgment of her age discrimination claims?

## III.   FACTUAL BACKGROUND

### A.   Ms. Leong was a successful and highly valued IBM employee for 35 years.

Ms. Leong joined IBM as a college intern in 1983 and began working full time for IBM the following year as an industrial engineer after completing her bachelor's degree in industrial

engineering. Ex. 1 (Leong Dep.) at 16:18-17:2, 17:20-22, 20:7-18.[1] In 1987, she moved into a sales role for IBM in New York City. *Id.* at 20:21-23. In 1996, after briefly working in IBM's marketing, Ms. Leong transitioned back into sales and began working for IBM in California. *Id.* at 21:1-15, 22:4-23:19.

In her various sales roles since then, Ms. Leong received numerous awards and recognitions, including being recently named a member of IBM's "100% Club" (recognizing sales employees who exceed their quota for both sales periods in a year) in 2016 and 2017 and awarded IBM's Sales Eminence Award in 2011 and 2014 (recognizing the upper echelon of IBM's sales representatives for excellent performance the previous year). Ex. 2 [IBM-LEONG0025]; Ex. 3 [Dep Ex 78]. She received consistently positive employment reviews. *See*, *e.g.*, Ex. 4 [Dep Ex. 85]; Ex. 3 [Dep Ex 78]; Ex. 5 (Buyarski Dep.) at 41:9-22, 43:12-43:2. And in 2018, Ms. Leong was named "Best of IBM," an award given to the top 0.25% of IBM employees, and was awarded a 15% raise, far above the standard increase at IBM. Ex. 6 [Dep Ex 5]; Ex. 7 [Dep Ex 40] at 2-3; Ex. 1 (Leong Dep.) at 43:24-44:9, 45:11-46:23; *see also* Ex. 8 (Stacy Dep.) at 37:14-38:16 ("Best of IBM" is "arguably, the top one percent IBM population worldwide" and recognizes "a best representative of being an IBM-er").

As her then-manager Amy Buyarski acknowledged, sales representatives may have a leaner year following the type of success Ms. Leong experienced in 2017 since their customers may not make large purchases two years in a row. Ex. 5 (Buyarski Dep.) at 46:25-47:18. Successful years also often lead to lower achievement in subsequent years because IBM primarily calculates quotas based on the previous three years' average attainment. Ex. 1 (Leong Dep.) at 35:15-19. Said another way the more you sell, the higher your quota will be next year. At the time, Ms. Buyarski noted that Ms. Leong had "a tough 2018 but on the flip side there is no question compared to your peers you put the success of your clients ahead of your person[al] interest. You are a model to others for customer satisfaction and going beyond to ensure customer satisfaction." Ex. 9 [Dep Ex

---

[1] Unless otherwise noted, all exhibits are attached to the Lee Declaration.

PLAINTIFF'S RESPONSE TO IBM's MSJ                                      3:21-cv-01291-VC

41] at IBM-Leong000014. In addition to coming off a year of extraordinarily large deals, there were "multiple critical situations at a few accounts" in Ms. Leong's portfolio in 2018, including technical issues at her largest account outside of her control, that caused her to not make her sales quotas. *Id.* at IBM-Leong000013; Ex. 1 (Leong Dep.) at 54:3-55:19, 58:15-59:24.

**B.      In 2019, IBM recognized Ms. Leong for 35 years of service and removed her from the accounts she had spent years cultivating.**

In 2019, Ms. Leong celebrated her 35th year of employment with IBM. Todd Stacy, who became director of storage and data management sales in February 2019, Ex. 8 (Stacy Dep.) at 28:13-20, told Ms. Leong's direct manager, "Nelly at 35 years … let's def make the team aware." Ex. 10 [Dep Ex 9]. Ms. Leong's team members were invited to post congratulatory messages. *Id.*; Ex. 1 (Leong Dep.) at 202:13-19. Ms. Leong's achievement was also recognized on the team call. Ex. 8 (Stacy Dep.) at 80:23-83:12. Because they knew she graduated from college and had been with the company for 35 years, Ms. Leong's managers knew she was at least in her mid-50s. Ex. 1 (Leong Dep.) at 68:25-69:16; Ex. 11 (Cortez Dep.) at 97:15-19.

In the first half of 2019 (IBM divides years into six-month sales periods), Ms. Leong continued to serve her portfolio of accounts, including several large accounts. Ex. 1 (Leong Dep.) at 103:12-104:1. Unfortunately for Ms. Leong and IBM, some of her largest accounts made strategic decisions not to purchase from IBM for reasons out of Ms. Leong's control, as her management acknowledged. Ex. 12 [Dep. Ex. 43 at 6]. But it wasn't just Ms. Leong's accounts that were not buying from IBM. During multiple quarterly business review meetings Mr. Stacy told the team things like: "You suck! You guys are the worst of the worst. Your f#cking pipeline sucks." *See* Ex. 5 (Buyarski Dep.) at 38:20-39:22. Nonetheless, Mr. Stacy acknowledged Ms. Leong's hard work. Ex. 13 [Dep Ex 51] ("I appreciate all of your hard work in Q1!").

By May 2019, however, Mr. Stacy identified Ms. Leong as one of four out of more than 60 team members who "might be leaving" for performance reasons. Exs. 14 & 15 [Dep Exs 52 & 53]. Mr. Stacy claimed in his deposition that Ms. Buyarski had given him Ms. Leong's name. Ex. 8 (Stacy Dep.) at 57:21-59:20, 62:5-24. Ms. Buyarski unequivocally denied that she had done so.

PLAINTIFF'S RESPONSE TO IBM's MSJ                                    3:21-cv-01291-VC

4

Ex. 5 (Buyarski Dep.) at 68:12-70:14 ("Q: So but you can say definitively, you did not give him Nelly Leong's name for a list like this, right? A: That is correct.").

In July 2019, Ms. Leong's managers assigned her to a brand new role known as "DES hunter." Ex. 16 (IBM Int. 5); Ex. 17 [Dep Ex 37] at IBM-Leong000074; Ex. 18 & 19 [Dep Exs 7 & 8]; Ex. 1 (Leong Dep.) at 76:6-24. In this new role, Ms. Leong had no dedicated accounts of her own and instead supported the rest of her team in servicing their accounts. Ex. 1 (Leong Dep.) at 78:11-79:21, 81:4-82:20 ("I was no longer responsible for the—for the account relationship … the general coverage. … You go in, you put on the fire, and then you go out."), 90:2-91:12, 95:23-96:3. Ms. Leong was told she was given this new role because she was the most experienced in selling products and her support would help the entire team hit its sales goals. Ex. 1 (Leong Dep.) at 86:12-23; *see also* Ex. 18 [Dep Ex 7] ("Unless IBM owns all of the storage in an account, neither the BSS nor DES Hunter 'owns' an account."); *see also id.* ("As with any new role, it takes awhile for everyone to understand the mission, roles/responsibilities, and how the role is integrated with the extended IBM team.").

Ms. Leong had developed long-term relationships with the accounts she managed. Ex. 1 (Leong Dep.) at 36:2-37:10, 49:23-50:3. Working on accounts for many years allows sales representatives to cultivate meaningful relationships, which increases their ability to be successful in their roles. *See* Ex. 20 [Dep Ex 81] ("The most consistently successful rep I ever managed was successful because she had the 'luxury' of being assigned the same territory every 6 months for 4+ years; there was no magic or secret to her success ... she inherited a small pipeline early on and built-on that with good short-term tactical execution and a strategic long-term investment across her territory."). Moving Ms. Leong from her dedicated accounts to a support role left her with little to no control over whether she hit her sales goals. *See* Ex. 18 [Dep Ex 7] ("DES hunters will spend most of their time doing business development, i.e., the work needed to identify/develop opportunities to generate first half '20 pipeline, which is just as important as progressing validated opportunities."). Ms. Leong was prohibited from contacting accounts on her own and could only attend client meetings when her teammates included her. Ex. 21 (Leong Int 3); Ex. 1 (Leong Dep.)

at 79:14-80:17, 83:1-84:5. Ms. Leong's role also focused on "a couple of core product areas," further limiting her sales opportunities. Ex. 5 (Buyarski Dep.) at 71:9-21. Since the other representatives had broader product sets within their territories, they could close sales that helped them hit their numbers. Ms. Leong was left with no way to close her own deals to meet her quota. *See* Ex. 12 [Dep Ex 43] at 6.

In August 2019, Ms. Buyarski took a new position and Sandy Florey became Ms. Leong's manager. Ex. 16 (IBM Int. 2); Ex. 5 (Buyarski Dep.) at 24:6-11. Ms. Florey praised Ms. Leong's customer service skills in her 2019 performance review, adding that she "was responsive to management and peers, acted as a 'buddy' to a new employee, is a team player, and genuinely cares about the client/IBM relationship overall" and "drove IBM's engagement with The Gap during their critical holiday season." Ex. 12 [Dep Ex 43] at 6. Ms. Florey also noted that Ms. Leong did not achieve revenue goals "primarily due to strategic decisions made by her largest accounts." *Id.*

Ms. Florey characterized the DES hunter role as "a new role that, frankly, was not fully baked by the brand leadership" and recognized that Ms. Leong "struggled to gain traction outside of the accounts where she already had relationships, partly due to the DES Hunter role and partly due to the IQP rep's lack of relationships." *Id*. Even Mr. Stacy characterized the transition to DES hunter as "a hard jump." Ex. 8 (Stacy Dep.) at 65:11-24. And Ms. Buyarski called it "a six-month mistake." Ex. 22 [Dep Ex 86]. IBM eliminated the DES hunter role at the end of 2019. *Id.*

## C. Ms. Leong was returned to her prior position in January 2020 but with all new accounts to cultivate just as the pandemic hit.

In January 2020, IBM returned Ms. Leong to her position as storage brand sales specialist. Ex. 16 (IBM Int. 5); Ex. 23 [Dep Ex 38]. Ms. Leong was given a series of small accounts—"all new accounts that no one knew much about"—that she had to build new business relationships with. Ex. 1 (Leong Dep.) at 39:19-23, 67:7-8, 121:10-122:18, 123:6-24 ("they said it's going to be a tough territory"); Ex. 24 [Dep Ex 39] ("territories have changed considerably"). The new accounts included retailers and small farms selling to restaurants, an airline, and a travel company.

PLAINTIFF'S RESPONSE TO IBM's MSJ                          3:21-cv-01291-VC

*See* Ex. 25 [IBM-Leong002922-25]. These companies were soon struggling because of the economic impact of the pandemic and not interested in purchasing new products or services from IBM. Ex. 1 (Leong Dep.) at 121:15-122:18, 131:18-23. Some had massive employee layoffs and were on the verge of bankruptcy. Ex. 1 (Leong Dep.) at 137:19-138:4, 143:7-12 ("all my accounts are pretty much either filing bankruptcy or going on pause"). The pandemic impacted IBM sales for even established accounts, as representatives had a difficult time reaching customers who were working remotely, customers' businesses were suffering, and there were supply chain issues. Ex. 11 (Cortez Dep.) at 100:6-101:9, 103:6-104:4; Ex. 8 (Stacy Dep.) at 112:14-20. Mr. Cortez testified that he was only able to still close deals when CoVID struck because he'd been able to build a pipeline for his accounts 9-12 months prior to when the CoVID pandemic hit. Ex. 11 (Cortez Dep. At 102:2-22) ("..our sales cycles are typically 12 to 18 months long .... So anything that I've developed or started to develop was starting to close was probably started a year ago."). Ms. Leong didn't have that opportunity since she was on her third role in as many sales periods and had been assigned all new accounts that had no existing pipeline or intelligence about them. Despite these challenges, Ms. Leong still closed multiple deals in the first half of 2020. Ex. 1 (Leong Dep.) at 140:19-150:17, 169, 10-13, 173:5-9; Ex. 26 [Dep Ex 58]. She also researched potential customers and their technology landscapes and hosted webinar sessions for them in an effort to develop more business. Ex. 1 (Leong Dep.) at 139:17:140:4.

Ms. Leong's new role came with a new sales plan called "SRAP," or "Straight Rate Absolute Sales." The SRAP plan includes no quotas and no revenue target. Ms. Leong was instead paid a percentage of the sales she closed. Ex. 21 (Leong Int. 4); Ex. 23 [Dep Ex 38]; Ex. 1 (Leong Dep.) at 38:15-25.

Ms. Leong lost another direct manager in February 2020, when Ms. Florey left IBM. Ex. 16 (IBM Int. 2). In a transition memo documenting significant information for the next manager, Ms. Florey described Ms. Leong as "capable" and noted that "[b]ecause of her integrity, she'll continue to be a hard-worker" though she did "question her level of engagement (which was probably a result of the DES Hunter role)." Ex. 20 [Dep. Ex. 81] at IBM-Leong006129; Ex. 8

(Stacy Dep.) at 86:25-87:20. Mr. Stacy asked Ms. Buyarski and fellow team member Robert Cortez to serve as acting managers, and Ms. Buyarski managed Ms. Leong again until Mr. Stacy selected Mr. Cortez to take over managing the team on May 5. Ex. 5 (Buyarski Dep.) at 83:19-20; Ex. 11 (Cortez Dep.) at 131:20-21; Ex. 27 [Dep Ex 19]; Ex. 8 (Stacy Dep.) at 85:1-20.

**D.    Mr. Cortez, with Mr. Stacy's backing, targeted Ms. Leong for elimination, put her on an unachievable performance plan, and terminated her early before the PIP period was even completed.**

By mid-April 2020, before Mr. Cortez was even given the manager position, he and Mr. Stacy decided to remove Ms. Leong from the team. Exs. 28 & 29 [Dep Exs 14 & 15]; Ex. 11 (Cortez Dep.) at 156:7-157:11. Mr. Stacy asked Ms. Buyarski to come up with a plan for reassigning Ms. Leong's accounts to other team members on April 15. Ex. 30 [Dep Ex 89]. Mr. Cortez also targeted another older team member, Randall Whitfield, who was 64 and subsequently "resource actioned." Exs. 28 & 29 [Dep Exs 14 & 15]; Ex. 11 (Cortez Dep.) at 158:6-161:8; Ex. 16 (IBM Int. 7).

On May 8, Mr. Stacy asked human resources partner Yvonne Justice for help implementing a Performance Improvement Plan, or "PIP," for Ms. Leong. Ex. 31 [Dep Ex 21]. After a telephone call about the PIP, Ms. Justice followed up with Mr. Cortez twice to see if he had met with Ms. Leong to coach her before implementing the PIP. Ex. 32 [Dep Ex 24]. He never did, even though IBM's policy is to ensure employees are coached and counseled before moving to a PIP. Ex. 1 (Leong Dep. at 142:21-144:2); Ex. 33 (Justice Dep.) at 32:25-33:11.

The draft PIP that Mr. Cortez prepared and Mr. Stacy approved in mid-May required Ms. Leong to close $660,000 in revenue and build a $1.98 million pipeline by June 19. Ex. 34 [Dep Ex 23]. They delayed notifying Ms. Leong about the PIP, first because her mother died of CoVID and then they inexplicably continued delaying notifying her despite several follow-ups from Ms. Justice. Ex. 35 [Dep Ex 26]; Ex. 36 [Dep. Ex. 73]. On June 18, Mr. Cortez informed Ms. Leong that IBM was putting her on the PIP. Ex. 1 (Leong Dep.) at 144:12-21. The final version of the PIP included six targets Ms. Leong had to meet to avoid termination, including substantially increased revenue and pipeline amounts: (1) close $300,000 in revenue by June 30—**12 days later**,

PLAINTIFF'S RESPONSE TO IBM's MSJ                                3:21-cv-01291-VC

(2) close $760,000 by July 22, and (3) build a $4.23 million pipeline by July 22. Ex. 37 [Dep Ex 60]. The PIP also required Ms. Leong to have at least 5 in person meetings per week with potential customers, even though Mr. Cortez acknowledged in his deposition that wasn't feasible at that time due to the pandemic's impact. Ex. 37 [Dep. Ex. 60]; Ex. 11 (Cortez dep.) at 193:21-194:10 and 108:6-9.

The unusually short turnaround was due to Mr. Stacy's and Mr. Cortez's desire to "have an improvement plan that could … be initiated sooner rather than later, … and in an amount of time that could enable us to, you know, to get conclusion of—of—of the desired result." Ex. 8 (Stacy Dep.) at 119:23-120:17; *see also* Ex. 31 [Dep Ex 21] (Mr. Stacy insisting on a "30-day PIP" for Ms. Leong because "no reason to offer anymore as I want immediate improvement/change or exit as we need to move soon (as we have backfill approval)."). Typically, IBM gives employees sufficient time to improve their performance by achieving the goals in the PIP, usually at least ninety days Ex. 38 [Dep Ex 6] (email discussing 90-day PIP for another sales representative); Ex. 5 (Buyarski Dep.) at 58:18-59:4, 62:20-65:12; Ex. 21 (Leong Int. 6) (the shortest amount of time Ms. Leong is aware of other employees being provided is an entire quarter); Ex. 1 (Leong Dep.) at 208:9-210:6; Ex. 11 (Cortez Dep.) at 76:2-79:2 (the only other employee he put on a PIP was given 60 days). IBM's written guidelines emphasize that "[*a] realistic time frame should reinforce the expectation of immediate and ongoing action to improve performance, while giving him sufficient opportunity to demonstrate improvement.*" Ex. 39 [Dep Ex 70] at IBM-Leong006460; Ex. 33 (Justice Dep.) at 46:2-11. The specific revenue targets in the PIP also contradicted the SRAP plan IBM had just put Ms. Leong on, which included no quotas and no revenue targets. Ex. 23 [Dep Ex 38].

When Ms. Leong told Mr. Cortez the targets appeared to be designed to be unachievable, he responded, "It's all about the numbers." Ex. 21 (Leong Int. 5); Ex. 1 (Leong Dep.) at 144:22-146:10; *see also* Ex. 1 (Leong Dep.) at 148:14-149:13 ("I did not have a $4.2 million … of territory, even on a good day"), 161:18-162:15 (the PIP required meetings with accounts that were mostly shut down because of the pandemic). Even Ms. Justice noted "the very high goals [Mr. Cortez and

PLAINTIFF'S RESPONSE TO IBM's MSJ                    3:21-cv-01291-VC

9

Mr. Stacy] want to include on the PIP." Ex. 40 [Dep Ex 72]; Ex. 33 (Justice Dep.) at 79:8-80:7, 85:3-88:19; *see also* Ex. 41 [Dep Ex 28] (email from Ms. Justice to Mr. Stacy and Mr. Cortez stating "as long as both of you are completely comfortable that these goals are reasonable this is good to go"). Mr. Cortez told Ms. Leong that if she did not close $300,000 in revenue by June 30, she would be fired. Ex. 1 (Leong Dep.) at 152:3-9, 161:1-4.

Ms. Leong heard nothing more from Mr. Cortez even though a "*CRITICAL STEP*" in IBM's PIP guidelines—communicated to Mr. Cortez on May 8, 2020—is to "provide feedback throughout the PIP period" and "[c]learly communicate how employee is trending against the objectives on the PIP." Ex. 1 [Leong Dep. at 146:11-17]; Ex. 31 [Dep Ex 21] at IBM-Leong003310; Ex. 33 (Justice Dep.) at 56:19-57:12. On June 30, when Ms. Leong had not closed $300,000, she called Mr. Cortez to ask, "So what does this mean now?" he responded, "You're out." Ex. 1 (Leong Dep.) at 146:11-147:5, 152:14-19; *see also* Ex. 11 (Cortez Dep.) at 220:18-221:4. This decision was made 12 days after Ms. Leong was given the PIP even though IBM's written policies mandate a 30 to 90-day PIP, with 30 days as the bare minimum. Ex. 33 (Justice Dep.) at 42:24-43:17; Ex. 39 [Dep Ex 70] at IBM-Leong006459.

On July 15—a week before the two July 22 deadlines in the PIP—Ms. Justice emailed Mr. Cortez about "next steps with the unsuccessful PIP," starting with a "[m]eeting with employee to notify of the PIP being closed as unsuccessful, and separation will occur as a result" and stating that "[t]he last day of work should be 7/22." Ex. 42 [Dep Ex 30]. On July 16, Mr. Cortez informed Ms. Leong that she was being terminated as of July 22. Exs. 43 & 44 [Dep Exs 31 & 32]; Ex. 11 (Cortez Dep.) at 218:19-219:3. Ms. Leong was 59 years old. Ex. 1 (Leong Dep.) at 171:19-24.

In August 2020, IBM hired Alexandra Clark to fill the open storage solutions sales specialist position. Ex. 11 (Cortez Dep.) at 113:5-23, 127:9-128:12; Exs. 45 & 46[Dep Exs 11 & 12]; Ex. 8 (Stacy Dep.) at 217:4-218:5. Ms. Clark started her first job in 2015, graduated from college in 2016, started working in sales in 2017, and is younger than 40. Ex. 46 [Dep Ex 12]; Ex. 5 (Buyarski Dep.) at 97:16-24.

E.     **IBM rebranded as a youth-oriented tech company and directed managers to eliminate older workers to make room for younger workers.**

Just months after IBM terminated Ms. Leong, the EEOC issued a determination that IBM engaged in systemic age discrimination between 2013 and 2018, the time period it investigated. Ex. 47 [EEOC Determination]. The EEOC found that IBM had engaged in "top down messaging from [IBM's] highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for" younger workers. *Id.* at 2. The EEOC found that 85.85% of the employees considered for layoff were older workers. *Id.* And the EEOC found that IBM's defense that the employees were selected for layoff because of "performance, relevant skills, utilization, and consolidation of services" did "not withstand scrutiny." *Id.*

The EEOC investigation and determination followed a reinvention and rebranding effort IBM launched after Ginni Rometty became CEO in 2012. At a 2014 conference called "Reinvention in the Age of the Millennial," IBM asserted that its "future growth will be influenced by the values system of Millennials." *See* Ex. 48. IBM recognized that Millennials represent a "trillion dollar market" that could translate into "billions" of dollars in sales for IBM. *See* Ex. 49. IBM's goal was to change the face of IBM and transform the company into a "Cognitive Solutions" company, invested in the Cloud, Analytic, Mobile, Security, and Social technology markets, or CAMS. *See* Ex. 50. IBM claimed its "leadership in millennial engagement is the ideal value proposition for generating CAMS pipeline, which is driven by Millennial traits." *Id.* And IBM represented that "millennial employees are your most valuable and accessible asset when it comes to successfully marketing your business to the millennial generation." *Id.*

In a push to transform its workplace, IBM created a Twitter hashtag, #IBMillennial, to praise Millennials and encourage them to come work for IBM. *See* Ex. 51. And in 2017, IBM launched its "You" Campaign, an international campaign portraying IBM as a youth-oriented tech company. Ex. 52. IBM recognized that "Millennials represent the first wave of digital natives to enter the workforce, and this does distinguish them. Organizations that have embarked on their

own transformation urgently need this digital capital." *See* Ex. 53. By June 2017, Ms. Rometty boasted that over half of IBM's workforce was made up of Millennials. *See* Ex. 54.

**F.   After a challenging job search during the height of the pandemic, Ms. Leong accepted a position that uses her skills and has comparable pay.**

Faced with a challenging job market during the height of the pandemic shutdowns, Ms. Leong initially applied to become a contact tracer and substitute teacher—both opportunities uniquely in demand due to COVID-19. Ex. 1 (Leong Dep.) at 187:16-188:14. She did some training with Wealth Financial Group to potentially take advantage of her insurance license but then focused on applying for technology jobs once those started to open back up. Ex. 1 (Leong Dep.) at 189:11-191:8. She struggled with the idea of working for an IBM competitor because of her 35-year history with the company, and most of the sales openings involved software rather than her specific skill set around storage. Ex. 1 (Leong Dep.) at 194:20-197:14; *see also* Ex. 55 (Cary Report) at 16 ("This was matter of professional integrity for Ms. Leong, as she had spent 35 years selling IBM products and solutions to customers that she felt were superior to IBM's competitors."). Ms. Leong researched jobs at companies like Facebook and Google but found that Google required an advanced degree and Facebook was not focusing on the alliance co-sales position she was qualified for at the time. Ex. 55 (Cary Report) at 5. She networked in California, Texas, and New York, but found smaller companies in the information technology sector were freezing new hires, as were most mid-size to large companies. *Id.* at 5-6. She applied for multiple positions at Amazon. Ex. 1 (Leong Dep.) at 194:4-19.

On February 21, 2021, Ms. Leong accepted an offer from KPMG for a position as Manager, Transformation Delivery, at a salary of $165,000. Ex. 56 [Dep Ex 61]. She receives performance-based bonuses. Ex. 1 (Leong Dep.) at 184:20-185:13. She has received two raises since she was hired. Ex. 55 (Cary Report) at 6. In this role, Ms. Leong uses the skills she has developed over her career, serving as a project manager counseling clients going through business process or technology transformations. Ex. 1 (Leong Dep.) at 183:9-25; Ex. 55 (Cary Report) at 17.

## IV.    ARGUMENT AND AUTHORITY

### A.    Genuine issues of material fact exist as to Plaintiff's age discrimination claims.

Under the ADEA, it is "unlawful for an employer … to discharge any individual … because of such individual's age." 29 U.S.C. § 623(a)(1). FEHA prohibits employers from discharging any employee over 40 based on the employee's age. Cal. Gov't Code §§ 12926(b), 12940(a). Courts use the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze ADEA and FEHA claims. *France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015); *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011) (citation omitted) (California courts use the *McDonell Douglas* analysis to analyze FEHA claims). The plaintiff must first establish a prima facie case of discrimination, creating an inference of discrimination. The employer then has the burden to produce a legitimate, nondiscriminatory reason for the challenged employment action. If the employer meets that burden, the plaintiff must raise a triable issue of material fact as to whether the reason for her termination is a mere pretext for unlawful discrimination. *France*, 795 F.3d at 1173.

"In deciding a motion for summary judgment, a court should not weigh the evidence or determine the truth of the matter; it should only determine whether there is a genuine dispute of fact for trial." *Id.* at 1172. And "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000)). This is because "the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record.'" *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011) (citation omitted).

### 1.    Ms. Leong can establish a prima facie case of age discrimination.

A plaintiff may establish a prima facie case of age discrimination by showing that "(1) she was at least forty years old, (2) she was performing her job satisfactorily, (3) [she was] discharged, and (4) either replaced by [a] substantially younger [employee] with equal or inferior qualifications

*or* discharged under circumstances otherwise 'giving rise to an inference of age discrimination.'" *Diaz*, 521 F.3d at 1207 (citation omitted). The plaintiff's burden is "not onerous" and "[a]t the summary judgment stage, the 'requisite degree of proof necessary to establish a *prima facie* case … is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (alteration in original) (citations omitted). IBM does not dispute that Ms. Leong was over 40 and was discharged.

> a.    *Ms. Leong was performing her job satisfactorily.*

Courts consider objective job criteria like level of education, years of experience, and similar criteria when determining whether the low threshold of showing satisfactory job performance has been satisfied for the plaintiff's prima facie case. *See Flanagan v. City of Richmond*, No. 14-cv-02714-EMC, 2015 WL 5964881, at *16 (N.D. Cal. Oct. 13, 2015) (for discriminatory termination claim, "the issue is not whether Plaintiff's performance was satisfactory, but whether she was *qualified* for the position" and "[t]here is no real dispute that Plaintiff could satisfy the objective criteria of a position she has held for over twenty years"); *Hauprich v. Fireman's Fund Ins. Co.*, No. 13-cv-01609-JCS, 2014 WL 3366736, at *20 (N.D. Cal. June 26, 2014) ("the issue of whether FFIC's contention that Hauprich was not qualified for her position is credible is best addressed in the context of the pretext analysis," and "[a]t the first step of the analysis, where Plaintiff is required to offer only minimal proof that she was qualified for her position, Plaintiff's academic training, many years of experience at FFIC and consistently positive performance ratings are sufficient to meet Plaintiff's burden"). IBM's contention that Ms. Leong was terminated because she did not meet sales objectives is relevant to the pretext analysis, not Ms. Leong's prima facie case. Considering disputes over performance at this stage would "collapse the three step analysis into a single initial step at which all issues would be resolved" and would "defeat the purpose underlying the *McDonnell Douglas* process." *Lynn v. Regents of the Univ. of Cal.*, 656 F.2d 1337, 1344 (9th Cir. 1981).

There is no question that Ms. Leong satisfied the objective criteria for the storage solutions sales specialist role she held when she was terminated. She succeeded in that role for a decade,

including in 2017, when she had a stellar year and achieved the rare of honor of being named "Best of IBM." Ex. 3 [Dep Ex 78]; Ex. 4 [Dep Ex. 85]; Ex. 6 [Dep Ex 5]; Ex. 8 (Stacy Dep.) at 37:14-38:16. Her performance reviews (including her 2019 review that was completed just three months before she was terminated) were positive and she was rated highly by her managers for client success, innovation, skills, and responsibility to others. Ex. 9 [Dep Ex 41] at IBM-Leong000013; Ex. 12 [Dep Ex 43] at IBM-Leong000008-9. Her managers consistently cited her excellent customer service, recognizing that "there is no question compared to your peers you put the success of your clients ahead of your person[al] interest." Ex. 9 [Dep Ex 41] at IBM-Leong000014; Ex. 12 [Dep Ex 43] at IBM-Leong000009. As discussed below in the pretext analysis, Ms. Leong's managers praised these strengths even when she missed her sales quotas. This requirement is satisfied. *See Villalobos v. TWC Admin. LLC*, 720 F. App'x 839, 844 (9th Cir. 2017) (finding triable issue of fact as to whether plaintiff was performing his job satisfactorily because "[h]e need only 'demonstrate some basic level of competence at his … job" (quoting *Sandell v. Taylor-Listug, Inc.*, 188 Cal. App. 4th 297, 322, 115 Cal. Rptr. 3d 453 (2010)); *Decker v. Barrick Goldstrike Mines, Inc.*, 645 F. App'x 565 (9th Cir. 2016) (plaintiff established he was performing his job satisfactorily by showing that "aside from a small number of safety violations, his eighteen-year tenure with Barrick was unblemished" and it was "undisputed that he possessed the requisite training, experience, and knowledge").

        b.      *IBM replaced Ms. Leong with a younger, less qualified employee.*

Mr. Cortez testified that he hired Alexandra Clark in August to fill the storage solutions sales specialist position that Ms. Leong left open at the end of July. Ex. 11 (Cortez Dep.) at 113:5-23, 127:9-128:12; *see also* Exs. 45 & 46 [Dep Exs 11 & 12] (Ms. Clark joined IBM as a storage solutions sales specialist in August 2020); Ex. 8 (Stacy Dep.) at 217:4-218:5 (acknowledging Ms. Clark's role when she was hired was the same as Ms. Leong's role when she was fired). Ms. Clark graduated from college in 2016, had worked in sales for only a couple of years, and is younger than 40. Ex. 46 [Dep Ex 12] (showing Ms. Cortez started working in 2015 and started in sales in 2017); Ex. 11 (Cortez Dep.) at 113:22-114:11 (Ms. Clark previously worked at IBM for two or

three years); Ex. 5 (Buyarski Dep.) at 97:16-24. After a break in the deposition, Mr. Cortez attempted to retract his unequivocal testimony about hiring Ms. Clark to replace Ms. Leong. Ex. 11 (Cortez Dep.) at 121:23-124:13. This about-face raises credibility issues that can only be resolved by the factfinder. *See Diaz,* 521 F.3d at 1211 n.4 (fourth element is met if there is a "triable issue of fact," that is, the "circumstantial evidence is ... cumulatively sufficient to permit reasonable jurors to infer that [the plaintiff] was discriminated against because of his age").[2]

IBM's motion must be denied even if Mr. Cortez's second version of Ms. Clark's hiring is accurate. A plaintiff suing under the ADEA may establish a prima facie case even if the person selected to fill the position was also within the class protected by the ADEA if there is other direct or circumstantial evidence supporting an inference of discrimination. *See France*, 795 F.3d at 1174 (plaintiff established a prima face case of age discrimination even though he was less than ten years older than his replacements by showing his employer considered age in general to be significant to its promotion decisions and his age to be relevant); *Diaz*, 521 F.3d at 1211 n.4 (affirming denial of summary judgment where plaintiff could not show he was replaced by an equally or less qualified younger worker because "the remaining circumstantial evidence is still cumulatively sufficient to permit reasonable jurors to infer that [the plaintiff] was discriminated against because of his age"). As discussed in the pretext analysis below, reasonable jurors could infer from the evidence that Ms. Leong was discriminated against because of her age.

    2.   <u>There are triable issues of fact as to whether IBM's asserted justification for Plaintiff's termination is pretext.</u>

IBM must "articulate a legitimate, nondiscriminatory reason for the plaintiff's rejection" by "clearly set[ting] forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Lyons*, 307 F.3d at 1112 (citations omitted). Ms. Leong can demonstrate that this reason is pretext "in either of two ways: (1) directly, by showing that unlawful discrimination

---

[2] Mr. Cortez's revised story is suspect, since his claim that Ms. Clark actually replaced Ginny Roth, who left around the same time he fired Ms. Leong, turns on his contention that "Ginny was the BSS, Nelly was the DES" and is contradicted by Ms. Leong's incentive plan letter, which identifies her as a BSS and Mr. Stacy's testimony that Ms. Leong "was a BSS" and that's the role Ms. Clark assumed. *Compare* Ex. 11 (Cortez Dep.) at 123:1-8 *with* Ex. 23 [Dep Ex 38]; Ex. 8 (Stacy Dep.) at 217:22-218:5.

PLAINTIFF'S RESPONSE TO IBM's MSJ                       3:21-cv-01291-VC

more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl*, 658 F.3d at 1112-13. As with Ms. Leong's prima facie case, "a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *France*, 795 F.3d at 1175. The Ninth Circuit has "repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *Id.* This is in part because "'the question facing triers of fact in discrimination cases is both sensitive and difficult,' and …'[t]here will seldom be eyewitness testimony as to the employer's mental processes.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (alteration in original) (citation omitted). Thus, "any indication of discriminatory motive … may suffice to raise a question that can only be resolved by a factfinder." *Lyons*, 307 F.3d at 1113 (alteration in original) (citation omitted); *see also id.* ("[F]or that reason 'summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of [an ADEA] dispute is the elusive factual question of intentional discrimination.'" *(citation omitted))*.

IBM contends Ms. Leong was terminated for performance reasons, and specifically for failing to meet sales quotas in 2018 and 2019. Mtn. at 13-14. But the evidence raises a genuine issue of material fact as to whether IBM's claimed reason is pretext, precluding summary judgment. *See France*, 795 F.3d at 1175; *see also Gardner v. City of Berkeley*, No. 18-CV-07784-VC, 2020 WL 7388074, at *1 (N.D. Cal. Dec. 16, 2020) ("there are too many questions of credibility and judgment to allow the Court to block these claims from going to trial").

IBM's contention that Ms. Leong was fired for failing to meet sales quotas strips those numbers of their context. During the final two years of her lengthy career at IBM, Ms. Leong was removed from her role servicing accounts that she had developed strong relationships with, the kind of relationships that led to her extraordinary success in 2017. She held three different positions under four different managers. Ex. 8 (Stacy Dep.) at 84:4-25; Ex. 16 (IBM Int. 2). In mid-2019, Ms. Leong was moved to a new support role that all her managers acknowledged was "not fully baked" and "a mistake" and was ultimately eliminated after six months. *Id*. Meeting sales

objectives is only one of several criteria IBM uses to evaluate its salespersons, and Ms. Leong's managers praised her performance even when she did not meet her sales quotas in 2018 and 2019. Ex. 9 [Dep Ex 41] at IBM-Leong000013; Ex. 12 [Dep Ex 43] at IBM-Leong000008-9. Ms. Buyarski acknowledged the challenges outside of Ms. Leong's control that impaired her ability to meet her sales objectives and made it "a tough 2018." Ex. 9 [Dep Ex 41] at IBM-Leong000014. And Ms. Florey recognized that "strategic decisions made by her largest accounts" in the first half of 2019 and the "not fully baked" DES hunter role that Ms. Leong was assigned for the second half prevented her from achieving her 2019 revenue goals. Ex. 12 [Dep Ex 43] at IBM-Leong000009; *see also* Ex. 57 [Dep Ex 82] (recounting team meeting in the first quarter of 2019 when "sales were lagging and our opportunity pipeline was not healthy").[3] In January 2020, Ms. Leong was returned to her prior position of storage solutions sales specialist position but was given all new accounts that were soon hit hard by the economic effects of the pandemic. Ex. 1 (Leong Dep.) at 39:19-23, 67:7-8, 121:10-122:18, 123:6-24, 131:18-23, 137:19-138:4, 143:7-12; Ex. 24 [Dep Ex 39]; Ex. 25 [IBM-Leong002922-25]. These accounts were largely new to Ms. Leong's team even and she was given zero intelligence into them or existing pipeline to sell into. Ex. 1 (Leong Dep.) at 121:3-17. She was given only a few months under those challenging circumstances to build new customer relationships before Mr. Cortez and Mr. Stacy decided to eliminate her from the team.

IBM's discriminatory motive is evidenced by Mr. Cortez's other conduct. Mr. Cortez told Ms. Leong on more than one occasion that she should talk to his 25-year-old son because "these young people, you know, they're just really creative." Ex. 1 (Leong Dep.) at 173:10-176:13; *see also* Ex. 11 (Cortez Dep.) at 149:7-152:7 (acknowledging he told Ms. Leong, as well as Jack Egan, 65, and Don Custardo, 60, to talk to his son about how to effectively reach customers. Similarly,

---

[3] IBM cites inapt cases in which employees disputed the methodology or merits of their employer's evaluations. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1275 (9th Cir. 2000) (plaintiff's argument that Quaker's rating system did not do a good job of evaluating employees failed to show Quaker used a subjective system in order to discriminate against older employees); *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 957-58 (8th Cir. 2001) (plaintiff claimed a low rating on his performance evaluation was erroneous, relying solely on his own testimony).

PLAINTIFF'S RESPONSE TO IBM's MSJ                                    3:21-cv-01291-VC

either Mr. Cortez or Mr. Stacy told Ms. Justice that Ms. Leong had "not shifted with business changes 2017/2018" since winning Best of IBM in 2015 or 2016. Ex. 40 [Dep. Ex. 72]; Ex. 33 (Justice Dep.) at 69:2-25. These misguided statements couldn't be further from the truth since Ms. Leong won Best of IBM in 2018. Mr. Cortez's remarks are circumstantial evidence of age discrimination. *See Mangold v. Cal. Public Util. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995) (remarks by senior decision-makers "were certainly relevant and, along with other substantial evidence, created a strong inference of intentional discrimination"); *see also Reeves*, 530 U.S. at 152 (reversing where the court of appeals discounted age-related comments made by the decision-maker because they were not made in the "direct context" of the plaintiff's termination). In the cases IBM cites, the remarks *alone* were insufficient to withstand summary judgment because the courts found no other credible evidence of discriminatory intent. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1284 (9th Cir. 2000) (finding "the word 'promotable' by itself" does not give rise to an inference of discriminatory motive); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1966) (none of plaintiff's evidence raised a genuine issue of fact as to whether his termination was due to age discrimination, including a comment about "old timers" that "could refer as well to longtime employees or to employees who failed to follow directions as to employees over 40"); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-1439 (9th Cir. 1990) (plaintiff failed to proffer evidence that he was not promoted because of his age and comment that another person was promoted because he was "a bright, intelligent, knowledgeable young man" was not enough on its own to raise an inference of age discrimination). Whether Mr. Cortez's comments revealed his discriminatory intent or were simply expressions of pride in his son as IBM contends is a factual question for the jury. *See Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000) ("It is not the province of a court to spin such evidence in an employer's favor when evaluating its motion for summary judgment. To the contrary, all inferences must be drawn in favor of the non-moving party."); *see also Villalobos v. TWC Admin. LLC*, 720 F. App'x 839, 845 (9th Cir. 2017) ("the task of disambiguating ambiguous utterances is for trial, not summary judgment" (quoting *Reid v. Google*, 50 Cal.4th 512, 113 Cal. Rptr. 3d 327

(2010)); *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (the jury is the appropriate body to evaluate the significance of ambiguous statements about age, not the court).

Mr. Cortez's remarks must also be considered in the context of his other conduct. Even before Mr. Cortez took over managing the team, he targeted only two older employees for elimination: Ms. Leong and 64-year-old Randall Whitfield. Exs. 28 & 29 [Dep Exs 14 & 15]; Ex. 11 (Cortez Dep.) at 158:6-159:9. He hired Ms. Clark, a much younger individual with very little sales experience to replace Ms. Leong. Ex. 11 (Cortez Dep.) at 113:5-23, 127:9-128:12; Exs. 45 & 46 [Dep Exs 11 & 12]; *see also Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 777-78 (7th Cir. 2013) (the suspicious timing of the employer's firing of the highly experienced 56-year-old plaintiff and a fellow salesman who was over 50 and hiring of two "very inexperienced" men was circumstantial evidence of age discrimination). And during Mr. Cortez's management, the team shifted from all 40 and older individuals to a younger group, particularly after five of the team members over 50, including Ms. Leong, departed during 2020 and 2021. Ex. 16 (Egan, Cook, Whitfield, and Roth departed). IBM argues that the two other team members who were put on PIPs were younger than Ms. Leong but they were both also 40 or older. *Id.* (Munoz was 40 and Mark was 47). None of the team members under 40 were placed on PIPs. IBM's assertion that it is "fatal" to Ms. Leong's claim that half her team members were older than her is just wrong. Ms. Leong does not have to prove that all employees in her protected group were fired or discriminated against based on their age to prevail on her claim. *See Conn. v. Teal*, 457 U.S. 440, 454-55 (1982) (holding that a racially balanced workforce does not immunize an employer from liability for specific acts of race discrimination); *see also Reeves*, 530 U.S. at 153 (that the defendant employed many managers over 50 "is certainly not dispositive").

Mr. Cortez also disregarded IBM's policies in his haste to terminate Ms. Leong. He did not meet with Ms. Leong before putting her on the PIP even though IBM policy is to ensure employees are coached before moving to a PIP—and even though Ms. Justice reminded him more than once to do so—and he skipped the "*CRITICAL STEP*" of "provid[ing] feedback throughout the PIP period." Ex. 1 (Leong Dep.) at 142:21-144:2. (Ex. 31 [Dep Ex 21] at IBM-Leong003310; Ex. 32

PLAINTIFF'S RESPONSE TO IBM's MSJ                    3:21-cv-01291-VC

[Dep Ex 24]; Ex. 33 (Justice Dep.) at 32:25-33:11. IBM policy is to give employees "[a] realistic time frame" and "sufficient opportunity to demonstrate improvement," and requires a minimum of 30 days for a PIP. Ex. 39 [Dep Ex 70] at IBM-Leong006459-60; Ex. 33 (Justice Dep.) at 42:24-43:17. Mr. Cortez told Ms. Leong, "You're out" just 12 days after giving her the PIP and officially informed Ms. Leong of her termination on July 16, with a week remaining before the July 22 deadlines in her PIP. Exs. 43 & 44 [Dep Exs 31 & 32]. A plaintiff may raise a triable issue of pretext through evidence that her employer did not follow established policy or practice. *See Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) (evidence that plaintiff's supervisor deviated from company's normal internal disciplinary procedure in her termination); *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1214 (9th Cir. 2008) ("The evidence is consistent with the view that Brandt disregarded company policy because it conflicted with his intent to discriminate."); *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015) ("when an employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext").

The backdrop of Mr. Cortez's conduct was IBM's efforts to rebrand itself as a youth-oriented company and successful campaign to replace older workers with Millennials. The EEOC determined that IBM engaged in "top down messaging from [IBM's] highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for" younger workers. Ex. 47 [EEOC Determination] at 2. IBM's attitude toward older workers, and in particular its direction to managers to eliminate older workers is highly relevant to the circumstances of Ms. Leong's termination. *See Heyne v. Caruso*, 69 F.3d 1475, 1479–80 (9th Cir. 1995) ("It is clear that an employer's conduct tending to demonstrate hostility towards a certain group is both relevant and admissible where the employer's general hostility towards that group is the true reason behind firing an employee who is a member of that group. … [E]vidence of the employer's discriminatory attitude *in general* is relevant and admissible to prove … discrimination.").

The evidence would allow a jury to find that age was the reason for Ms. Leong's termination, and IBM's motion must be denied.

**B.      Genuine issues of material fact exist as to Plaintiff's mitigation of damages.**

IBM has the burden of proving that "comparable" or "substantially similar" work was available, that Ms. Leong failed to use "reasonable efforts" to obtain those jobs, and the amount she would have earned if she had. *Teutscher v. Woodson*, 835 F.3d 936, 947-48 (9th Cir. 2016); *Parker v. Twentieth Century-Fox Film Corp.*, 3 Cal.3d 176, 182, 474 P.2d 689 (1970). IBM cannot do so. Despite the challenges of job hunting during the height of the pandemic's shutdown, Ms. Leong found a position using her skills with a comparable salary less than seven months after she was terminated. IBM's contentions that Ms. Leong did not use diligent efforts, should have sought a sales position, and that suitable sales positions were available are issues for the jury to resolve. *See Jackson v. Shell Oil. Co.*, 702 F.2d 197, 202 (9th Cir. 1983) (jury could have found "it was reasonable for a successful salesman of animal health products to go into sales of real estate" and he did not earn more because of "general economic conditions"); *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1346-48 (9th Cir. 1987).

IBM cites no support for its contention that Ms. Leong was required to find another sales position. And IBM relies on an unreliable expert report to support its contention that sales positions were available.[4] Vocational Rehabilitation Counselor John Cary, says of IBM's expert report:

> Mr. Skilling's opinions are best described as hypotheses that lack empirical data by which to substantiate any of his conclusions. In other words, it would be impossible to make any conclusions based on the data Mr. Skilling cites to be the sources supporting his analysis and opinions. His analysis further ignores very basic elements of a vocational assessment. From a clinical Vocational Rehabilitation Counseling perspective, I find Mr. Skilling's analysis to be invalid and unreliable.

Ex. 55 (Cary Report) at 8. Mr. Cary explained that Mr. Skilling's purported "labor market information" is "purely anecdotal" and he merely "hypothesize[s] that the listed technology

---

[4] Expert discovery concluded on May 30, 2022 and Plaintiff intends to file a motion to exclude Mr. Skilling at the appropriate time.

companies were hiring for jobs that Ms. Leong was qualified for at the time she was searching for work." Ex. 55 (Cary Report) at 10-11. Mr. Skilling mischaracterizes 2021 data as 2020 data and fails to disclose that the data includes "Wholesale and Manufacturing" products in addition to technical and scientific products. *Id.* at 11. He cites no evidence to support his conclusion that Ms. Leong's termination at the height of the pandemic did not impact her employment search, provides no data about the type of jobs he claims were available or what wages they were paying, cites articles with no relevant substantive facts, and ignores the spike in unemployment rates in the Bay Area during the pandemic. *Id.* at 12-14. "Mr. Skilling's claim that there was and continues to be 300 job openings annually is erroneous." *Id.* at 18.

Ms. Leong cast a wide net in her job hunt, networking in California, Texas and New York, applying for positions uniquely available during the pandemic like contact tracer when technology companies were freezing new hires, and then considered a variety of jobs, including in sales, that would use her skill set, before accepting an offer from KPMG. Ex. 1 (Leong Dep.) at 187:16-188:14, 189:11-191:8, 194:4-19; Ex. 55 (Cary Report) at 5-6. Mr. Cary notes that "[a]t her current age of 60, Ms. Leong's post termination job search and workplace experiences are likely to be remarkably different for her, despite having plenty of skills, knowledge, and work experience, than it would be for a younger job seeker" because of bias and negative stereotypes about older workers. Ex. 55 (Cary Report) at 20. He concluded that "Ms. Leong's ability to find comparable work within the time frame she did, is remarkable. It is my opinion that Ms. Leong demonstrated a meaningful job search upon termination from IBM, consistent with the California EDD standards for work search activity at the time." *Id.*

Mr. Cary explains that Mr. Skilling used an "unorthodox at best" method for determining Ms. Leong's projected 2020 income that "appears to be a methodology of his own design." Ex. 55 (Cary Report) at 9. But even using this "unorthodox" method, the salaries are comparable. Mr. Skilling projects that if Ms. Leong had not been terminated, she would have earned $185,475 in 2020 in her position at IBM. *Id.* at 18. Her starting salary at KPMG was $165,000—or 90% of Mr. Skilling's projection—plus bonuses. *Id.* Ex. 56 [Dep Ex 61]; Ex. 1 (Leong Dep.) at 184:20-185:13.

IBM has not shown that there were specific comparable job opportunities available to Ms. Leong, or that her efforts to find employment were not reasonably diligent. Indeed, she found a new position within seven months of her termination that paid 90% of IBM's projection of her 2020 salary despite the challenges of job hunting during the pandemic.

**C.    Genuine issues of material fact exist as to Plaintiff's claim for punitive damages.**

Ms. Leong agrees that punitive damages are not available under the ADEA. However, she may recover double damages if she proves IBM's conduct was willful, 29 U.S.C. § 626(b), but IBM has not moved for summary judgment on these damages.

IBM's argument that Ms. Leong cannot present clear and convincing evidence of "oppression, fraud, or malice" to recover punitive damages for her FEHA claim is premature. Courts routinely deny summary judgment on punitive damages as premature when the plaintiff has provided sufficient evidence to survive summary judgment on her discrimination claim. *See Martinez v. Costco Wholesale Corp.*, 481 F. Supp. 3d 1076, 1104 (S.D. Cal. 2020) (citing cases).

**V.    CONCLUSION**

Ms. Leong respectfully requests that the Court deny IBM's motion.

Dated: June 2, 2022

BY:     */s/ Matthew E. Lee*
Matthew E. Lee*
Jeremy R. Williams *
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mlee@milberg.com
jwilliams@milberg.com

Alex R. Straus (SBN: 321366)
**MILBERG GOLEMAN BYRSON
PHILLIPS GROSSMAN, PLLC**
280 Beverly Hills Drive, Penthouse

PLAINTIFF'S RESPONSE TO IBM's MSJ                          3:21-cv-01291-VC

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Beverly Hills, CA 90212
Telephone: (310)-450-9689
Facsimile: (310) 496-3176
astraus@milberg.com

Toby J. Marshall*
**TERRELL MARSHALL LAW
GROUP, PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile:  (206) 319-5450
tmarshall@terrellmarshall.com

*Attorneys for Plaintiff*

* admitted *pro hac vice*

PLAINTIFF'S RESPONSE TO IBM's MSJ                    3:21-cv-01291-VC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2022, I electronically filed the foregoing, **PLAINTIFF'S RESPONSE TO DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court, and upon the counsel of record using the CM/ECF system.

/s/ Matthew E. Lee
Matthew E. Lee

PLAINTIFF'S RESPONSE TO IBM's MSJ                    3:21-cv-01291-VC