# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4     NELLY LEONG,                    ) Case No.:
                                      ) 3:21-cv-01291-VC
5                  Plaintiff,         )
                                      )
6            vs.                      )
                                      )
7     INTERNATIONAL BUSINESS MACHINES )
      CORPORATION,                    )
8                                     )
                   Defendant.         )
9                                     )
      _____)

10

11

12

13

14       VIDEOCONFERENCE DEPOSITION OF NELLY LEONG

15             Palo Alto, California

16            Friday, April 15, 2022

17

18

19

20

21

22    Reported by:

23    JANA J. BOMMARITO

24    CSR No. 10880

25    Job No. 5176800

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    NELLY LEONG,                    ) Case No.:
                                     ) 3:21-cv-01291-VC
5              Plaintiff,            )
                                     )
6              vs.                   )
                                     )
7    INTERNATIONAL BUSINESS MACHINES )
     CORPORATION,                    )
8                                    )
               Defendant.            )
9                                    )
     _____)

10

11

12          Videoconference deposition of NELLY LEONG,

13    taken on behalf of Defendant, in Palo Alto, California,

14    beginning at 9:03 a.m., and ending at 4:22 p.m., on

15    Friday, April 15, 2022, before Jana J. Bommarito,

16    Certified Shorthand Reporter No. 10880.

17

18

19

20

21

22

23

24

25

                                              Page 2

```
 1        APPEARANCES:
 2
 3        FOR PLAINTIFF NELLY LEONG:
 4                MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC
                  BY:  JEREMY WILLIAMS, ESQ.
 5                BY:  SARAH J. SPANGENBURG, ESQ.
                  900 West Morgan Street
 6                Raleigh, North Carolina 27603
                  (919) 600-5000
 7                jwilliams@milberg.com
 8
 9        FOR DEFENDANT INTERNATIONAL BUSINESS MACHINES
          CORPORATION:
10
11                JACKSON LEWIS PC
                  BY:  JUSTIN R. BARNES, ESQ.
12                171 17th Street NW
                  Suite 1200
13                Atlanta, Georgia 30363
                  (404) 525-8200
14                justin.barnes@jacksonlewis.com
15                    - and -
16                JACKSON LEWIS P.C.
                  BY:  MICHAEL Y. HSUEH, ESQ.
17                160 West Santa Clara Street
                  Suite 400
18                San Jose, California 95113
                  (408) 579-0404
19                michael.hsueh@jacksonlewis.com
20                    - and -
21                IBM CORPORATION
                  BY:  ANDREW HEYMAN, IN-HOUSE COUNSEL
22                IBM1 North Castle Drive
                  Armonk, New York 10504-1784
23                aheyman@us.ibm.com
24
25
```

Page 3

```
 1                        I N D E X
 2
 3      Examination by:                               Page
 4      MR. BARNES                                7, 238
 5      MR. WILLIAMS                                 237
 6
 7
 8
                         E X H I B I T S
 9
10      Exhibit No.          Description        Page Marked
11
        Exhibit 7      Email dated November 1, 2019
12                     (Previously marked)
13      Exhibit 20     Email chain, top dated
                       May 7, 2020
14                     (Previously marked)
15      Exhibit 31     Email dated July 17th, 2020
                       (Previously marked)
16
        Exhibit 32     Performance Separation Plan
17                     Summary Plan Description
                       (Previously marked)
18
        Exhibit 33     LinkedIn profile of Nelly Leong      16
19
        Exhibit 34     Agreement Regarding Confidential     26
20                     Information and Intellectual
                       Property
21
        Exhibit 35     Incentive Plan Letters from 2017     28
22
        Exhibit 36     Incentive Plan Letters from 2018     29
23
        Exhibit 37     Incentive Plan Letters from 2019     33
24
        Exhibit 38     Incentive Plan Letter from first     37
25                     half of 2020
```

Page 4

E X H I B I T S

| Exhibit No. | Description | Page Marked |
|---|---|---|
| Exhibit 39 | Email chain, top dated January 11, 2020 | 40 |
| Exhibit 40 | Summary of compensation from 2013 through 2020 | 42 |
| Exhibit 41 | 2018 Global Performance Assessment | 50 |
| Exhibit 42 | Excel spreadsheet | 56 |
| Exhibit 43 | 2019 Global Performance Assessment | 117 |
| Exhibit 44 | Excel spreadsheet | 71 |
| Exhibit 45 | Email dated July 18, 2019 | 88 |
| Exhibit 46 | Email dated September 17, 2019 | 91 |
| Exhibit 47 | Excel spreadsheet | 93 |
| Exhibit 48 | Email dated December 9, 2019 | 96 |
| Exhibit 49 | Excel spreadsheet | 98 |
| Exhibit 50 | PowerPoint Q2 2019 QBR | 102 |
| Exhibit 51 | Email dated April 4th, 2019 | 107 |
| Exhibit 52 | Email chain, top dated May 1, 2019 | 111 |
| Exhibit 53 | Market Hiring Excel spreadsheet | 113 |
| Exhibit 54 | Email chain dated January 13, 2020 | 124 |
| Exhibit 55 | Email dated February 24th, 2020 with attachment | 134 |
| Exhibit 56 | Email dated February 25th, 2020 with attachment | 136 |
| Exhibit 57 | Email dated March 31, 2020 with attachment | 137 |

Page 5

1                        E X H I B I T S
2

          Exhibit No.              Description            Page Marked
3

4         Exhibit 58      Excel spreadsheet                    140
5         Exhibit 59      Performance Improvement Plan         147
6         Exhibit 60      Performance Improvement Plan         150
7         Exhibit 61      Offer letter from KPMG               183
                          dated February 25, 2021
8

          Exhibit 62      Career Rookie application for        188
9                         contact tracer
                          dated June 22, 2020
10

          Exhibit 63      Swing Education email                193
11                        dated August 17, 2020 regarding
                          substitute teacher
12

          Exhibit 64      Email dated January 14, 2021         194
13                        regarding Amazon position
14        Exhibit 65      Business Conduct Guidelines          199
15        Exhibit 66      Journal notes                        210
16        Exhibit 67      Journal notes                        221
17
18
19
20
21
22
23
24
25

                                                          Page 6

 1           Palo Alto, California; Friday, April 15, 2022

 2                   9:03 a.m. - 4:22 p.m.

 3

 4                   NELLY LEONG,

 5    having been first duly sworn by the Certified Shorthand

 6    Reporter, was examined and testified as follows:

 7

 8                   EXAMINATION

 9    BY MR. BARNES:

10        Q.    Good morning.

11        A.    Good morning.

12        Q.    We met off the record, but for the record, my

13    name is Justin Barnes.  I'm one of the attorneys

14    representing IBM in the lawsuit that you filed, and

15    we're here today to take your deposition.  Appreciate

16    you being here today and spending the time with us.

17              Could you start off just by stating your full

18    name for the record.

19        A.    Yes.  My name is Nelly Leong.

20        Q.    Thank you, Ms. Leong.

21              Have you ever gone by any other names?

22        A.    My maiden -- well, yes.  So at birth I was

23    Sau Kuen, and my maiden name is Ng, yeah.

24        Q.    Okay.  You go by Nelly Leong now?

25        A.    Yes.

                                              Page 7

1      Q.   Okay.  Have you ever had your deposition

2  taken before?

3      A.   No.

4      Q.   All right.  What I'd like to do is start off

5  just by kind of talking about the process, what to

6  expect, and going over a couple of ground rules for --

7  really for both of us to keep in mind in this process.

8           I'll be asking some questions.  You'll be

9  answering my questions.  Your counsel, Mr. Williams,

10  may speak from time to time, and during all of that our

11  court reporter is going to be taking down everything

12  that everyone says.  And because of that it's really

13  important that we keep a couple of things in mind so

14  that we can get a nice clean transcript and so that we

15  make our court reporter's life as easy as possible.

16           The first is, let's make sure we don't speak

17  over each other.  I'm going to try my hardest to let

18  you finish your answer before I ask my next question,

19  and I'd ask that you let me finish my question, get it

20  all the way out, before you start answering.

21           And I'll tell you, that's really hard in

22  normal conversation.  You're going to probably see

23  where I'm going with a lot of my questions and be

24  tempted to start answering before I finish my question,

25  but it's important that you let me get the full

Page 8

1      question out, one, so that you understand my question,

2      but, two, so that the court reporter can -- can take

3      the whole thing down.

4              And from time to time your counsel may chime

5      in and object to my questions, and so we need to give

6      him time to speak as well.  So let's all make sure that

7      we don't talk over each other during the deposition.

8      Okay?

9          A.   Okay.

10         Q.   Great.

11              Another important thing to keep in mind is to

12     give verbal answers.  It's hard for the court reporter

13     to take down things like "uh-huh" or head nods, and so

14     it's important that you speak up with your answers,

15     "yes," "no."  "I don't know" or "I don't remember" is

16     always a perfectly acceptable answer or some

17     explanation, but it's important that you give a verbal

18     response.  Okay?

19         A.   Okay.

20         Q.   It's also really important that you

21     understand my questions, and this is particularly

22     important given the remote nature of -- of us doing

23     this.  We've been doing this for a few years now

24     remote, so I think we're -- we're getting pretty used

25     to it, but occasionally my voice may drop out or I may

Page 9

```
 1     just ask a question in a way that doesn't make sense to
 2     you.
 3            If you don't understand my question or you
 4     can't hear me, then please ask me to repeat my
 5     question.  Okay?
 6        A.   Okay.
 7        Q.   If you don't ask me to repeat or rephrase my
 8     question, I'm going to assume that you understood my
 9     question.
10            Is that fair?
11        A.   Yes.
12        Q.   We'll take breaks.  I usually take a break
13     about every hour to an hour and a half, but this is not
14     a marathon, so you can take a break sooner than that if
15     you'd like.  You can take a break anytime you'd like.
16     The only caveat to that is, if there's a question
17     pending, I'll ask you to answer the question before we
18     take a break.  Okay?
19        A.   Okay.
20        Q.   Excuse me.
21            You understand you're under oath today,
22     right?
23        A.   Yes.
24        Q.   Are you on any medications today that you
25     think would impact your ability to understand or answer
```

Page 10

1     my questions?

2         A.   No.

3         Q.   Can you think of any reason why you wouldn't

4     be able to give us your best testimony today?

5         A.   None that I can think of.

6         Q.   Great.

7         Let me ask you, what did you do to prepare

8     for your deposition today?

9         A.   I reread the documents that I provided to

10    Mr. Williams.  I read some of the documents that were

11    shared with me by Mr. Williams.

12        Q.   Do you remember what documents in particular

13    you looked at?

14        A.   Not exactly.  I kind of skimmed through them.

15    I noticed that there were a lot of duplicates, so after

16    a while I skimmed through a lot.

17        Q.   There's a lot of documents in this case.

18        A.   A lot of documents, yeah, yeah.  I didn't

19    really have time, you know, earlier in the week because

20    of work to get -- to start reading.

21        Q.   Understood.

22        Can you think of any documents in particular

23    that you looked at that stood out to you?

24        A.   There was one.  I think it was a handwritten

25    note.  I'm not sure who wrote it.  It -- it appeared to

Page 11

1    be notes taken by someone in a meeting with Todd Stacy

2    and Robert Cortez where they -- where there were notes

3    on the fact that I wasn't -- you know, I didn't shift

4    into change in 2017, 2018, you know, something along

5    that line.

6        Q.   Okay.  Anything else that you looked at that

7    stood out to you?

8        A.   I also saw two, looked like, quota letters

9    for 2018 that listed Mr. Cortez and Mr. Stacy as my

10   first and second line managers, and that's not what I

11   recall who my management team was for that year.  So

12   other than that, I can't think of -- yeah, it was -- it

13   was getting late.

14       Q.   Sure, I understand.

15            Did anything that you reviewed surprise you

16   or strike you as different than what you remembered,

17   other than what you've already mentioned?

18       A.   Surprise?  I can't think of any right now,

19   yeah.

20       Q.   Okay.  Other than your attorneys, have you

21   discussed your deposition today with anyone else?

22       A.   No.

23       Q.   What is your current address?

24       A.   4156 King Arthur Court, Palo Alto, California

25   94306.

1      Q.   How long have you lived in California?

2      A.   Oh, 25 years or so.

3      Q.   Did you say 25 or 45?

4      A.   25.

5      Q.   25?

6      A.   Yeah.

7      Q.   And how long have you lived at the 4156 King

8   Arthur Court address?

9      A.   About 20 years, 20, 21 years.

10     Q.   Do you own it?

11     A.   Yes, with my husband.

12     Q.   I was just about to ask if you were married.

13     A.   Yes, I am.

14     Q.   What does your husband do?

15     A.   He owns a small business.

16     Q.   What kind of business is it?

17     A.   Custom printing, like local merchandise.

18     Q.   What is the name of the business?

19     A.   Uproar Ink, U-p-r-o-a-r I-n-k.

20     Q.   How long has he been doing that?

21     A.   Oh, it was registered late 2017, yeah,

22   November, something like that, 2017.

23     Q.   What did he do before that?

24     A.   He took a -- a few years of gap, and then

25   before that he worked for Microsoft as a evangelist

Page 13

1          or -- or product manager, something like that, yeah.

2               Q.   Evangelist, I like that term.

3               A.   Yeah.

4               Q.   Do you have any kids?

5               A.   Yes.

6               Q.   How many?

7               A.   Three.

8               Q.   How old are they?

9               A.   27, 20, 17.

10              Q.   I assume the 17-year-old is still in school?

11              A.   Yes.

12              Q.   What about the other two?  What do they do?

13              A.   The 27-year-old, he is working.  The

14         20-year-old, she is in college, third year.

15              Q.   Where does she go to school?

16              A.   She goes to UC Riverside.

17              Q.   And your oldest is -- what does he do for a

18         living?

19              A.   He is a product manager at a software

20         company.

21              Q.   What's the name of the company?

22              A.   Workday.

23              Q.   Have you -- before this lawsuit have you ever

24         filed any lawsuits against anyone else?

25              A.   No.

                                              Page 14

```
1          Q.   Has anyone ever filed a lawsuit against you?

2          A.   No.

3          Q.   Have you ever testified under oath in any

4     other proceeding other -- before today?

5          A.   No.

6          Q.   Have you ever filed for bankruptcy?

7          A.   No.

8          Q.   Have you ever been charged with a crime?

9          A.   No.

10          Q.   Before the -- the charges that you filed with

11     the California agency and the EEOC that led to this

12     lawsuit, had you ever filed any sort of complaints with

13     any government agency before that?

14          A.   No.

15          Q.   All right.  Let me ask you to -- if you go to

16     the Exhibit Share link --

17          A.   Uh-huh.

18          Q.   -- pull up what I've marked as Exhibit 33.

19          A.   I don't -- I see 32.

20          Q.   If you refresh, it should be --

21          A.   Oh, okay.

22          Q.   -- 33 now.

23          A.   Okay.  Oh, yes.

24          Q.   And there's still a 32 sticker on it.  That's

25     my fault.  We're going to correct that and put a 33
```

                                                        Page 15

```
 1          sticker on it.
 2                  And Jeremy, don't let me forget when I mark
 3          my next exhibit to make it 34.  Otherwise, I'll get us
 4          way off the rails.
 5              MR. WILLIAMS:  That's all right.  We -- we can get
 6          it handled.
 7              MR. BARNES:  All right.
 8                  (Whereupon Exhibit 33 was marked for
 9          identification, a copy of which is attached hereto.)
10      BY MR. BARNES:
11              Q.   So Ms. Leong, I believe this is a copy of
12          your LinkedIn profile; is that correct?
13              A.   Yes.
14              Q.   And I want to just walk through this and kind
15          of go over some of your background.  Let's start at the
16          bottom.
17              A.   Okay.
18              Q.   On Page 2 in the Education section, this
19          reflects that you have a Bachelor's in Industrial
20          Engineering from New York Polytechnic School of
21          Engineering.
22              A.   Yes.
23              Q.   Is that right?
24              A.   Yes.
25              Q.   When did you graduate?
```

Page 16

1        A.    1985.  I went to the 1985 graduation

2    ceremony.  I finished my degree in December of 1984.

3        Q.    Okay.  Gotcha.

4              And other than this degree in industrial

5    engineering, do you have any other degrees?

6        A.    No.

7        Q.    Have you -- did you go to any other colleges

8    for any period of time?

9        A.    Yes.

10       Q.    Where?

11       A.    I started taking classes for an M.B.A. degree

12   when I was in Virginia at, I think it was, George

13   Mason.

14       Q.    And you never finished that degree?

15       A.    No.

16       Q.    Okay.  Have you attended any other colleges?

17       A.    No.

18       Q.    Was IBM your first job out of college?

19       A.    Yes.

20       Q.    I believe you started as an intern at IBM; is

21   that right?

22       A.    Yes.

23       Q.    What was your job during your internship with

24   IBM?

25       A.    The first one -- yeah.  The first one I was

Page 17

1          in the industrial end -- actually in the engineering

2          group really helping with some system programming to

3          support the manufacturing line.

4                  Q.    Okay.  And that was during your internship?

5                  A.    Yes.

6                  Q.    What else did you do during your internship?

7                  A.    Are you asking for, like, which year, a

8          specific year, or just in general?  Because -- because

9          I did two internships with IBM.

10                 Q.    Oh, you did?  Okay.

11                 What did you -- what did you do during your

12         first internship with IBM?

13                 A.    I -- I can't remember which one is first.

14                 Q.    That's fine.  It doesn't matter.

15                 A.    So one of them I was working in Armonk,

16         New York in the headquarter office with the Building

17         Engineering Department.  I was a mechanical engineering

18         major, so I helped them with mostly inventory and also

19         dispatching the building maintenance technicians how to

20         hang pictures for the CEO, you know, fix the --

21         anything in -- in the building at the headquarter

22         office.  And then the other one was when I helped with

23         system programming with the manufacturing line.

24                 Q.    Got it.

25                 Did you spend any time at the -- attending

                                                        Page 18

1         the University of Rochester?

2              A.    Yes, I did.  Oh, yes.  Sorry.

3              Q.    No, that's okay.

4                    And -- and there may be times today where you

5         forgot to say something or maybe you said something

6         earlier that you feel like you need to clarify or

7         correct.  At any point you can go back and say, "Hey,

8         you know what, I just remembered this," and -- and just

9         let us know that.  It's perfectly fine.  Okay?

10             A.    Yes.

11             Q.    So it looks like you spent a few years at the

12        University of Rochester before you went to the

13        Polytechnic school, right?

14             A.    Yes.

15             Q.    What did you study at Rochester?

16             A.    I studied mechanical engineering.

17             Q.    Got it.

18                   What -- what made you move from Rochester to

19        the Polytechnic school?

20             A.    Change of major.

21             Q.    Going from mechanical to industrial?

22             A.    Yes.

23             Q.    I went to Georgia Tech undergrad, and we

24        always called industrial engineering imaginary

25        engineering.

                                                    Page 19

```
1              A.   Yes.
2              Q.   So I'm sorry if I accidentally say "imaginary
3         engineering" at some point.
4              A.   That's okay.  I've heard it before.
5              Q.   Yeah, it's -- it's -- I keep having to stop
6         myself, so no offense intended.
7                   Okay.  So you had the two internships with
8         IBM, and then right after graduating, you joined IBM as
9         an employee?
10             A.   Yes.
11             Q.   What was your first job at IBM?
12             A.   My first job was with the Industrial
13        Engineering Department, yes, as an industrial engineer.
14             Q.   Okay.  How long were you in the Industrial
15        Engineering Department?
16             A.   Until I transferred to New York City.
17             Q.   When was that?
18             A.   1987.
19             Q.   Okay.
20             A.   '87, yeah.
21             Q.   And what did you do once you transferred to
22        New York City?
23             A.   I went into sales.
24             Q.   And you said that was 1987?
25             A.   Yeah, around 1987.
```

Veritext Legal Solutions
866 299-5127

1          Q.   And I believe you've been in sales since then

2     except for one period you were in marketing; is that

3     right?

4          A.   Yes.

5          Q.   What was the time period you were in

6     marketing?

7          A.   Marketing, that would have been from '93

8     until '96 -- '96, '97.

9          Q.   Okay.  So about three or four years?

10         A.   Three or four years, yeah.  I can't remember

11    the exact duration I --

12         Q.   Okay.  So other than that three- or four-year

13    period, you've been -- you were in sales at IBM from

14    1987 through your termination, right?

15         A.   Yes.

16         Q.   At the time of your termination, you were in

17    storage sales; is that right?

18         A.   Yes.

19         Q.   How long had you been doing storage sales?

20         A.   I can't quite remember.  I can't remember.

21         Q.   Let's look at your -- your LinkedIn profile

22    here.

23         A.   Uh-huh.

24         Q.   That might help.

25         A.   Okay.

                                              Page 21

1      Q.   I'm looking at your -- your -- the first job

2   you have listed on here is sales rep starting in July

3   1996.

4           So I take it that's when you moved out of

5   marketing, was probably July of '96?

6      A.   July '96, yes.

7      Q.   Okay.  And what was -- what were you selling

8   in 1996 when you went back into sales?

9      A.   I was selling at that time called a power

10  system or RS/6000 power system.

11     Q.   And what is that?

12     A.   They are service.  You know, they do

13  computational processing.

14     Q.   How long were you involved in server sales?

15     A.   So I was involved strictly in server sales

16  until 2008 when I became a manager, and I was

17  responsible for a whole portfolio, server and

18  storage --

19     Q.   Okay.

20     A.   -- for a couple of years.

21     Q.   And that would be the system sales manager

22  position on your LinkedIn profile here?

23     A.   Correct, yes.

24     Q.   And was that a people manager role?

25     A.   Yes.

Page 22

1        Q.    How many people were you managing?

2        A.    Four, four and a half.  One -- one employee I

3    shared with another manager, so we co-managed her.

4        Q.    Okay.  And then when you left that role in

5    January 2010, did you go back to an individual

6    contributor storage sales role?

7        A.    Yes.

8        Q.    And were you in storage sales from that point

9    all the way through your termination?

10       A.    Yes.

11       Q.    Okay.  And I think I know, but just so we get

12   a clean record, what is storage?

13       A.    Storage is basically systems where data

14   resides, so anything, whether they are pictures, radio,

15   documents.  When you say you store them, it's kind of

16   like your hard drive on your laptop but in a much

17   larger scale.

18       Q.    But much bigger than a laptop?

19       A.    Much much bigger than a laptop, yes.

20       Q.    Yeah.

21       A.    And still a lot more (inaudible).

22       Q.    Did you ever -- did you sell both hardware

23   and software as it related to storage or just hardware?

24       A.    Both, yes.

25       Q.    And so IBM would sell the actual physical

Page 23

1     storage hardware as well as the software used to run

2     that hardware, right?

3         A.   Yes.

4         Q.   Okay.  And I realize I'm jumping around a

5     little bit here, but I'm trying to get a complete

6     picture.

7         So in the time period you were in sales

8     before you went to marketing, what were you selling

9     during that time period?  This would have been '87

10    through roughly '93.

11        A.   I was selling also all the servers, the

12    mainframe, (inaudible) systems.  Today they are known

13    as power system running the i operating system and also

14    the beginning of IBM PCs.

15        Q.   Got it.

16        So it sounds like you've got a lot of sales

17    experience in your career, right?

18        A.   Yes.

19        Q.   Would you consider yourself a seasoned sales

20    representative?

21        A.   Yes.

22        Q.   And I assume that means you know what it

23    takes to be a successful salesperson, right?

24        MR. WILLIAMS:  Objection to form.

25        MR. BARNES:  It leads -- let -- let me rephrase.

                                               Page 24

1    BY MR. BARNES:

2        Q.   As it relates to storage sales, you know what

3    it takes to be a successful sales representative,

4    right?

5        MR. WILLIAMS:   Same objection.

6    BY MR. BARNES:

7        Q.   You can answer.

8        A.   To the best of my understanding.

9        Q.   Do you feel like you have the skills it takes

10   to be successful at storage sales?

11       A.   That's evolving because the products, new

12   products are always introduced, so at point in time,

13   yes.

14       Q.   Let me -- let me -- that's fair.  Let me

15   narrow it down.

16            In the 2019 and 2020 time period, do you feel

17   like you had the skills it took to be a successful

18   storage sales rep?

19       A.   Would you repeat that?

20       Q.   Sure.

21       A.   I'm not sure I understand what you're asking.

22       Q.   In the 2019 to 2020 time frame, do you feel

23   like you had the skills needed to be a successful

24   storage sales rep at IBM?

25       A.   To the best of, yeah, my knowledge, yes, I

Page 25

1    do.

2         Q.   You mentioned that products are always

3    evolving and new products come in, right?

4         A.   Yes.

5         Q.   So I take it that means if you're not keeping

6    up with that; your skills can become out of date,

7    right?

8         A.   If one decides not to keep up to date, yes.

9         Q.   Did anyone ever tell you that your -- let me

10   be more specific.

11        Did anyone at IBM ever tell you that your

12   skills were out of date?

13        A.   No.

14        Q.   Do you believe your skills were out of date?

15        A.   No.

16        MR. BARNES:  All right.  Let me introduce a few

17   more exhibits here.  The next one will be Exhibit 34.

18        (Whereupon Exhibit 34 was marked for

19   identification, a copy of which is attached hereto.)

20        THE WITNESS:  Do I just refresh?

21   BY MR. BARNES:

22        Q.   Yeah, one second.  Okay.  It should be there

23   now if you refresh.

24        A.   Okay.

25        Q.   This is a document entitled "Agreement

                                            Page 26

1        Regarding Confidential -- Confidential Information and

2        Intellectual Property," right?

3           A.   Okay.  Yes.

4           Q.   Okay.  And if you look at the second page, is

5        that your signature?

6           A.   Yes.

7           Q.   And you would have signed this when you

8        joined IBM back in the '80s, right?

9           A.   Yes.

10          Q.   Okay.  When you were in sales at IBM, so the

11       time periods you were in sales, you were paid a salary

12       plus commissions, right?

13          A.   Yes.

14          Q.   And your -- you -- for the commission part of

15       your pay, you were required to accept something called

16       an Incentive Plan Letter, right?

17          A.   Yes, in -- yes.

18          Q.   And those Incentive Plan Letters would spell

19       out the various terms of your commission plan, right?

20          MR. WILLIAMS:  Object to the form.

21             Go ahead and answer.

22          THE WITNESS:  They spelled out the goals, the

23       object -- the goals.

24       BY MR. BARNES:

25          Q.   Okay.  Let me just ask it this way.

```
 1                What was your understanding of the Incentive
 2      Plan Letter?
 3           A.   My understanding of the Incentive Plan Letter
 4      is to provide a set of goals that I was asked to do my
 5      best to achieve.
 6           Q.   And you were required to accept that
 7      Incentive Plan Letter in order to get paid commissions,
 8      right?
 9           A.   Yes.
10           Q.   Okay.  Take a look at what I've marked as
11      Exhibit 35.
12                (Whereupon Exhibit 35 was marked for
13      identification, a copy of which is attached hereto.)
14      BY MR. BARNES:
15           Q.   I want to just ask you to confirm if these
16      are your Incentive Plan Letters from 2017.  I believe
17      the first half of 2017 would be the first three pages,
18      and then the second half of 2017 would be the last
19      three pages.  If you could take a look and confirm
20      that.
21           A.   I can't confirm the numbers, but it looks
22      like an Incentive Plan Letter.
23           Q.   Okay.
24           A.   I cannot remember the numbers.
25           Q.   So -- so you don't know whether these are
```

Page 28

1     your Incentive Plan Letters or not?

2          A.   I don't remember the numbers that were on --

3          Q.   Okay.

4          A.   Yeah.

5          Q.   If -- if IBM said these were your Incentive

6     Plan Letters from 2017, would you have any reason to

7     dispute that or doubt it?

8          A.   I don't suppose so.

9          Q.   Okay.  Now let me show you what I'll mark as

10    Exhibit 36.

11              (Whereupon Exhibit 36 was marked for

12    identification, a copy of which is attached hereto.)

13    BY MR. BARNES:

14         Q.   And it's my understanding that -- okay.  It

15    should be up now.  It's my understanding that

16    Exhibit 36 would be the Incentive Plan Letters from

17    2018, again, first half would be the first three pages.

18    Second half of '18 would be the last three pages.

19              And the same question.  If IBM said these

20    were accurate copies of your IPLs from 2018, would you

21    have any reason to -- to doubt that?

22         A.   I do have a question about this one because I

23    don't recall at that time that Mr. Robert Cortez was my

24    manager, nor was Mr. Todd Stacy my second line.

25         Q.   Okay.  Other than that, is there anything

                                        Page 29

1        else that looks inaccurate about these to you?

2            A.   Again, I can't confirm the numbers because I

3        don't remember.

4            Q.   So if IBM said that those were accurate

5        numbers, would you have any reason to doubt that?

6            A.   For this one, yes, I do, because the

7        management -- the manager names do not appear to be

8        correct based on what I remember.

9            Q.   Okay.  So it's my understanding that when

10       IPLs get printed out, it just lists the last manager in

11       those slots, and that's why Robert and Todd would be

12       listed there, because Robert was your first line

13       manager at the time of your termination, right?

14           A.   Yes.

15           Q.   And Todd was second line manager at the time

16       of your termination, right?

17           A.   Yes.

18           Q.   And so it's my understanding that's why

19       they're listed there, is because of when they're

20       printed out, it just lists the last managers, and so

21       that's my understanding about that point.

22                With that explanation, do you have any reason

23       to doubt whether the rest of the information in here is

24       accurate or not?

25           A.   On the 2017 Incentive Plan Letter, it did

                                                      Page 30

1      show Amy Buyarski, who was my manager at that time.

2          Q.   Okay.  We've got to determine whether we can

3      authenticate these documents or not, and I need to know

4      the basis for why you won't authenticate 2018 IPLs.

5               So far you've mentioned the manager.  Is

6      there any other basis?

7               MR. WILLIAMS:  Objection to form.

8               THE WITNESS:  I don't know how to answer that

9      question.

10     BY MR. BARNES:

11         Q.   What's confusing about the question?

12         A.   That when I -- the names would be -- could

13     have been incorrect.

14         Q.   And I'm saying other than the names, is there

15     anything else about Exhibit 36 that you think would be

16     inaccurate?

17         A.   Oh, okay.  Now -- yes.

18         Q.   What else?

19         A.   I was not an IQP rep at any time in 2018.  I

20     did not even notice that.

21         Q.   You were not on an Individual Quota Plan in

22     2018?

23         A.   IQP, yes, I -- I was.  Sorry, I -- I -- I was

24     confused with the acronyms.

25         Q.   Okay.  IQP stands for Individual Quota Plan,

                                           Page 31

```
1        right?
2              A.   Right.
3              Q.   And that's a type of sales plan at IBM?
4              A.   Yes.
5              Q.   And you were on an IQP in 2018, right?
6              A.   Yes.
7              Q.   Okay.  So is there anything else about
8        Exhibit 36 that you don't think is accurate?
9              A.   I don't know for sure.
10             Q.   Okay.  And so if IBM said these were accurate
11       copies of your Incentive Plan Letters from 2018, aside
12       from noting the issues about your managers, your
13       response would be, "I don't know whether they are or
14       not."
15                  Is that what you're saying?
16             A.   I suppose my response would be if IBM said
17       these -- this is the Incentive Plan Letter that I
18       received back then, I would trust the numbers to be
19       right because I cannot remember whether they are or
20       not, but I will trust IBM on that.  But I also wonder,
21       right, why the names would be incorrect and if there
22       would be anything else that made it not as accurate as
23       possible.
24             Q.   Okay.  I think that answers my question.
25                  All right.  Let's take a look at Exhibit 37.
```

Page 32

1      A.   Okay.

2           (Whereupon Exhibit 37 was marked for

3      identification, a copy of which is attached hereto.)

4      BY MR. BARNES:

5      Q.   It's my understanding that Exhibit 37 are

6      your IPLs from 2019.  First three pages would be the

7      first half, and the last three pages would be the

8      second half of 2019.

9      A.   Okay.

10     Q.   And -- and the same question about whether

11     you would have any reason to doubt whether these are

12     accurate versions of your IPL.

13     A.   Besides the manager names to be inaccurate --

14     actually, for 2019 I do -- I do recall that Todd Stacy

15     was my second line but not Robert Cortez.  So besides

16     that, my -- what was your question again?

17     Q.   Just whether there's anything else that --

18     that you don't know whether it would be accurate or

19     not.

20     A.   No.

21     Q.   Okay.

22     A.   Not that I can see.

23     Q.   And so I noticed that in -- let's look at --

24     keep looking at Exhibit 37, for example.  Your -- your

25     primary revenue element there has a quota of about

                                              Page 33

1      3.2 million, right?

2          A.   I -- may I ask, are you looking at the first

3      half?

4          Q.   Yes, first half.

5          A.   Okay.  Yes.

6          Q.   And then the second half has a quota of about

7      2.5 million, right?

8          A.   I'm looking for it.  Yes.

9          Q.   And then if we -- if we go back to Exhibit 36

10     from 2018 --

11         A.   2018.

12         Q.   -- it looks like for the first half your

13     primary element had a quota of about 4. -- a little

14     under 4.5 million, right?

15         A.   Yes.

16         Q.   And then second half, it was about

17     4.3 million, right?

18         A.   Yes.

19         Q.   So it looks like your quotas went down from

20     2018 to 2019, right?

21         A.   Yes, because my role changed.

22         Q.   Okay.  Your role changed in the first half of

23     2019?

24         A.   My territory changed in first half 2019.  My

25     role changed in second half of 2019.

Veritext Legal Solutions
866 299-5127

1       Q.   Okay.  Your -- let's go back and look at

2    Exhibit 35, your 2017 IPLs.  It looks like primary

3    element in the first half of 2017 was about a little

4    under 3 and a half million, right?

5       A.   Yes.

6       Q.   And the second half was about 3.3 million,

7    right?

8       A.   Yes.

9       Q.   So -- so your quota went up from '17 to '18;

10    is that right?

11       A.   Yes.

12       Q.   Did your accounts stay the same from '17 to

13    '18?

14       A.   Very similar.

15       Q.   Okay.  Do you know how quotas are calculated?

16       A.   Yes.

17       Q.   How?

18       A.   Based on the weighted average of the

19    account's attainment for the previous three years.

20       Q.   Okay.  So what that account had spent for the

21    last three years is used to estimate what they'll spend

22    in the upcoming year?

23       A.   That's my understanding.

24       Q.   Got it.

25       And in the 2017 and 2018 time frame, were --

1    were you -- what was the geographical territory that

2    you were working in?

3        A.    It was not geographical.

4        Q.    So you had accounts all over the country?

5        A.    I have accounts still belong to the west

6    region, but they have locations all over the country.

7        Q.    Okay.  So your 2017 IPL -- actually, let's

8    look at your 2018 IPL --

9        A.    Okay.

10        Q.    -- Exhibit 36.

11            It says "Named accounts in California,

12    Washington, and Oregon," right?

13        A.    Yes.

14        Q.    And so California, Washington, and Oregon, is

15    that where your clients were headquartered at least?

16        A.    Yes.

17        Q.    Did you work more in California or Oregon or

18    Washington?

19        MR. WILLIAMS:  Objection to form.

20        THE WITNESS:  As I mentioned, it -- its

21    accounts -- account dependent.  For example, McKesson's

22    headquarter was in California.  The Data Center is in

23    Virginia and Atlanta, Georgia.

24    BY MR. BARNES:

25        Q.    Okay.  Let me ask my question in a different

                                            Page 36

```
 1        way.
 2                    Did you work more with accounts that were
 3        headquartered in California or Washington or Oregon or
 4        was it evenly split?
 5            A.    Evenly split.
 6            Q.    And how long had you been working with
 7        clients that were headquartered in those three states?
 8            A.    I -- in California, since I became storage
 9        sales, since I joined the storage sales team.  In
10        Washington, Oregon, fairly new in 2017, '18.
11            Q.    All right.
12            A.    That's what I recall, yeah.
13            Q.    Got it.  Thank you.
14            A.    Yeah.
15            Q.    Okay.  Now let's take a look at Exhibit 38 --
16            A.    Okay.
17            Q.    -- which I believe is your Incentive Plan
18        Letter from the first half of 2020.
19                    (Whereupon Exhibit 38 was marked for
20        identification, a copy of which is attached hereto.)
21        BY MR. BARNES:
22            Q.    If you could look at it and confirm.
23            A.    Oh, I'm sorry.  I opened 36 instead.
24            Q.    Oh, no, that's okay.
25            A.    Okay.
```

Page 37

1    Q.   So is Exhibit 38 a copy of your Incentive

2    Plan Letter from the first half of 2020?

3    A.   I would say for most part except for the

4    "Territory Opportunity: $1," that line.  I don't recall

5    ever seeing that on my Incentive Plan Letter.

6    Q.   Got it.

7         Do you know what "Territory Opportunity"

8    means?

9    A.   Yes.

10   Q.   What does that mean?

11   A.   The potential, right, of revenue potential

12   in -- in that territory, the accounts that you -- that

13   you received as part of my territory.

14   Q.   Got it.

15        And in -- in 2020 you were put on what's

16   called a Straight Rate Absolute Plan; is that right?

17   A.   That's what I recall.

18   Q.   And the Straight Rate Absolute Plan is

19   basically you're paid a percentage of revenue you

20   achieve, right?

21   A.   Yes.

22   Q.   And so for purposes of your incentive plan,

23   your attainment's not measured against any sort of

24   quota; is that right?

25   A.   That was my understanding.

Page 38

1    Q.   But I assume there was still some -- some

2    expectation that you would deliver more than a dollar

3    worth of revenue.

4         Is that fair?

5    MR. WILLIAMS:  Objection to the form.

6    THE WITNESS:  I have expectation of myself

7    delivering more than a dollar, even though that dollar

8    value was not on my version of the letter.

9    BY MR. BARNES:

10    Q.   Did your version of the letter contain any

11    dollar figure that you recall?

12    A.   Not that I recall.  I don't remember.

13    Q.   And I know you said you have expectations of

14    yourself.

15         What were your expectations of yourself about

16    the territory opportunity in 2020?

17    A.   Make a lot of money.

18    Q.   That's fair.

19         Did you have any sort of expectation about

20    how much revenue you could achieve in the first half of

21    2020?

22    A.   I did not, because they were all new accounts

23    that no one knew much about.

24    Q.   Did your managers ever tell you how much they

25    expected you to sell in the first half of 2020?

Page 39

1          A.    If they did, I don't remember.

2          Q.    All right.  Let me pull up something that

3     might help.  I will introduce what I've marked as

4     Exhibit 39.

5          A.    Okay.

6                (Whereupon Exhibit 39 was marked for

7     identification, a copy of which is attached hereto.)

8     BY MR. BARNES:

9          Q.    Let me know when you have it.

10         A.    I have it.

11         Q.    Okay.  So this Exhibit 39 is a -- is an email

12    chain.  I want to ask you to focus on the first page,

13    bottom of the page there's an email from Sandra

14    Florey --

15         A.    Uh-huh.

16         Q.    -- to a number of people, including you,

17    right?

18         A.    Right.

19         Q.    And it's --

20         A.    That's what it looks, yeah.

21         Q.    It's dated January 10, 2020, right?

22         A.    Yes, I -- that's what I'm reading, yes.

23         Q.    And Sandra says here "Territory Reps," so I

24    assume the other people that this email is to were

25    other territory reps on your team; is that right?

                                              Page 40

1     A.    On the -- I believe so.  On the bottom half

2     of the letter, yeah, I believe so.

3          Q.    Right.  There's Don Custardo, Henry Stipe,

4     John Egan, Laura Cook, you, and Randall Whitfield.

5               Were those people all on your team?

6          A.    They were on my team.  I did not know all of

7     them to be certain that they are on -- they are on

8     the -- they are territory reps or not.

9          Q.    Got it.

10         A.    Yeah.

11         Q.    Okay.  I understand.

12              And who's Sandra Florey?

13         A.    At that time she was my first line manager.

14         Q.    Okay.  And Sandra says "While I haven't seen

15    quota files and territory reps don't actually receive

16    quotas, please use 1.6 million as your 1H target for

17    planning purposes," right?

18         A.    That's what I'm reading too, yeah.

19         Q.    And so Sandra was informing you that you

20    should assume your target for the first half of 2020

21    was $1.6 million, right?

22         A.    That's what it says on there, yes.

23         Q.    And was that your understanding?

24         A.    I actually don't recall.

25         Q.    That's fine.  Look, this was a couple years

                                              Page 41

```
1          ago, so if there's anything you don't remember or you
2          don't recall, that -- that is a perfectly acceptable
3          answer.
4                   She goes on to say "Assume 1Q is 40 percent
5          of that or 640,000," correct?
6          A.    Yes, that's what it says, yeah.
7          Q.    And so presumably the remaining 60 percent
8          would be in the second quarter.
9                   Is that fair?
10         A.    Yes, that's usually, yeah, the split.
11         Q.    That's what I was going to ask.
12                  Usually do you assume 40 percent in first
13         quarter and 60 percent in second quarter?
14         A.    Sometimes it's different.
15         Q.    Okay.  All right.  Now let me show you what
16         I'm marking as the next exhibit.  This will be
17         Exhibit 40.
18         A.    Okay.
19                  (Whereupon Exhibit 40 was marked for
20         identification, a copy of which is attached hereto.)
21         BY MR. BARNES:
22         Q.    You should have it now.
23         A.    Okay.
24         Q.    So I will represent to you that this is a
25         summary of your compensation from 2013 through 2020
```

Page 42

1    through your termination, and I just want to ask you a

2    couple of questions about this.

3              So for each year there's various lines here,

4    and I want to look first at the salary line.

5              So it looks like in 2013 your salary was

6    around $121,000 on this document, right?

7         A.   Yes, that's what I'm seeing too.

8         Q.   And then it looks like in 2014 it goes down

9    to $112,000.

10             Do you remember that happening?

11        A.   I can't say I remember.

12        Q.   Okay.  And then the next few years, '15, '16,

13   '17 really through your termination, you start getting

14   raises, it looks like, pretty much every year, right?

15        A.   Yes, it looks like it.

16        Q.   And is that consistent with your

17   recollection, that you got raises pretty much every

18   year?

19        A.   Yes.

20        Q.   Who decided whether to give you a raise and

21   how much?

22        A.   It's my understanding that my first line

23   manager would make the recommendation and then present

24   it to management for approval.

25        Q.   Okay.  And from 2017 to 2018, it looks like

Page 43

1      your salary went up pretty significantly, almost

2      $25,000.

3              You see that?

4      A.    Yes.

5      Q.    And is that consistent with your

6      recollection, that you got a pretty big raise in 2018?

7      A.    Yes.

8      Q.    And was that based on your 2017 performance?

9      A.    I would suppose so.

10     Q.    Who was your first line manager in 2018?  Was

11     it Amy Buyarski?

12     A.    That's who I -- who I remember, yes.

13     Q.    And so is Amy the one who would have

14     recommended this almost $25,000 raise for you?

15     A.    It will probably be -- I -- I don't know

16     who -- I -- I would guess she -- she was part of it,

17     but -- but she was my new manager at the time.

18     Q.    Okay.  It also looks like in 2017 in terms of

19     commissions, at least in this summary, 2017, was your

20     best year commission-wise.

21             Is that your recollection as well?

22     A.    Based on this document?

23     Q.    If -- not just based on this document.

24     A.    Okay.

25     Q.    But your recollection, do you recall that

Page 44

1        2017 was your best year commission-wise?

2            A.    My recollection, my best year was probably

3        2000 because of Y2K, so I was very successful in 1999.

4            Q.    Got it.

5            A.    Yeah.

6            Q.    That makes sense.

7                  So we'll say in this time period, from 2013

8        through your termination, would 2017 have been your

9        best year commission-wise?

10           A.    Yes.

11           Q.    Okay.  And you ended up getting Best of IBM

12       as a result of your 2017 performance, right?

13           A.    Yes.

14           Q.    What is Best of IBM?

15           A.    Best of IBM is a global award for the top

16       quarter percent of employees who have high -- very high

17       performance.

18           Q.    Had you ever gotten Best of IBM before that?

19           A.    I got something similar.  It's -- I believe

20       it's called Global -- now I can't remember the full

21       name.  It is another Global award.  That would have

22       been 1998 or '99 -- I can't remember -- somewhere

23       around there.

24           Q.    I know for at least some years if you made

25       Best of IBM, you got to, like, go on a trip, right?

Page 45

```
 1            A.    Yes.
 2            Q.    Did you get to go on a trip?
 3            A.    The Best of IBM in 2018 was to the Bahamas.
 4     The earlier Global award, it was a Mediterranean
 5     cruise.
 6            Q.    Wow.
 7            A.    Yeah.
 8            Q.    I need to tell my firm to step it up.
 9            MR. WILLIAMS:  I think we're both doing it wrong,
10     Justin.
11     BY MR. BARNES:
12            Q.    That's great.
13                  So how does the nomination process for Best
14     of IBM work?
15            A.    My understanding is you have to -- your --
16     your percent attainment has to be very high.  Your
17     customer sat has to be very high.  Although, it's not
18     measured on an (inaudible), but I guess you don't get
19     complaints from customers.
20                  And then -- then it's a nomination process,
21     and I believe the 2018 Best of IBM, all the nominations
22     went up to our then CEO, Ginni Rometty, and she made
23     the final decision.  That was my understanding, yeah.
24            Q.    Who initially nominated you?
25            A.    I don't know.
```

Page 46

1       Q.   At the time in the -- when -- when did they

2   decide Best of IBM?  Was it early 2018?

3       A.   That's when they announce who the winners

4   are.  Then -- then -- then -- yeah, then you're

5   informed of which -- there were two groups, yeah.

6       Q.   And it was -- I believe it was based on your

7   2017 performance, right?

8       A.   That's my understanding, yes, yeah.

9       Q.   Who was your first line manager at the

10  beginning of 2018 when they announced Best of IBM?  It

11  was Amy Buyarski, right?

12      A.   It was Amy, yes.

13      Q.   Who was your second line manager?

14      A.   I recall that to be Mark Dawson.

15      Q.   What did you think of Mark and Amy as

16  managers?

17      A.   Would you clarify what -- you know, as a

18  person or as -- yeah.

19      Q.   As a manager.  We can start with Amy.

20           What did you think of Amy as a manager?

21      A.   They both are very -- they have very much

22  a -- a collaborative style, coaching, and supportive.

23      Q.   Did you like them both as managers?

24      A.   Yes, I did.

25      Q.   You enjoyed working with them?

```
1              A.    Yes, I did.

2              Q.    And in 2017 do you remember who your managers

3       were?

4              A.    I seem to recall that Michael Hardoin might

5       have been my first line manager for most of the year or

6       maybe Amy.  Now I can't remember.  I think Mike and Amy

7       split the year.

8              Q.    So Mike started off as your manager in 2017,

9       and then Amy took over at some point in 2017?

10             A.    That's kind of how I remember.

11             Q.    And then Amy continued to be your manager in

12      2018?

13             A.    That's what I remember, yes.

14             Q.    Okay.  Throughout 2017 through the end of

15      your employment, were you always selling the same thing

16      or did that vary?

17             A.    That varied.

18             Q.    Okay.  So in 2017 what were you selling?

19             A.    I was selling the entire storage portfolio.

20             Q.    What about in 2018?

21             A.    2018 was -- I cannot -- I cannot say for

22      sure, but IBM started splitting out the hardware from

23      software and turn it into two different portfolios, and

24      then -- and there were also other people who were

25      responsible for the software portfolio.  So on the
```

                                                    Page 48

1    hardware portion, I was still responsible for the

2    entire hardware portfolio.

3              Earlier you asked me whether IBM, you know,

4    sold the systems with hardware/software.  That was a

5    switch in product strategy, that hardware and software

6    got split up.

7         Q.   Okay.  So in 2017 you were hardware and

8    software, and then in 2018 you were hardware only?

9         A.   Like I said, I can't remember whether it was

10   '18 when that product strategy changed or sales

11   strategy changed.  I know that I've always had

12   hardware.  Was it -- I cannot remember whether it was

13   '18 when -- but it was -- so when that changed,

14   whatever year it turned out to be, I would still get

15   part of the software revenue, but I was not the primary

16   salesperson.

17             Does that make sense?

18        Q.   Yeah, I'm following you.

19        A.   Okay.  Yeah, because it's still my account,

20   so I was more in an assist role, if I -- there was one

21   period of time, that's how it was arranged.

22        Q.   Got it.

23             And I believe you said earlier that your

24   clients stayed the same, for the most part, from 2017

25   to 2018; is that right?

                                           Page 49

1              A.    I may have gotten, if I recall correctly, a

2      couple less, but the larger ones I continued to have in

3      2018.

4              Q.    Got it.

5              A.    Yeah.

6              Q.    All right.  Let me show you the next exhibit.

7      This will be Exhibit 41.

8              A.    Okay.

9                   (Whereupon Exhibit 41 was marked for

10     identification, a copy of which is attached hereto.)

11     BY MR. BARNES:

12             Q.    Let me know when you have it.

13             A.    Yes, I do have it.

14             Q.    Okay.  So Exhibit 41 is your 2018 Global

15     Performance Assessment, right?

16             A.    Yes.

17             Q.    And if you go to the bottom, it looks like it

18     was completed by Amy Buyarski, right?

19             A.    Yes.

20             Q.    And it's dated 2/28/2019, right?

21             A.    Yes, that's what it says.

22             Q.    Which would have been -- that would have been

23     when Amy delivered the assessment to you, right?

24             A.    Yes.

25             Q.    Okay.

                                                        Page 50

1          A.    That's what this says, yeah.

2          Q.    So if you -- if you go to Page 3, that's

3    where the Dimension Ratings start, right, on the bottom

4    of Page 3?

5          A.    Yes, I see it.

6          Q.    And then on the next page there are five

7    different dimensions that you're rated on, right?

8          A.    Yes.

9          Q.    It looks like -- so we'll just run through

10   them real quick.  For Business Results, Amy rated you

11   as an Expects More, right?

12         A.    Yes, as far as I'm reading.

13         Q.    Of the ratings, Expects More is the lowest,

14   then it's Achieves, then it's Succeeds; is that right?

15         A.    I cannot say for sure for 2018, but I seem to

16   recall that there's one lower than Expects More.

17         Q.    Well, if you -- if you look here, it says

18   "Business Results" and then it says -- has the three

19   categories, Exceeds, Achieves, and Expects More, right?

20         A.    Okay.

21         Q.    And then it explains what each of those

22   means.

23               Do you see that?

24         A.    Would you point me to the page?

25         Q.    Bottom of Page 3, top of Page 4.

                                             Page 51

```
 1              A.    Okay.  Yes, I see, yes.

 2              Q.    Are those the three categories that the

 3       manager --

 4              A.    That's correct.  Yes, that's correct.

 5              Q.    And so she rated you Expects More for

 6       Business Results, right?

 7              A.    Yes.

 8              Q.    Exceeds for Client Success, right?

 9              A.    Yes.

10              Q.    Achieves for Invasion, right?

11              A.    Would you repeat how you rate it?

12              Q.    Yes.  So we can start back at the beginning.

13                    Business Results she rated you Expects More,

14       right?

15              A.    Yes.  Yes.

16              Q.    Client Success she rated you as Exceeds,

17       right?

18              A.    Yes.

19              Q.    Invasion, she rated you as Achieves, right?

20              A.    Yes.

21              Q.    Responsibility to Others, she rated you as

22       Achieves, right?

23              A.    Yes.

24              Q.    And then Skills she rated you as Expects

25       More, right?
```

Page 52

1   A. Yes.

2   Q. Did you agree with this assessment?

3   A. At the time I agreed to it because I only

4 focused on the Business Results, and I agreed with

5 her --

6   Q. Okay.

7   A. -- where I stood at that time, yeah.

8   Q. And I forgot to ask you this.

9   Who was your second line manager in 2018?

10 Did it continue to be Mark?

11   A. I -- 2018, if I recall correctly, I think it

12 was Mark for part of the year, and then -- and then I

13 don't recall whether John Rafferty came back as a

14 second line or the third line, but I -- I recall he did

15 come back to the storage group.

16   Q. Okay.

17   A. So I cannot -- I cannot remember who the

18 second line was, but I believe Mark started the year.

19   Q. Okay.  And eventually Todd Stacy became your

20 second line, but that wasn't until 2019, right?

21   A. That's how I recall it, yes.

22   Q. Okay.  Okay.  And then back to this

23 Exhibit 41, your 2018 assessment, under the Skills

24 rating here, bottom of Page 4 it says "Optional: Nelly

25 Leong, any other comments for the year?"

1          Do you see that?

2     A.    Yes.

3     Q.    And then below that you wrote that in there,

4     right, where it says "2018 was a tough year"?

5     A.    Uh-huh.

6     Q.    Yes?

7     A.    Yes.

8     Q.    Okay.  You say "2018 was a tough year with

9     multiple critical situations at a few accounts," right?

10    A.    Yes.

11    Q.    What were you referring to there?

12    A.    The largest account that I had at the time,

13    which was also the account where I sold majority of my

14    2017 attainment, had multiple critical situations as

15    they -- they -- as they were implementing the solution

16    result of previous year.  The solution was not stood up

17    and put into production until end of 2018, so for the

18    whole year during implementation, we were just dealing

19    with critical situations.

20          Critical situations are incidents where the

21    customer cannot just call in 1-800 support line to get

22    help.  They are very focused incidents that generally

23    has an assigned team working on it.

24    Q.    And so it sounds like there were technical

25    issues -- was this McKesson, by the way?

Page 54

1      A.    Yes, it was.

2      Q.    Okay.   There were technical issues at

3  McKesson with implementing the product that had been

4  sold to them in 2018?

5      A.    In 2017.   Yeah, in 2018 the problems, yes.

6      Q.    Yeah, I should have said --

7      A.    Yeah.

8      Q.    -- the product was sold to them in 2017.

9  There were technical issues in 2018, right?

10      A.    Yes.

11      Q.    Was it your job to deal with those technical

12  issues?

13      A.    As the -- the primary account rep, I -- it

14  was my job to manage those situations.

15      Q.    Were there technical people, though, who

16  could actually do the fixing of the issue?

17      A.    Yes.   I would pull the technical experts in

18  at different point in time, yes.

19      Q.    Got it.

20          You go on to say "With my management team's

21  support, I was able to neutralize some of the

22  situations and allowed IBM to continue to compete for

23  new business," right?

24      A.    Yes.

25      Q.    So you felt like you had the support of

                                            Page 55

1         your -- your management team at that point?

2              A.   Yes.

3              Q.   All right.  Let me just pull up a few more

4         exhibits here and then we can take a break.

5              A.   Okay.

6              Q.   Let me show you what will be Exhibit 42.

7                   (Whereupon Exhibit 42 was marked for

8         identification, a copy of which is attached hereto.)

9         BY MR. BARNES:

10             Q.   And this is an Excel spreadsheet which

11        hopefully will load in your browser, but let me know if

12        you have any issues with it?

13             A.   I do have the -- I do see it.

14             Q.   So I'll represent to you that my

15        understanding is this is a chart showing the

16        performance of the various people on your team in 2018.

17             A.   Okay.

18             Q.   And you can see that there are -- if you look

19        in Column O, it has the Full Year Quota.

20                  You see that?

21             A.   Yes.

22             Q.   And then Column P is the Year to Date

23        Achievement, right?

24             A.   Yes.

25             Q.   And then Column Q is the Full Year

                                                      Page 56

1        Achievement Percentage, right?

2            A.   Yes.  Okay.

3            Q.   All right.  So if you look at -- Rows 2 and 3

4    are for you, the first half of 2018 showing your

5    primary and secondary elements.

6                 You see that?

7            A.   Yes.

8            Q.   And this shows that you were about 38 percent

9    of your primary achievement and about 71 percent of

10   your secondary element, right?

11           A.   Yes.

12           Q.   And is that your recollection of what your

13   achievement was for the first half of 2018?

14           A.   I can't say I remember.

15           Q.   Well, let me ask you this.

16                Do you remember hitting your quotas in 2018?

17           A.   No, I --

18           Q.   You didn't hit them in first half or second

19   half, right?

20           A.   Not that I recall.

21           Q.   Okay.  And then Rows 12 and 13 are your

22   primary and secondary elements for the second half of

23   the year.  Row 12 shows about 36 percent primary.  Row

24   13 shows about 58 percent secondary.

25                Do you remember whether those are about what

Page 57

1        you achieved?

2              A.    About right.   I can't -- I cannot -- yeah, I

3        cannot remember the exact percentage or the amount.

4              Q.    That -- that's fair.

5                    I mean, these are exact numbers from several

6        years ago, but does that sound about where you were?

7              A.    So sorry about the dog.

8              Q.    Don't worry about it.   We all understand.

9              A.    I suppose so, yeah.

10             Q.    Okay.   So you mentioned sort of -- the last

11       question and then we can take a break.   I wanted to ask

12       you about the challenges in 2018 that prevented you

13       from hitting your numbers, and you mentioned these --

14       these technical challenges with McKesson.

15                   Were there any other challenges that come to

16       mind that prevented you from achieving your quotas in

17       2018?

18             A.    I think I also was assigned to, I think it

19       was, Gap Incorporated, and I -- I picked up that -- if

20       I recall correctly, I picked up that account in 2018

21       only to find out that the customer had issues with our

22       install base, so I had to deal with that.

23                   And I'm trying to remember.   In 2018 I

24       believe I also picked up Costco, and Costco, I think

25       maybe one or two years prior to that, did buy something

1    from IBM.  And when I picked up the account they were

2    in the process of pulling them out, so I had to deal

3    with some situations there.

4              So -- so there were a few accounts that I had

5    in my territory at that time that were -- that had a

6    lot of challenges which directed my focus to ensure

7    that the customers are still happy and willing to

8    continue to work with IBM because they were not in a

9    position to acquire anything from IBM or they were not

10   willing to acquire anything from IBM.

11       Q.   Got it.

12            Would you agree that that happens from time

13   to time?  I mean, that's just part of sales?

14       A.   Yes and no.  Yes, generally you may have one

15   critical situation that lasts for a couple of months,

16   but in a case of McKesson, it lasted for like 11

17   months, 10 -- over 10 months.  I think I -- when I went

18   through some of the documents, you actually saw my

19   documentation of the critical situations that they had,

20   so there was like a 10-month effort.

21            So -- so yes, we do run into critical

22   situations because no product is perfect, but it's

23   unusual to have so many critical situations for such

24   long duration for one solution.

25       Q.   Did the issues with McKesson spill over into

                                              Page 59

1    2019?  Excuse me.

2        A.   Yes or no.  I have -- I don't recall that I

3    have McKesson in 2019 be- -- but the issue with

4    McKesson going from 2018 into 2019 was McKesson issue a

5    request for proposal for Cloud and Data Center

6    infrastructure solution, and IBM was not invited to

7    participate.

8             So my -- my role is to sell into Data Centers

9    on-prem only.  As -- as a result, 2019, once -- so once

10   IBM -- the bigger IBM -- because it -- it spills over

11   into the Cloud division, right?  The bigger IBM

12   realized that we did not -- we were not invited and

13   prevented from even participating in that RFP.

14            My understanding is we -- IBM knew that

15   McKesson wasn't going to be a large account it once was

16   or once had been going into 2019.  McKesson did

17   announce their partnership agreement with Google around

18   March 2019.

19       Q.   Got it.

20            And when you say "on-prem," I know what you

21   mean, but just for the record, explain to us what you

22   mean by "on-prem."

23       A.   On-prem means equipment or -- or, you know,

24   or systems or solutions that IBM sell that actually

25   sits in the customer's own Data Centers.  So it cannot

                                            Page 60

1    be anything that sit in a Cloud where -- whether it's

2    IBM Cloud or Amazon Cloud.  So -- so I only get revenue

3    credit if the customers actually purchase it and

4    install it at their location.

5         Q.   Right.

6              All right.  Let's go off the record.

7              (Brief recess taken.)

8         MR. BARNES:  Let's go back on the record.

9    BY MR. BARNES:

10        Q.   Ms. Leong, you -- you understand you're still

11   under oath?

12        A.   Yes.

13        Q.   And is there anything you feel like you need

14   to change or clarify about your testimony so far?

15        A.   None that I can think of.

16        Q.   Okay.  Great.

17             So I want to move into 2019 now, but before

18   we do, I want to clarify a couple of terms that I've

19   seen.  One of them is "pipeline."

20             Can you tell me what a pipeline is?

21        A.   Pipeline is essentially a list of potential

22   opportunities, accounts that you either have made a

23   connection with or without.

24        Q.   Okay.  And -- and so a pipeline would

25   essentially be a seller's view of what their potential

Page 61

1      opportunities are with various clients; is that right?

2          A.   Yes, with -- with different probability.

3          Q.   And you -- did you keep track of that

4      pipeline at IBM in -- in any sort of customer

5      management system?

6          A.   Yes.

7          Q.   What did you use?

8          A.   I used -- at that time IBM had the Sugar CRM,

9      and I also used my own spreadsheet.

10         Q.   Okay.  And I believe it was your

11     responsibility to go into the CRM and update your

12     pipeline with various opportunities, right?

13         A.   Yes.

14         Q.   And one of the things you had to update was

15     the potential size of the deal, right?

16         A.   Yes.

17         Q.   And you also had to update the, I'll call it,

18     level of certainty or level of risk with a potential

19     deal; is that right?

20         A.   Yeah, yes.

21         Q.   And what were the different levels of risk

22     that IBM used?

23         A.   Generally they are -- we -- we do use

24     something slightly every year but at a high level, like

25     identify, right, validate it, and then a couple levels

Page 62

1    that whether, you know, you -- it -- and oftentimes

2    that -- that is rep dependent, right?

3         So there's a couple levels whether you have

4    already delivered proposal, whether you have already

5    gotten a verbal all the way through, whether you have a

6    PO, right, and -- and then actually be able to ship and

7    do business.

8         So identify is sometimes really based on the

9    research on the account, on the -- on the company,

10   especially when it's new is, I think, right, based on

11   my research, they have a competitor's product in store,

12   and Michael Cosisco (phonetic) would place it, so that

13   could be a identify but not validated because you have

14   not made a connection with the customer yet; that,

15   indeed, that's an opportunity.

16        Q.   Seeing the words "stretch," "key stretch,"

17   "at risk," do you know what those mean?

18        A.   Yeah.  Stretch is -- well, usually stretch is

19   definitely opportunities that you already have

20   validated with the customer that they may be looking

21   for something, right, in the time frame that IBM -- our

22   commission period, right?  And also -- so -- so that's

23   stretch.

24        Key stretch is -- and it's also, you know,

25   base -- is also rep depen- -- dependent, right?  Where

Page 63

1       key stretch generally means to me -- meant to me was

2       customer -- the customer has not confirmed a buy from

3       anybody, but they are definitely looking for a

4       solution, right?

5              But then also time frame may or may not be in

6       the same commission period that we are -- we are

7       working towards, so those are usually key stretch,

8       right, because you already have confirmation that the

9       customer is, indeed, looking for a solution from

10      somebody.

11             Q.   And -- and what does "at risk" mean?

12             A.   At risk is usually you have gone all the way

13      through to delivering a proposal, and at a technical

14      level the customer said, "Yeah, you know, this is a

15      sound solution" and with -- shown interest of the -- of

16      the IBM solution.

17             So you essentially call that -- it's like a

18      call -- you know, calling a bet or something, right,

19      that, you know, there's a good chance of my closing it,

20      but it's not firm because you have not gotten any

21      purchase order or, right, anything like that from the

22      client, from the customer yet.

23             Q.   Got it.

24             So -- so stretch is the least certain, key

25      stretch is a little more certain, and at risk is more

                                                    Page 64

1      certain than that?

2          A.   Yes.

3          Q.   Is that right?

4          A.   That's right, yeah.

5          Q.   I wanted to make sure I got them in the right

6      order.

7          A.   Yes.

8          Q.   Okay.  So moving into 2019, Amy Buyarski

9      continued to be your first line manager at the start of

10     2019, right?

11         A.   I think she was acting at the start because

12     my understanding was that she relinquished her role as

13     the first line, but because we didn't -- the team did

14     not have a first line, so she was acting like an

15     interim until Todd could hire someone.

16         Q.   And eventually Sandra Florey became your

17     first line manager in July of 2019; is that right?

18         A.   Yes, something like that, yeah.  I --

19         Q.   So roughly Amy was your acting manager first

20     half of '19, and Sandra was your official manager

21     second half of '19?

22         A.   That's how I recall it, yeah.

23         Q.   Okay.  What was your impression of Ms. Florey

24     as a manager?

25         A.   She was a good manager.  She was very

```
1      analytical.  She was also very -- she's collaborative,
2      yeah.
3            Q.  Did you feel like Ms. Florey supported you in
4      your role?
5            A.  To the best that she could, because we both
6      learned about our roles eventually, my -- my role
7      eventually, yeah.
8            Q.  And Todd Stacy, we mentioned, became your
9      second line manager at the beginning of 2019; was that
10     right?
11           A.  That's what I recall, yeah, yes.
12           Q.  And he remained your second line manager
13     until your termination; is that right?
14           A.  Yes.
15           Q.  What was your impression of Todd as a
16     manager?
17           A.  He's very -- my impression of him at that
18     point is he was very focused on large deals and closing
19     them at that minute, yeah.
20           Q.  Do you -- do you think that was a bad thing?
21           A.  In general, not, especially if you were
22     working on one of those large deals.
23           Q.  Was -- do you think that Todd was a good
24     manager?
25           A.  I don't know how to answer that.  That --
```

Page 66

1    that -- like, it's -- it's very hard to define good or

2    not good.

3         Q.   Do you feel like Todd supported you in your

4    role?

5         A.   I didn't think so at that time.

6         Q.   Why not?

7         A.   Because my territories did not have very

8    large deals because they are not large customers.

9         Q.   And you felt like he was only focused on the

10   large deals on the -- on the team?

11        A.   That's -- just judging my -- judge -- you

12   know, based on my recollection on team calls, meaning

13   not -- usually not even just, you know, my immediate,

14   but including, you know, everyone who reported up to

15   Todd, the focus was usually just on the large deals.

16        Q.   Speaking of -- of meetings, did -- did you

17   ever have any in-person meetings with Todd?

18        A.   I had -- I believe I met him when we were

19   preparing for a -- when I was helping to prepare him

20   for a sales call to Costco early in the year, and then

21   we had a kickoff meeting for his entire team sometime

22   July, second half 2019.

23        Q.   An in-person kickoff meeting?

24        A.   Yes, an in-person kickoff meeting, yes.

25        Q.   Were most of your meetings by telephone or by

                                              Page 67

1      video with -- with Todd?

2           A.   By telephone, yes.

3           Q.   What about with Amy and with Sandra?  Were

4      most of your meetings with them by video or telephone?

5           A.   By telephone, yes.

6           Q.   And eventually in 2019 -- I mean in 2020

7      Robert Cortez became your first line manager, right?

8           A.   Yes.

9           Q.   Did you have -- were most of your meetings

10     with Robert by video or telephone?

11          A.   It was always by telephone.

12          Q.   What was your impression of Robert as a

13     manager?

14          A.   I -- I can't -- I mean, he was only my

15     manager for a very short period of time, so I can't say

16     I have a really good -- I mean, a complete assessment

17     of how he was because I was -- yeah, I was conducting

18     the sales activities that, you know, that as a

19     teammate, you know, we all agreed on -- on, right, the

20     best approach.  So I cannot really say whether, you

21     know, what -- I don't have a -- an assessment of him as

22     good or not good.

23          Q.   Okay.  That's fair.

24          A.   Yeah.

25          Q.   Do you know whether any of these managers,

                                        Page 68

1    Todd, Sandra, Amy, or Robert, whether any of them knew

2    how old you were?

3        A.    Oh, yes, I do know they knew how old I was.

4        Q.    How do you know that?

5        A.    Because my 35th anniversary was announced to

6    a lot of people, yeah.

7        Q.    So they knew you had been with the company

8    for 35 years, but do you know whether they knew how old

9    you were?

10       A.    I think -- this is my -- right?  I think they

11   have an idea they -- they knew that I went to college.

12       Q.    And then that you had been with the company

13   for 35 years?

14       A.    Exactly, yes.

15       Q.    How old were you in relation to the other

16   sellers on your team?

17       A.    Judging from the experience that I've heard

18   from them, I thought we were about the same age.  Maybe

19   a couple of them maybe have more experience than I do.

20       Q.    Got it.

21            Were you ever -- going back to Todd Stacy,

22   were you ever interviewed by Human Resources related to

23   Todd or any of the complaints about Todd?

24       A.    Yes, I -- yes.

25       Q.    When was that?

1          A.   Now I cannot remember.

2          Q.   Was it 2019 or 2020?

3          A.   I believe it was -- I -- I recall -- well, at

4     least I recall -- I think I recall it was 2019.

5          Q.   Okay.

6          A.   Yeah.

7          Q.   Do you know why you were being interviewed?

8          A.   So I -- I received, I cannot remember,

9     whether a phone call or email from Human Resources

10    asking to set up a time to talk with me.  I didn't know

11    what that was.  And when the Human Resource person came

12    on, she said just, "I just want to let you know that

13    the reason we're interviewing you, because you are one

14    of the senior members on his team, so we value your

15    feedback on the complaint that has -- that is out there

16    against Todd."

17         Q.   But -- but you don't know what that complaint

18    was?

19         A.   The only thing that I heard from the

20    Human Resource person is about Todd's conduct in

21    meetings and -- and -- and -- yeah, in -- in

22    interaction with other employees.  I think that's

23    the -- that was the very summarized, you know, reason

24    that -- that I was given, yeah.

25         Q.   Who interviewed you?

Page 70

1      A.   I cannot remember her name.

2      Q.   Do you recall what you told that person about

3  Todd?

4      A.   I -- I recall -- I seem to recall what I told

5  him was my observation of Todd was also usually in a

6  big meeting, right?  I did not have a lot of

7  one-on-ones with him because I -- I -- you know, I --

8  my accounts were not the bigger accounts.

9        So my observation with him was I did not

10  notice that he was confrontational or anything like

11  that, and I think I might have said that, you know,

12  I -- I'm not sure I can -- I said, "Todd is an intense

13  person, and partly because he's passionate about

14  selling, so it -- I can vouch for how he conducted in

15  other settings, but I did not observe anything."

16        I think that's what I said about Todd because

17  I really did not have a whole lot of one-on-one

18  interaction with Todd to -- to warrant my experience

19  or -- or observation or further observation.

20      Q.   Got it.

21        Okay.  Going back to the 2019 performance,

22  let me show you -- first, let's take a look at

23  Exhibit 44, which is another Excel spreadsheet.

24      A.   Okay.

25        (Whereupon Exhibit 44 was marked for

Page 71

1      identification, a copy of which is attached hereto.)

2      BY MR. BARNES:

3          Q.    And there's two tabs, one for first half of

4      '19, one for second half of '19.  I want to look at the

5      first half of '19 first.

6          A.    Okay.

7          Q.    So similar to the other spreadsheet we looked

8      at, Column O shows the Quota, right?

9          A.    Okay.  Please bear with me.  Let me scroll.

10         Q.    Oh, sure.

11         A.    Yeah, mine shows up at the bottom corner.

12     Okay.

13         Q.    Yeah, you may need to scroll up and over.

14         A.    Yeah.

15         Q.    So Column O shows the Full Year Quota, right,

16     or I guess the Quota for the first half of '19, right?

17         A.    Yes.

18         Q.    Column P shows the -- the Achievement for

19     Each Person, right?

20         A.    Yes.

21         Q.    And then Column Q shows the Percentage

22     Attainment, right?

23         A.    Okay.  Okay.  Yes.

24         Q.    And then if you look at Lines 2 and 3 on the

25     first half-tab, and it shows that you got about 42 and

                                                    Page 72

1    a half percent of your primary element and about

2    30 percent of your secondary element in the first half

3    of 2019.

4              This is what it shows here, right?

5        A.   Line 2?

6        Q.   Lines 2 and 3.

7        A.   My Line 3 says it's Don.

8        Q.   Says what?

9        A.   Says it's Don.  The employee name is

10   Don Custardo.

11       Q.   Oh, I'm looking at the first half.  There's

12   two tabs.

13       A.   Oh, sorry, yes.

14       Q.   No, that's okay.  That's okay.

15            So on the first half of '19 tab, you should

16   be at Lines 2 and 3.

17       A.   Okay.

18       Q.   Do you see that?

19       A.   Yes.

20       Q.   Okay.  And Line 2 shows about 30 percent

21   achievement on your secondary, and Line 3 shows about

22   42 and a half percent achievement on your primary,

23   right?

24       A.   Yes.

25       Q.   Is that your recollection of about what your

Page 73

1      achievement was in the first half of '19?

2           A.   I cannot remember the exact number, but I do

3      remember that I did not meet my quota.

4           Q.   Okay.  What -- what challenges did you face

5      in the first half of '19 that kept you from hitting

6      your quota?

7           A.   So there were a couple of large accounts,

8      like McKesson and Costco, that I had in 2018.  But then

9      in -- if I recall correctly, in first half of 2019 they

10     were not officially assigned to me, but I had to work

11     it because there was -- well, definitely no one was

12     working McKesson, so I had to cover the account like I

13     were -- I was the sales rep.

14          And then Costco was transitioned to

15     Coberen Brock, I think.  Yeah, I remember it was

16     Coberen.  He was new to IBM, so I had to work with him

17     for quite a few months to transition him, going to meet

18     with customers up in Issaquah, Washington, you know,

19     quite a few times.

20          So I would have to say that hindsight 20/20,

21     maybe I shouldn't have worked on those -- helped with

22     those accounts that much, but they were large IBM

23     accounts, so -- and I had them the previous year and I

24     wanted to not lose that momentum for -- on behalf of

25     IBM.

                                                    Page 74

1       Q.  And so you don't know if those accounts were

2  officially --

3       A.  I know they were not, right.  They were not

4  assigned to me, but McKesson, there was no rep assigned

5  to it, so I -- I covered it.  I had to cover the

6  account partly because there was no one covering it and

7  partly because the customer -- it was announced to the

8  customer that I was no longer a rep and the customers

9  continued to call me, and then my manager asked me to

10  just continue to support them.

11       Q.  Who assigned your accounts in 2019?

12       A.  At the beginning of the year, I believe -- so

13  Amy helped, right, because there was no first line

14  manager, if I remember correctly, so Amy was the

15  interim, and so she helped all the account assignment

16  and -- and, you know, and then gave it to Todd to

17  decide.

18       Q.  Okay.  All right.  Let's look at the 2H 2019

19  tab.

20       A.  Okay.

21       Q.  And this one you were Line 2.

22       A.  Yes.

23       Q.  It shows quota of 2 and a half million,

24  achievement of about 427 and a half thousand, and

25  percentage achievement of about 17 percent, right?

Page 75

1          A.    Yes.

2          Q.    And is that your recollection of what your

3    achievement was in the second half of 2019?

4          A.    Same.  I don't recall the exact number, but I

5    do recall that I did not hit my number.

6          Q.    And in the second half of 2019, you were in

7    what's called a -- a DES Hunter role, right?

8          A.    Yes.

9          Q.    Was anybody else on your team in that

10   DES Hunter role?

11         A.    No, not on my immediate team, no.

12         Q.    Were any of the people listed on this 2H 2019

13   tab in that role?

14         A.    I don't believe so.  I don't think so, no.

15         Q.    What was the DES Hunter role?

16         A.    I think they were created in second half of

17   2019 to focus on the software portion of the IBM

18   storage solutions and -- and only a subset of the --

19   the software portfolio.  The reason for that, my

20   understanding is IBM believed at that time that subset

21   of software solution, we have -- we might have

22   competitive edge that we could potentially go out there

23   to displace our competitors, strictly from a software

24   perspective.

25         Q.    Okay.  Do you know why you were chosen for

                                                    Page 76

1     that role?

2          A.   No, I don't.

3          Q.   Do you know who chose you for that role?

4          A.   No, I don't.

5          Q.   So if you would look at what I've pulled up

6     as Exhibit 7.

7          A.   Okay.

8          Q.   And it's 7 because we marked it in a prior

9     deposition as Exhibit 7.

10         A.   Oh, okay.  That's fine.

11         Q.   And this is an email from Sandy Florey to

12    Ginni, Laura, you, Dan, Don, and Robert, right?

13         A.   Okay.  Yes.

14         Q.   And it's dated November 1, 2019, right?

15         A.   Yes.

16         Q.   And it says "As most of you know, the

17    Distributed Enterprise Storage DES Hunter role, filled

18    by Nelly and Don on our team, was put in place in July

19    of this year to drive more business in the

20    distributed/competitive space."

21              Did I read that correctly?

22         A.   Yes.

23         Q.   Okay.  So this suggests that Don Custardo was

24    also in that role, right?

25         A.   Yes.

Page 77

1      Q.   And does -- so does this refresh your

2   recollection about whether anyone else on your team was

3   in that role?

4      A.   No, because otherwise Don and I would have

5   strategized more.

6      Q.   So do you know whether Don was in that role

7   or not?

8      A.   I don't recall.

9      Q.   Okay.

10     A.   Yeah.

11     Q.   Now let me ask you to take a look at

12   Exhibit 8 --

13     A.   Okay.

14     Q.   -- which is a slide that describes the

15   DES Hunter role, and I just want to ask you to take a

16   look at it and let me know if that's consistent with

17   your understanding of what the role was.

18     A.   For the most part.

19     Q.   Okay.  Is there anything in here that stands

20   out as -- as inaccurate to you?

21     A.   First off, I don't recall receiving this,

22   so -- so sorry that I took a while to read it --

23     Q.   No, that's okay.

24     A.   -- or receiving this when I was assigned this

25   role.

Page 78

1          So one is, I didn't have a -- I didn't have

2      12 to 15 accounts, not that I recall.  The other that

3      stands out is -- is -- I think there was one bullet

4      that says, you know -- oh, "DES Hunters are not

5      overlay."

6          That -- so my understanding of overlay

7      with -- with IBM throughout the years is you're overlay

8      when you're not the primary seller, whatever the

9      product line is on the account, right?  And DES are

10     never the primary.  So you may go in and do your best

11     to sell a solution, but you're not the primary seller,

12     so -- so that's one thing that maybe -- my definition

13     is I was an overlay, my understanding also.

14         The other thing is -- is, I wasn't free to

15     hunt, because while I am responsible to set a strategy,

16     my strategy has to support the primary seller's

17     strategy because I could not create a strategy that may

18     jeopardize any relationship, any potential

19     opportunities.  So essentially the left hand has to be

20     working with the right hand or with -- I wasn't

21     hunting.

22         Q.   So were you allowed to call on accounts

23     directly?

24         A.   I am allowed after having kind of strategy

25     planning sessions with the primary seller that the

                                             Page 79

```
 1      areas that -- at least for me, right, the areas that I
 2      could go focus on because -- first, if it fits within
 3      my portfolio, right, and then IBM has no penetration
 4      there.
 5              And then also it is distinct enough that I
 6      can go call on without confusing the -- the customer
 7      because, you know, typically you don't want to have
 8      multiple people calling on the customers for multiple
 9      things, right?  You want to have IBM, we call it,
10      single flow-to chart, so you try to have a same -- the
11      primary one-on-one type of relationship built.
12              So when I was, you know, under, you know,
13      careful planning with the primary rep, right, then I
14      would get, okay, these are the customers I don't call
15      into and this is an area that we have no install base,
16      and -- and it -- it is distinct enough that, you know,
17      you can go there, that kind of arrangement.
18          Q.   And was that the same for all of the
19      DES Hunters?
20          A.   That, I would not know.
21          Q.   What about overlay distinction you mentioned
22      earlier?  Was that the same for all DES Hunters?
23          A.   I would think that people who have been with
24      IBM for, you know, a few years, that would be their
25      understanding.
```

Page 80

```
1              Q.   Did -- how many DES Hunters were there?  Do
2      you know?
3              A.   I don't.
4              Q.   Did your accounts change when you became a
5      DES Hunter?
6              A.   Yes, completely.
7              Q.   Are you sure about that?
8              A.   Well, there might have been one or two that
9      I -- I had them before, but I'm no longer their primary
10     storage rep.
11             Q.   Was McKesson still one of your accounts when
12     you were a DES Hunter?
13             A.   No.
14             Q.   All right.  Let me pull up a document here.
15     Give me one second.
16             A.   Okay.
17             Q.   Actually, I'll -- I'll circle back to that.
18             A.   Okay.
19             Q.   In the interest of time, we can circle back
20     to that piece.
21             A.   Okay.
22             Q.   So are there any other ways other than what
23     you've mentioned to us how your job duties changed when
24     you became the DES Hunter?
25             A.   What do you mean by that?
```

Page 81

1       Q.    Well --

2       A.    Siri thinks that I was asking her a question.

3   Sorry.

4       Q.    No, that's okay.

5             You mentioned that you were no longer the

6   primary --

7       A.    Correct.

8       Q.    -- when you were a DES Hunter, right?

9       A.    Yes.

10      Q.    How did your job duties change as a result of

11  that?

12      A.    You -- I suppose the difference is you are

13  not the -- I was no longer responsible the -- for the

14  account relationship, right, you know, the general

15  coverage.  So my understanding of the job was it's

16  almost like there's a fire.  You go in, you put out the

17  fire, and then you go out, that -- that kind of

18  arrangement, and then -- then you kind of strategize

19  with another primary seller whether there could be a

20  potential fire that you can go fight.

21      Q.    Okay.  Do you think the DES Hunter role

22  required a different skillset than your prior role?

23      A.    Not a different skillset but a different

24  account coverage mile.

25      Q.    What do you mean by that?

Page 82

1        A.    So when -- before there were DES, right, we

2    always -- we always just had one storage seller on an

3    account, and the storage seller would know when to

4    engage in SME.  Usually those are folks from the

5    development labs, right, to prep for the opportunity so

6    you know how to orchestrate all the activities that

7    need to happen at the account to make sure that you can

8    balance the opportunities and also, right, handle all

9    the customer relationships.

10            With a DES, you're assigned to the account,

11    but not as a primary, and if I were to call in an SME

12    and my -- my cadence, right?  So for instance, my

13    cadence, I need to have a cadence with the primary

14    storage rep, right?  So a cadence is kind of like a

15    weekly, you know, opportunity review.  So -- so that

16    coverage model is different because I was told that I

17    was free to go hunt, but I wasn't.

18            Like, I'll give you an example.  At one of

19    the accounts, right, I was told to go work on a

20    replacement opportunity, but then there was a mainframe

21    opportunity that is going up and down and there's other

22    tapes that will support the mainframe in Rymon

23    (phonetic).

24            So maybe after a couple of weeks, you know, I

25    was advised to pause, right, on my -- on my activities

                                              Page 83

1    because IBM could not jeopardize the mainframe

2    opportunity because mainframe usually is large deals --

3    large deals.  So, you know, that's kind of -- you know,

4    so when you have to -- the -- the coverage model is a

5    little bit -- was a little bit confusing, right?

6         Q.   Okay.

7         A.   Yeah.

8         Q.   I think I'm following you there.

9         A.   Yeah.

10        Q.   And -- and DES stands for Distributed

11   Enterprise Storage; is that right?

12        A.   Yes.

13        Q.   Was that a particular type of product or set

14   of products at IBM?

15        A.   Just a subset of the storage portfolio, yeah.

16   And -- and I was wrong that it did have the flash

17   system only because the soft- -- the software that we

18   had on bundle to sell as a software solution is already

19   embedded in the flash storage.

20             So for that particular hardware set, IBM did

21   not -- could not unbundle it, so we were allowed to

22   sell the flash system because it has the software

23   solution embedded.

24        Q.   Okay.

25        A.   Does that make sense?

Page 84

1          Q.    Yeah, I see what you're saying.

2          A.    But we could still also sell that software,

3    right, by itself, so it's a software solution that we

4    could sell -- I could sell by itself.  But because it's

5    embedded into the flash hardware, so I could sell that

6    whole thing because the software was embedded.

7          Q.    Yeah.

8          A.    Yeah.

9          Q.    So -- so when you took on this DES Hunter

10   role, someone -- who took over your -- the

11   responsibilities you had been performing in the first

12   half of 2019?

13         A.    They were just assigned to everyone else.  I

14   don't -- let's see.

15         Q.    Just split up among the teams?

16         A.    Yeah, just split up among the teams, yeah.  I

17   think McKesson might have gone to someone new at IBM,

18   Ginni, but I think she's -- so yeah, they were just

19   split up to the -- to my team.  And -- and I believe

20   there might have been a handful that IBM deemed to be

21   lost cause.  We just didn't assign anyone to cover

22   them.

23         Q.    Got it.

24               You said you think it went to Ginni?

25         A.    Ginni, yeah, Ginni Roth, I think, Virginia,

                                              Page 85

```
1        Virginia Roth.  I think McKesson went to her.
2           Q.   How -- do you know how old Ginni is?
3           A.   I don't.  I mean, like I said, you know, we
4     have training and experience.  I think she had worked
5     with -- worked for EMC or different places, so we -- we
6     thought we were about the same age, yeah.
7           Q.   Got it.
8           A.   At least I thought we were the same age,
9     yeah.
10          Q.   Got it.
11          A.   Yeah, around there.
12          Q.   Did you agree with the move to the DES Hunter
13    role?
14          A.   Yes.  I mean, Pat asked me, right, and he
15    said, "Nelly, you've got to do this.  You're the best I
16    have."
17               I said, "Okay."  I'm always a team player, so
18    if -- you know, if Todd needed someone to fill the
19    position, I wasn't going to say, "Oh, no.  You know, go
20    find someone else," especially, you know, I didn't -- I
21    didn't know much about what a DES would be doing, but I
22    just look at that as a challenge, right, you know, to
23    continue to grow my career, right?
24          Q.   Got it.
25               Do you know whether others performed well in
```

                                                    Page 86

1   the DES Hunter roles, other DES Hunters?

2       A.   When I started joining the bigger DES

3   team calls later on in the year, I heard that a lot

4   were struggling for similar reasons that I had.  And

5   also I recall that there were a lot of people

6   complaining about that subset of portfolio, because

7   sometimes when you go out to sell solution, right --

8   for instance, if you go out and sell, you know,

9   something, then you don't back it up, right, such as

10  something, a backup solution, then you're not doing the

11  customer the full service.  But we didn't have certain

12  things in our portfolio, so -- so I did hear others,

13  yeah, struggling too.

14      Q.   Do you think that the DES Hunter program was

15  flawed from the start?

16      A.   I think it was not -- my -- this is my

17  opinion.  I don't think it was well thought out, right?

18  And it might have been executed too prematurely.

19          I know I, along with other DES, have provided

20  a lot of feedback and suggestions back to -- you know,

21  to -- to the program to alter it, to change it up.  So

22  yeah, I --

23      Q.   Do you think that -- well, let me ask you,

24  who created the program?  Do you know?

25      A.   That, I don't know.

Page 87

1          Q.    Do you think that the program was created

2     intentionally to fail?

3          A.    I don't believe so.

4          Q.    Presumably they were hoping it would result

5     in a lot more revenue, right?

6          MR. WILLIAMS:  Objection to the form.

7               You can answer.

8          THE WITNESS:  I don't know what the intention was

9     since I -- you know, I don't know who created it.

10    BY MR. BARNES:

11         Q.    That's fair.  That's fair.

12              But you don't have any reason to believe that

13    the program was just set up to fail intentionally from

14    the start, do you?

15         A.    In my opinion, I would hope not.

16         Q.    Okay.  I just introduced Exhibit 45.  If you

17    could take a look at it.

18         A.    Yeah.

19              (Whereupon Exhibit 45 was marked for

20    identification, a copy of which is attached hereto.)

21    BY MR. BARNES:

22         Q.    This is an email from Amy to Laura Cook.

23              Who's Laura Cook?

24         A.    Laura Cook was one of the primary storage

25    reps.

                                              Page 88

1      Q.   Okay.  And so this email from Amy to Laura is

2   dated July 18, 2019, right?

3      A.   Uh-huh.

4      Q.   Yes?

5      A.   Yes, that's what I'm reading too, yes.

6      Q.   And the subject says "Nelly DES rep coverage

7   account list," right?

8      A.   Oh, no.  I'm sorry.  Laura Cook.  Laura Cook.

9   Who is Laura Cook?  I was thinking about a -- my peer

10  who was also Laura.  I have a peer who was Laura, but

11  then she left IBM.  That's Laura somebody else, not

12  Laura Cook.  Laura Cook, I think, was an executive.

13     Q.   It's fine if you don't know.

14     A.   Yeah, I don't know.

15     Q.   Okay.

16     A.   The name just sounds familiar.

17     Q.   Sure.

18     A.   Yeah.

19     Q.   The subject of the email is "Nelly DES rep

20  coverage account list," right?

21     A.   Yes.

22     Q.   And it lists a number of accounts here, and

23  I'm -- are these the accounts that you had while you

24  were a DES Hunter?

25     A.   No.  I think that was changed also.  This --

Page 89

```
 1      this list was changed because I know I did not have --
 2      I'm trying to remember.  I -- I -- it's not the same
 3      list.
 4          Q.   Do you know which of these accounts you did
 5      have when you were a DES Hunter?
 6          A.   I remember American Airlines.  I remember
 7      Pepsico, JC Penney, Arrow Electronics, Avnet, Nestle,
 8      Station Casinos.  I might have Shutterfly too.
 9          Q.   But you don't think you had McKesson?
10          A.   I don't remember if I had McKesson, because I
11      know I wasn't a primary rep.  If -- I cannot remember.
12      I -- you know, I -- they might have left McKesson on my
13      account list because I have to maintain continuity.
14      And I believe because there's a new rep on McKesson, I
15      cannot -- I think it was Ginni who got assigned to --
16      to McKesson.
17              So they were trying to maintain continuity so
18      that my name is still, you know, seen by the -- by the
19      customers, right?  "Oh, she's still on the account,
20      right?"  So I think I -- I might still have McKesson.
21      I'm sorry.  I had this account for so long, all the
22      years kind of, like, all mesh together.
23          Q.   So you don't -- you don't know whether you
24      still had McKesson when you were a DES Hunter?
25          A.   I don't remember whether I still -- I -- I --
```

Page 90

1        I must have it, but it wasn't -- but it -- it was an

2        account that the primary asked to be involved because I

3        had very little interaction with them.  I think the

4        only thing that I had -- I did with McKesson towards

5        the end of 2019 was I might have talked to the CIO or

6        something, and that's it.

7            Q.   So did you have any opportunities at McKesson

8        when you were a DES Hunter?

9            A.   That I was supposed to, like, act as a DES --

10           Q.   Right.

11           A.   -- person?

12                Yeah, no, I did not.

13           Q.   All right.  Let me show you the next exhibit.

14           A.   Okay.

15           Q.   Let's do it this way.  We're going to have to

16       go through a couple of steps here because I've got the

17       emails and then the attachments to the emails.

18           A.   Okay.

19           Q.   So we'll start with Exhibit 46 --

20           A.   Okay.

21           Q.   -- which is an email from Philip Weed.

22           A.   Uh-huh.

23                (Whereupon Exhibit 46 was marked for

24       identification, a copy of which is attached hereto.)

25       ///

Page 91

```
1          BY MR. BARNES:

2               Q.   Who's Philip Weed?

3               A.   I learned that he was managing the DES team.

4      Like -- so the DES is supposed to still report to the

5      storage sales manager, but he's almost -- he's almost

6      like a program manager, right?

7               Q.   Like a dotted line?

8               A.   Dotted line, yes, yeah.

9               Q.   Got it.

10                   And so in this email he is saying -- you see

11     he says "Many of the opportunities listed within your

12     market's pipeline that show up under either your DES

13     Sales Hunter or DES CTS Hunter are opportunities from

14     their previous roles and are not products that the team

15     currently sells."

16                   Do you see that?

17               A.   Uh-huh.

18               Q.   And then attached to it, if you scroll

19     down --

20               A.   Okay.

21               Q.   -- you can see right above the signature line

22     there's a -- an attachment called "DES Hunter Pipeline

23     Road Map."

24               A.   Okay.

25               Q.   Do you see that?
```

Page 92

1          A.    Uh-huh.

2          Q.    "As of 9/12/19."

3                You see that?

4          A.    Yes.

5          Q.    Okay.  So now I'm going to introduce that

6     attachment --

7          A.    Okay.

8          Q.    -- which is an Excel spreadsheet.

9                (Whereupon Exhibit 47 was marked for

10    identification, a copy of which is attached hereto.)

11    BY MR. BARNES:

12         Q.    You should be able to see it now.

13         A.    Is that 47, Exhibit 47?

14         Q.    Yes, it is.

15         A.    Okay.

16         Q.    And there's two tabs.  There's a 3Q Pipeline

17    and a 4Q Pipeline.

18         A.    Uh-huh.

19         Q.    And if you go to the 3Q Pipeline tab in

20    Row 90, let me know when you're there.

21         A.    Yes, I'm there.

22         Q.    Row 90 through -- 90 through 93 are listed as

23    you're the opportunity owner and the customer is

24    McKesson.

25         A.    Yes.

Page 93

1          Q.   So were these DES opportunities or were these

2     left over from your prior role?

3          A.   They were left over from my prior role.  I

4     think that's how I read it from Phil's too --

5          Q.   Okay.

6          A.   -- the email, yeah.

7          Q.   So if you go to Column P.

8          A.   P.  Okay.

9          Q.   The opportunity name for these opportunities

10    is MMS JDE upgrade.

11         A.   Uh-huh.

12         Q.   What does that mean?

13         A.   Oh, MMS is McKesson Medical Solutions.  This

14    is -- this is one of the divisions that sell to

15    hospitals, clinics, you know.

16         Q.   Okay.

17         A.   Yes, they -- McKesson's a medical equipment

18    supply distributor.

19         Q.   Yeah.

20         A.   So this particular division, they sell to

21    hospitals and clinics.  And JDE is -- is a software

22    package, JD Edwards --

23         Q.   Okay.

24         A.   -- that Oracle owns, I believe, yeah.

25         Q.   And then if you go to Column AA for Brand

                                              Page 94

1      Code Description --

2           A.   Uh-huh.

3           Q.   -- it says -- for these opportunities which

4      are Lines 90 through 93, it says "System Storage

5      Hardware," "Flash Systems," "System Storage Hardware,"

6      and "System Storage Hardware."

7                Are those DES products?

8           A.   I would have to -- so the first one, if you

9      look at AC, that says "Switch," that is --

10          Q.   Yeah.

11          A.   -- a -- that either could be a bouquet -- or

12     not bouquet -- yeah, Cisco (phonetic) or (inaudible),

13     that's not.  The second one, Flash System, that is the

14     system that has the embedded software.

15          Q.   So is that DES?

16          A.   Potentially, yes.  Yes, I believe that is.

17     The next two, I don't believe so.  Maybe -- hold on.

18     93 maybe.  It's a virtualized software.

19          Q.   Okay.  So some of these opportunities might

20     be DES, but some of them are not.

21               Is that what you're saying?

22          A.   Right, yes.

23          Q.   Did you sell anything, any DES products to

24     McKesson in second half of 2019?

25          A.   I believe we got some flash.

                                                    Page 95

1      Q.   Okay.

2      A.   So I was in a support role to the primary

3    rep.

4      Q.   Okay.  So you did have some DES opportunities

5    with McKesson in the second half of '19?

6      A.   I -- I think it's second half of '19.  I -- I

7    can't remember whether -- I can't remember whether I

8    had McKesson on my DES road map -- I mean territory,

9    but if I had, I knew that we -- we closed the -- "we,"

10   meaning IBM, closed a few flash storage out there.

11     Q.   Okay.  And I assume you would not be able to

12   tell on this exhibit for other reps which were and were

13   not real DES opportunities?

14     A.   No, I cannot.  And as a matter of fact, I

15   never got this.

16     Q.   Okay.

17     A.   Yeah, I -- I did not even knew Phil existed

18   until maybe, like, October time frame or November time

19   frame.

20     Q.   Got it.

21          All right.  Let's take a look at the next

22   exhibit, which is Exhibit 48.

23     A.   Okay.

24          (Whereupon Exhibit 48 was marked for

25   identification, a copy of which is attached hereto.)

                                              Page 96

1           THE WITNESS:  Okay.

2     BY MR. BARNES:

3           Q.   This is another email from Philip Weed dated

4     December 9, 2019, right?

5           A.   Uh-huh.

6           Q.   Yes?

7           A.   Yes.  Yes.  Sorry.

8           Q.   No, that's okay.  I'm not trying to be rude.

9     I'm just trying to --

10          A.   No, no.  I forgot to say -- not "uh-huh."  I

11    was too busy reading.

12          Q.   It looks like you were copied on this email,

13    if you look.

14          A.   Yes, I see my name there, yes.

15          Q.   And he says "Team, this will be our last call

16    for 2019," right?

17          A.   Yes.

18          Q.   Did -- were you having periodic calls with

19    the DES Hunter team to talk about the -- the progress

20    and how people were doing?

21          A.   Yes.  Once I got connected to it, yes.

22          Q.   That role went away at the end of 2019,

23    right?

24          A.   Yes.

25          Q.   Do you know why it went away?

                                              Page 97

```
1              A.    I -- I -- I don't know the specific reason.
2        I only heard rumors.
3              Q.    What did you hear?
4              A.    It was not successful.
5              Q.    Did you have a sense whether any of the
6        hunters were successful in their role, if you know?
7              A.    I don't know.
8              Q.    Okay.
9              A.    I don't know.
10             Q.    Okay.  You see that he has attached to this
11       email something called the DES Hunter Pipeline Road Map
12       as of 12/5/19.
13                   You see that?
14             A.    12/5/19.  Okay.  Let me -- yes, uh-huh.
15             Q.    Okay.  So I am going to attach or -- or
16       introduce that attachment as Exhibit 49 --
17             A.    Okay.
18             Q.    -- which is -- okay.
19                   (Whereupon Exhibit 49 was marked for
20       identification, a copy of which is attached hereto.)
21       BY MR. BARNES:
22             Q.    You should be able to see it now.
23             A.    Okay.
24             Q.    So you did receive this attachment, right?
25             A.    Yes.
```

Page 98

```
 1                    Are we looking at 4Q or 1Q?
 2          Q.    Let's look at 4Q.
 3          A.    Uh-huh.
 4          Q.    There are for you -- oops.
 5                Do you -- did you have any opportunities in
 6      the fourth quarter that you recall?
 7          A.    Yeah.  Yeah, I have identified
 8      opportunities --
 9          Q.    Yeah.
10          A.    -- American Airlines, Costco, Amazon.
11          Q.    And you've also got some more McKesson on
12      here, right?
13          A.    On 4Q?
14          Q.    Yes.
15          A.    Oh, okay.  Now I --
16          Q.    If you look at Lines 94 and 95.
17          A.    Yeah, my apologies.  I was looking at 1Q.  I
18      thought I changed the tab, but --
19          Q.    That's okay.
20          A.    Yeah.
21          Q.    So do you see Lines 94 and 95 on 4Q?
22          A.    Yes.  Yes.
23          Q.    So those are more opportunities for McKesson,
24      right?
25          A.    Yes.  So I did have McKesson.
```

Page 99

1        Q.   You still had -- you still had some

2   opportunities for McKesson in -- in 4Q --

3        A.   Yes.

4        Q.   -- of 2019?

5        A.   Yes.

6        Q.   And then to your point, you also had some

7   opportunities in 1Q of 2020 for American Airlines and a

8   couple of other clients, right?

9        A.   Right.  They -- they -- early in the sale

10  cycle, yeah.

11       Q.   Do you know whether those ever closed?

12       A.   That, I don't know.

13       Q.   Okay.

14       A.   I can -- I can tell you that Costco, Amazon,

15  they were never closed.

16       Q.   Okay.  Okay.  So it does -- it does look like

17  you still had McKesson in the second half of 2019.

18       A.   Yes, that looks right, yes.  Thank you.

19       Q.   So if we go back to Exhibit 44.

20       A.   44.  Okay.

21       Q.   And you look at the -- this is the 2019

22  achievement results for your team.  If you look at the

23  2H 2019 tab.

24       A.   Uh-huh.

25       Q.   We already looked at you.  You're -- you're

Page 100

1        Line 2, right?

2            A.   Yes.

3            Q.   And then Line 3 is Don Custardo, right?

4            A.   Yes.

5            Q.   And it looks like he -- his achievement was

6        about $2.3 million.

7                 You see that?

8            A.   I see that, yes.

9            Q.   And you said you don't know whether he was a

10       DES Hunter or not?

11           A.   I -- I do not recall, but then, you know, it

12       says he is here, yes.  Oh, well, I -- I guess he is.

13       I -- I don't know.  I cannot tell from this

14       spreadsheet.

15           Q.   Okay.  That's fair.

16           A.   Yeah.

17           MR. BARNES:  All right.  Let's go off the record.

18           THE WITNESS:  Okay.

19                (Lunch recess taken.)

20           MR. BARNES:  We are back on the record after a

21       short lunch break.

22       BY MR. BARNES:

23           Q.   Ms. Leong, you understand you're still under

24       oath?

25           A.   Yes.

Page 101

1      Q.   And is there anything you want to change or

2   clarify about your testimony so far?

3      A.   Nothing that I can think of, no.

4      Q.   Okay.  Great.

5           So let me ask you to take a look at

6   Exhibit 50, please.

7      A.   50.  Okay.

8      Q.   Yes.

9           (Whereupon Exhibit 50 was marked for

10   identification, a copy of which is attached hereto.)

11   BY MR. BARNES:

12      Q.   And I apologize again for jumping around.

13   We're going to go back to the first half of 2019.  I

14   got a little distracted on the DES Hunter conversation,

15   but now I'm going to talk a little bit about the first

16   half.

17      A.   Okay.

18      Q.   So this document is entitled "Q2 2019 QBR."

19      A.   Okay.

20      Q.   What is a QBR?

21      A.   Quarter -- Quarterly Business Review.

22      Q.   Okay.  And is this a document that you would

23   have created?

24      A.   It looks familiar, yes.

25      Q.   It's date- -- it's dated April 4, 2019,

                                                    Page 102

```
 1        right?
 2              A.    Yes, that's --
 3              Q.    And is this something that you would review
 4        with your managers each quarter?
 5              A.    Yes.
 6              Q.    Okay.
 7              A.    Only as requested, yeah.  It's not a
 8        requirement.
 9              Q.    Got it.
10                    So if you go to the second slide.
11              A.    Uh-huh.
12              Q.    It says "Territory Overview," right?
13              A.    Yes.
14              Q.    "Six Accounts," and then it's got the first
15        three accounts listed here, right?
16              A.    Yes.
17              Q.    And were those three accounts in your
18        territory in the first half of '19?
19              A.    Yes.
20              Q.    Okay.  And then go to Slide 3.  There are
21        three more accounts, Gap, Ingram Micro, and McKesson,
22        right?
23              A.    Yes.
24              Q.    So those three accounts were also in your
25        territory in the first half of '19?
```

Page 103

1          A.    Yes.

2          Q.    Okay.  And under McKesson there's a bullet

3     that says "Excluded IBM from Data Center and Cloud

4     RFP," right?

5          A.    Yes.

6          Q.    You mentioned that earlier, didn't you?

7          A.    Yes.

8          Q.    Okay.  Go to Slide 4.

9          A.    Yes.

10         Q.    I think this is just the comparison of your

11    quota and attainment so far in the half, right?

12         A.    Yes.

13         Q.    Under Primary it says "Grow installed

14    accounts like McKesson."

15               You see that?

16         A.    Yes.

17         Q.    So even though IBM was excluded from this

18    RFP, it sounds like there were still some opportunities

19    at McKesson?

20         A.    So -- no.  The reason -- we did not -- "we,"

21    meaning at least the storage group, we did not find out

22    that -- at least -- well, I should say as a storage rep

23    I did not find out that we were excluded from the RFP

24    until about January, late January, from the account

25    executive.

                                        Page 104

1          And then along with that, account executive

2     and I were still hoping, right, they will do something

3     before they transition everything to Google and

4     Google's partner, Data Center partner.  So that's why

5     we were still, I guess, fighting, right, to -- to

6     maintain and maybe even grow the account.

7          Q.   And I believe you said that McKesson

8     announced their partnership with Google in March of

9     2019; is that right?

10         A.   Yeah, I think it was at -- it's around March

11    because it was a Google conference that McKesson went

12    on stage and announced their partnership, yeah,

13    some- -- sometime around March.

14         Q.   Okay.  All right.  Go to the next slide.

15         A.   Yeah.

16         Q.   And it says "2Q Sales Connect Pipeline,"

17    right?

18         A.   Uh-huh.

19         Q.   Right?

20         A.   Yes.  Oh, yes.  Sorry.

21         Q.   Thanks.

22         A.   Did it again.

23         Q.   And there are one, two, three, four, five,

24    six McKesson opportunities identified on here, right?

25         A.   Uh-huh.

Page 105

```
 1          Q.   Yes?

 2          A.   Yes.  Yes.

 3          Q.   So as of April 4th when you made this, you

 4     still had -- in fact, most of your opportunities in

 5     your pipeline were McKesson opportunities, right?

 6          A.   Yes.

 7          Q.   Did any of those pan out?

 8          A.   I can't see the entire description of that.

 9     I can tell you that starting from the bottom, BP1, that

10     one did not because it has to do with the solution that

11     I sold in 2017.  Oops, sorry.  I went too far.

12               Then go up again.  Oh, two BP1's.  They

13     actually opened by the business partners.  That's how I

14     could tell that they are created by the business

15     partners.

16          Q.   Okay.

17          A.   And -- and then the K9 is -- was what I

18     created.  Those are Internal Sales Connect IBM sales

19     reps use, yeah, to create.  Phase 1 of 3 of Hardware, I

20     don't believe we closed any of the phases.  We might

21     have closed a small amount of the Phase 1, but not

22     500,000.

23          Q.   Okay.

24          A.   Yeah.

25          Q.   And so these opportunities here, you're
```

1      showing on this -- just on this slide about $2 and a

2      half million of opportunity at McKesson; is that right?

3          A.    The ones that I created, 2 -- about -- yeah,

4      about 2 million, right, the top four.

5          Q.    Yeah.

6          A.    Yeah.

7          Q.    And -- and as of April 4th, did you -- did

8      you still think those were a possibility?

9          A.    I was still working them as stretch

10     opportunities not knowing that there were further

11     development at McKesson, so...

12         Q.    Okay.  All right.  Going back to Slides 2 and

13     3 --

14         A.    Okay.

15         Q.    -- where you've got the six accounts listed

16     here, which of these were new accounts to you?

17         A.    Foster Farms, Ingram Mico -- Micro.

18         Q.    The other four were accounts that you'd

19     previously had?

20         A.    Yes.

21         Q.    Okay.  All right.  Let me ask you to go to

22     Exhibit 51.

23         A.    Okay.

24               (Whereupon Exhibit 51 was marked for

25     identification, a copy of which is attached hereto.)

Page 107

```
1              THE WITNESS:  Okay.
2       BY MR. BARNES:
3              Q.   So this is an email from Todd Stacy to you
4       copying Stacie Mason and Amy Buyarski, right?
5              A.   Okay.  Yes.
6              Q.   Who's --
7              A.   Yes.
8              Q.   -- Stacie Mason?  Who is Stacie Mason?
9              A.   Stacie Mason is Todd's manager or was Todd's
10      manager.
11             Q.   Okay.  This is dated April 4th, 2019, right?
12             A.   Yes.
13             Q.   So Todd says "Nelly, I appreciate all of your
14      hard work in Q1.  I look forward to your progress in
15      Q2," right?
16             A.   Yes.
17             Q.   And so he was praising you for your hard work
18      in Q1, right?
19             A.   Yes.
20             Q.   Would -- would Todd often praise you for your
21      hard work?
22             A.   No.
23             Q.   He wouldn't?
24             A.   Well, he's not one who praise -- who praise
25      for the -- you know, just to praise.  He praise because
```

Page 108

1    he believe you have, you know, worked hard.

2         Q.   Got it.

3         A.   So yes, so -- in general.

4         Q.   So in his second paragraph here, he says "Per

5    my prior note to the team, here's where you're shaping

6    up as of last week for Q2 versus Q3/Q4."

7         A.   Uh-huh.

8         Q.   "Right now you are calling 50 percent of

9    plan."

10             What does that mean?

11        A.   Oh, when you say -- when you say "calling

12   50 percent of plan," that means that you believe you

13   have high degree of -- it's a high degree of

14   probability you will close 50 percent of your sales

15   quota.

16        Q.   Okay.  So -- so he's saying here that as of

17   April 4, you were calling -- you were expecting --

18   there's a high probability that you would close

19   50 percent of your plan; is that right?

20        A.   Yes.

21        Q.   Okay.  And he goes on to say "I look forward

22   to understanding how you look to attack your territory

23   in Q2 and make adjustments in your business to impact

24   Q3 and Q4 out-quarter pipeline build as you are rolling

25   almost zero across the board in Q3/Q4," right?

                                           Page 109

1          A.    Right.   Okay.   That's what I'm reading too,

2     yes.

3          Q.    So is he saying that your pipeline was

4     showing zero for Q3 and Q4?

5          A.    Yes, that's what he put, yes.

6          Q.    Was that accurate?

7          A.    Possibly, but we all know that we get new

8     accounts for the second half, so you're basically just

9     creating pipeline for -- on accounts that you don't

10    know whether you're going to have and then you --

11    there's a saying within reps, "Don't create

12    opportunities in there and fuck up your number for your

13    first half and then stick me with it and now I have to

14    explain why I'm not closing and now I pick up the

15    account."  So I don't do that because I don't know

16    whether I'll have the account or not.

17         Q.    Okay.

18         A.    Yeah.

19         Q.    So does that mean you -- you don't start

20    working on opportunities for your pipeline until Q3

21    rolls around?

22         A.    Until you get your account --

23         MR. WILLIAMS:  Objection to form.

24         THE WITNESS:  -- territory assigned -- sorry.

25         MR. WILLIAMS:  That's --

                                        Page 110

```
 1              THE WITNESS:  We -- we do not find -- find out --
 2     get -- we are not given our territory assignment until
 3     we're into the half.
 4     BY MR. BARNES:
 5          Q.   Okay.  All right.  Let's go to Exhibit 52,
 6     please.
 7          A.   Okay.
 8               (Whereupon Exhibit 52 was marked for
 9     identification, a copy of which is attached hereto.)
10     BY MR. BARNES:
11          Q.   So this is an email from Todd Stacy to
12     Scott Jensen.
13               Who's Scott Jensen?
14          A.   I don't know.
15          Q.   Okay.  If you go down to the bottom of Page 2
16     to top of Page 3, there's an email that starts from
17     Arthur Beller.
18          A.   Okay.
19          Q.   You see that?
20          A.   Yes.
21          Q.   Who's Arthur Beller?
22          A.   Art at that time, according to his title
23     here, yeah, he was the V.P. of storage sales.
24          Q.   Okay.  So Arthur says in this email "Team, I
25     want to get -- I want to go get a standing exception to
```

Page 111

1    hiring recruit without going to the review board so we

2    have an ongoing and proactive approach."

3            You see that?

4        A.   I see that.  I -- yeah, yes.

5        Q.   Okay.  And if you go down a couple of

6    sentences, he -- he states "Scott, can you create a

7    file (simple spreadsheet) that would list by market and

8    totals the number of resources that might be leaving

9    due to performance, retire, move out, tech or sales,

10   manager, or FLM and what city."

11           Do you see that?

12       A.   Yes, I did see it.

13       Q.   Okay.  And then if you scroll up to the top

14   of the first page, or I guess middle of the first page,

15   Scott sends an email to John Oldham, Todd Stacy, and

16   John Scott.

17           You see that?

18       A.   I'm sorry.  Did you say the top of Page 1?

19       Q.   Middle.

20       A.   Oh.

21       Q.   Middle of Page 1.

22       A.   Oh, oh, oh, okay.  Yes.

23       Q.   It's an email from Scott Jensen --

24       A.   Got it.  Okay.  Yes, I see it.

25       Q.   -- to John, Todd Stacy, and John Scott,

                                          Page 112

1    right?

2         A.   Yes.

3         Q.   And Scott Jensen says "Please send your

4    market hiring spreadsheet" -- excuse me.  "Please send

5    your market hiring spreadsheet back to me today per

6    Art's request last Friday.  See notes below," right?

7         A.   Yes, I see that, yes.

8         Q.   And then Todd responds to Scott and says

9    "Scott, apologies for the delay in my response.  See

10   the attached file," right?

11        A.   Yes, I see it.

12        Q.   Okay.  Let's go to Exhibit 53, which is the

13   file that Todd attached to his email with Scott.

14             (Whereupon Exhibit 53 was marked for

15   identification, a copy of which is attached hereto.)

16   BY MR. BARNES:

17        Q.   You got it?

18        A.   Yes.

19        Q.   So there are four people listed on here, and

20   it says "Reason for Leaving," and "Performance" is

21   checked for all of them, right?

22        A.   Yes.

23        Q.   And you're on here along with Art Munoz,

24   Coberen Mark, and Bill Asimos, right?

25        A.   I see that.

                                          Page 113

```
1          Q.   Who is Art Munoz?

2          A.   He was someone on my team.

3          Q.   Was he also a seller on your team?

4          A.   Yes.

5          Q.   How old was he?

6          A.   I do not know.

7          Q.   Do you know whether he was younger than you?

8          A.   I would not know.

9          Q.   Okay.  Do you know how old Coberen Mark is?

10         A.   I don't know either.

11         Q.   And -- and he was also a seller on your team,

12    right?

13         A.   Yes.

14         Q.   Do you know Bill Asimos?

15         A.   No.

16         Q.   Okay.  It looks like Bill reported to a

17    different manager, right?

18         A.   Yes, looks like it.  I never heard of his

19    name.

20         Q.   Okay.  And so as of when Todd made this list

21    in May of 2019, it looks like he was already thinking

22    that you, Art, Coberen, and Bill might be leaving due

23    to performance reasons, right?

24         A.   I don't know what he was thinking.  I didn't

25    know that.
```

Page 114

1    Q.   Do you know what happened to Art, Coberen,

2    and Bill?

3    A.   I know Art, he -- well, from what I learned

4    from him, he had to take a leave because I think either

5    his father or something or he -- he has to take care of

6    the child.  So -- so at first he took a leave, and then

7    he didn't come back.  He took a leave of absence.

8         And then Coberen, my understanding from him

9    was that he found a better job, paid better.  I -- I

10   don't know.  I mean, that's -- I -- I only know it from

11   brief conversation when I say goodbye to them.

12   Q.   Were either -- I'm sorry.  Go ahead.

13   A.   When I said goodbye to them, yeah.

14   Q.   Were either Art or Coberen put on Performance

15   Improvement Plans?

16   A.   I wouldn't know that.  I don't know, yeah.

17   Q.   What about Bill?  What happened with Bill?

18   A.   I don't even know Bill.

19   Q.   So when did Art and Coberen leave?

20   A.   Oh.  Oh, I don't remember.

21   Q.   Do you know why it was -- you -- your -- you

22   were fired in July of 2020, right?

23   A.   Yes.

24   Q.   Do you know why even though you're on this

25   list in 2019, why it wasn't until July of 2020 that you

Page 115

1    were fired?

2         A.   I -- I do not know.  I -- you know, I -- I

3    have -- you know, even though my numbers did not speak

4    for themselves, but all my managers knew that I put in

5    the hard work.  And in sales you all know that, you

6    know, your attainment has a lot to do with quota.  It

7    has a lot to do with your customer cycle, which may or

8    may not jive with IBM's.

9         Q.   And ultimately in a sales organization like

10   you were in, it doesn't matter how hard you work if you

11   don't sell.

12             Would you agree with that?

13        MR. WILLIAMS:  Objection to the form.

14        THE WITNESS:  As -- as a salesperson, I would

15   agree to that.  I -- you know, I -- when I -- when I

16   say I'm a salesperson, I -- my job is to sell.

17   BY MR. BARNES:

18        Q.   And you were measured on whether you sold or

19   not, right?

20        MR. WILLIAMS:  Objection to form.

21        THE WITNESS:  Yes, and I -- yes.  I was also

22   measured on customer sat too.

23   BY MR. BARNES:

24        Q.   Sure.  All right.  Let's go to Exhibit 43.

25        A.   Okay.

                                        Page 116

1          (Whereupon Exhibit 43 was marked for

2     identification, a copy of which is attached hereto.)

3     BY MR. BARNES:

4          Q.   This is your 2019 Global Performance

5     Assessment, right?

6          A.   Yes.

7          Q.   And if you go to the last page, it is signed

8     by Todd Stacy, right?

9          A.   Yes.

10         Q.   But it looks like right above that the

11    comments were made by Sandra Florey, right?

12         A.   Right, yes.

13         Q.   Is Sandra Florey the one who actually gave

14    you the ratings in here?

15         A.   At that time I believe Amy Buyarski was

16    handling -- she's like -- she was like a software sales

17    executive supporting Sandy, so I believe, you know, the

18    managers get together and talked about it.

19         Q.   So you think your 2019 review was completed

20    by Amy and Sandy together?

21         A.   I -- I would think so, yeah.

22         Q.   Okay.  So if you look at Page 5 is where your

23    Dimension Ratings start.

24         A.   Yes.

25         Q.   You received an Expects More for Business

Page 117

```
1        Results, right?
2            A.   Yes.
3            Q.   An Achieves for Client Success, right?
4            A.   Yes.
5            Q.   And Expects More for Invasion, right?
6            A.   Yes.
7            Q.   And Achieves for Responsibility to Others,
8        right?
9            A.   Yes.
10           Q.   And then Achieves for Skills, right?
11           A.   I see it, yes.
12           Q.   Okay.  Do you agree with those ratings for
13       2019?
14           A.   At the time I did.
15           Q.   You don't now?
16           A.   As I mentioned before, I focused more on,
17       right, the business results, right, and that I agree.
18       But Responsibility to Others, no.  Actually, Invasion,
19       I -- I -- thinking back, no, I don't agree.
20           Q.   But you still agree with the Business Results
21       rating?
22           A.   The Business Results rating is about right
23       where the -- the numbers -- whether you hit your
24       numbers.
25           Q.   And -- and you didn't hit your numbers?
```

Page 118

1          A.    In 2019, no.  If you don't hit down to the

2    dollar 100 percent, you don't -- you don't achieve.

3    That's how the rating is given out.  You can't be

4    99 percent and get an Achieve.

5          Q.    All right.  Scroll down to Page 6 where it

6    says "Comments by Sandra Florey."

7          A.    Uh-huh.

8          Q.    So about halfway down Sandra writes "I look

9    forward to seeing Nelly have her own territory in

10   2020."

11              You see that?

12         A.    I can't expand it.  I can't find it.  Where

13   is that?

14         Q.    It's --

15         A.    Oh, yes, I see it now.  Yeah, about six or

16   seven sentences down, yes.

17         Q.    Okay.  It says "I look forward to seeing

18   Nelly have her own territory in 2020 and

19   exercise/develop more hunting skills."

20              You see that?

21         A.    Yes.

22         Q.    What does "hunting skills" mean?

23         A.    That means that you have accounts that have

24   no IBM installation, so you cold-call.  You cold-call.

25   You build relationship.  You find out what they have

                                              Page 119

1    and then hope that, you know, they actually will talk

2    to you.

3          Q.   A few sentences later she says "I expect her

4    to be successful in her new role which will require her

5    to be more of a hunter than a farmer."

6                What's the difference between a hunter and a

7    farmer?

8          A.   A farmer is you have accounts that already

9    have an install base, so you have a possibility of

10   growing the account.  They buy more because they have

11   to store more data, right?  So that's a farmer.  So you

12   have to -- the account relationship is -- you're

13   maintaining the account relationship and you don't have

14   to cold call as much because you already have some

15   customer contacts that you can build on.

16         Q.   Do you think that -- would it be reasonable

17   to expect IBM to put their best sellers in hunting

18   roles as opposed to farming roles?

19         MR. WILLIAMS:  Objection to form.

20         THE WITNESS:  I -- I don't know what I can say

21   about what IBM expect.  I do -- I did hear that IBM is

22   shifting their belief that everything is an 80 -- 80/20

23   rule, meaning 20 percent of your customers will bring

24   in 80 percent of revenue and then just ignore the other

25   80 percent of the companies out there.  So IBM is

                                          Page 120

1     trying to go after accounts we never touched before.

2     BY MR. BARNES:

3         Q.    And part of their strategy was to go after

4     accounts that they'd never touched before?

5         A.    Right.

6         Q.    And -- and that's what was being expected of

7     you in the first half of 2020?

8         A.    That's the -- that's -- that's just the

9     territory, the accounts that I ended up getting.

10        Q.    Did you think your territory in the first

11    half of 2020 had a lot of opportunities?

12        A.    I did not know that going in because we had

13    no intelligence on them.  I had no intelligence on them

14    when I got the account listing.

15        Q.    By Q2 of 2020, did you think there was

16    opportunity in the territory?

17        A.    No.

18        Q.    Why not?

19        A.    COVID hit.  All the accounts that I had, they

20    were smaller companies.  I had travel companies.  I had

21    Thai companies, and West and Pacific Northwest were hit

22    by COVID very early on.

23        Q.    When did you start noticing an impact on your

24    territory from COVID?

25        A.    Probably about maybe mid-February as my

                                            Page 121

1      system architect and I were still trying to call
2      potential cold contacts of these accounts, right, based
3      on our research, on LinkedIn, on everything, right, all
4      the -- all the marketing research tools, tried to call
5      them, and we were not getting any calls back.
6              And then we would hear that people were not
7      going into the offices, so calling did not do anything.
8      And we started emailing, but then because a lot of
9      these accounts never heard from IBM, so we -- you know,
10     our email probably went into the junk folder for all we
11     know.
12             So -- so when we were not getting a whole lot
13     of responses, we did create a lot of marketing` -- other
14     marketing activities, partnering with business
15     partners.  But definitely by third week of -- of
16     February we know all the Pacific Northwest accounts are
17     pretty much shut down, right, from communicating with
18     us.
19         Q.   Who assigned you that territory in those
20     accounts?
21         A.   I wouldn't know that.  I -- I mean, I was
22     given to -- they were given to me by my first line
23     manager then.
24         Q.   You think when those accounts were given to
25     you, your managers knew that there was no opportunity

                                        Page 122

```
 1        there?
 2              A.    I wouldn't know.  I don't know what -- what
 3        they know.
 4              Q.    You don't --
 5              A.    I was -- go ahead.
 6              Q.    Do you think your managers gave you those
 7        accounts knowing that you were not going to succeed
 8        with them?
 9              MR. WILLIAMS:   Objection to the form.
10              THE WITNESS:   I wouldn't know how they were
11        thinking.
12        BY MR. BARNES:
13              Q.    Did anyone ever say anything to you that made
14        you think that that was the case?
15              A.    I can't recall anyone saying the way you said
16        it.  I recall they said it's going to be a tough
17        territory going in.
18              Q.    Who said that?
19              A.    I can't remember whether it was Todd, I
20        think, or -- yeah, or -- or Amy, because these are all
21        smaller in size accounts, right, or they might be
22        bigger companies, but IBM has no traction with them.
23        So any time that you get accounts that you have to
24        cold-call, it is a tough account.
25              Q.    Do you think you had the skills you needed to
```

Page 123

1          succeed in that territory?

2               A.   Yes, I believe so.

3               Q.   And so when you -- when you left the

4     DES Hunter role in the first half of 2020, was it

5     essentially the same role you had before DES Hunter,

6     just with a different set of accounts and territory?

7               A.   Pretty much, yes.

8               Q.   All right.  Let me pull up the next exhibit.

9               A.   Okay.

10              Q.   This will be Exhibit 54.

11              A.   Okay.

12                   (Whereupon Exhibit 54 was marked for

13        identification, a copy of which is attached hereto.)

14     BY MR. BARNES:

15              Q.   This is an email from Amy Buyarski to someone

16     named Johnny copying you, right?

17              A.   Yes.

18              Q.   It's dated January 13, 2020, right?

19              A.   Yes.

20              Q.   She says "Happy new year.  Need a favor.

21     Could you spend time with Nelly as she is picking up

22     some of the Pacific Northwest territory around your

23     customer meetings with specific clients, the good and

24     bad," right?

25              A.   Yes --

                                        Page  124

1       Q.   So Amy --

2       A.   -- I see that.

3       Q.   Amy was trying to connect you with other

4    people who had experience with these clients to try and

5    help get you up to speed.

6            Is that fair?

7       A.   According to this email, yes.

8       Q.   And was that your impression, that she was

9    doing that?

10      A.   Yes, that was the impression, that she was

11   trying to help.

12      Q.   If you go to Page 2 of this, it looks like

13   Amy the same day reached out to someone named

14   David Johnston?

15      A.   Yes.

16      Q.   Right?

17      A.   Yes.

18      Q.   David's got a sirius.com email address.  Was

19   he not IBM?

20      A.   No, he was a business partner.

21      Q.   Got it.

22           And so Amy's reaching out to David to see if

23   he can connect with you.  She says that you're picking

24   up the northern portion of Jack Egan's territory, and

25   she's reaching out to David to try to get him to help

                                              Page 125

1        you as well, right?

2            A.   Yes.  Yes, she was making a soft introduction

3        for me, yes.

4            Q.   And then the third page, there's an email

5        from Amy to Sandy, Jack Egan, and -- and you, right?

6            A.   Yes.

7            Q.   And she says "Jack, since you were behind

8        this effort in Pacific Northwest, I'd like to get some

9        help," right?

10           A.   Yes.

11           Q.   Who is Jack Egan?

12           A.   He -- he was another sales seller, storage

13       seller.

14           Q.   And was he moving to a different role or

15       different territory?

16           A.   No.  If I recall correctly, he was the only

17       one covering the Pacific Northwest, so he had a few

18       hundred accounts, which most of them he never called on

19       because he did not have the bandwidth.  So that's an

20       effort to grow IBM's presence in Pacific Northwest.  I

21       was asked to pick up some of his accounts.

22           Q.   Okay.

23           A.   Yeah.

24           Q.   How old is Jack?  Do you know?

25           A.   Oh, Jack?  Based on the experience and the

                                        Page 126

1    work, I thought he was older than me.  I don't know.

2    He's about the same age.

3         Q.   All right.  And -- and so here Amy's asking

4    Jack to get a call lined up with Trevor.

5              Who's Trevor?

6         A.   Trevor, if I recall correctly, at that time

7    he was my inside salesperson, I think, yeah.

8         Q.   Okay.

9         A.   Yeah.

10        Q.   In any event, this is another example of Amy

11   trying to get you up to speed, right?

12        A.   Yes.

13        Q.   Okay.  So was Sandy your manager at the start

14   of 2020 or was Amy?

15        A.   Sandy.  I think Sandy did not leave until

16   like February or something.  I can't remember when she

17   left.  I got the quota letter from Sandy, but Amy was

18   like a software sales executive, so her business

19   objectives tied to Sandy's, and so she continued to

20   provide assistance as much as possible, right?

21        Q.   Got it.

22             And when Sandy left, who became your manager

23   at that point?

24        A.   When Sandy first left, we did not have a

25   first line manager.  I think Amy, you know, supported,

                                              Page 127

```
1         right, and -- and stepped in to help, yeah.  We didn't
2         have a manager for -- until Robert came on board.
3              Q.   And when did Robert come on board?
4              A.   Oh, gosh, I want to say May -- April, May
5         maybe, yeah.
6              Q.   Okay.
7              A.   Yeah.
8              Q.   All right.  Let's take a look at Exhibit 20.
9              A.   Okay.  20.  Oh, did you just load it?  Okay.
10        Hold on.  Let me refresh.
11             Q.   Let me know when you're there.
12             A.   Okay.  Yes.
13             Q.   So if you go to Page 2.
14             A.   Page 2.  Okay.
15             Q.   There's an email bottom of -- actually, start
16        in the middle of Page 2.
17                  Sandy sends an email to Todd Stacy on
18        February 6th, right?
19             A.   Yes.
20             Q.   And she says "Todd, I made some updates below
21        and added a section on people following my Checkpoint
22        discussions this past week," right?
23             A.   Yes, I see it.
24             Q.   And then she says "You'll notice I'm
25        recommending Laura be put on a Performance Improvement
```

Page 128

1      Plan."

2                  You see that?

3            A.    Yes.

4            Q.    And is that the Laura on your team that you

5      were talking about earlier?

6            A.    Yes.   Yes.

7            Q.    Do you know whether Laura was put on a

8      Performance Improvement Plan?

9            A.    I don't know that.

10           Q.    Do you know how old Laura is?

11           A.    I wouldn't know that.

12           Q.    Okay.

13           A.    I think I met her one -- once, so...

14           Q.    All right.   So if you scroll down through

15     Sandy's email, her summary of you is on Page 4, the

16     bottom of Page 4.

17           A.    Page 4.   Okay.

18           Q.    You see that?

19           A.    Not yet.   Sorry.   Yep, I see it.   Okay.

20           Q.    It says "She's capable, seems somewhat

21     energized with the new territory."

22                  You see that?

23           A.    Oh, yeah, yeah.   I see, yeah.

24           Q.    It says -- under your name it says "She's

25     capable, seems somewhat energized with the new

                                              Page 129

```
 1       territory.  Because of her integrity, she'll continue
 2       to be a hard worker, but I questioned her level of
 3       engagement which was probably a result of the
 4       DES Hunter role."
 5              You see that?
 6       A.   Yes, I see it on here, yes.
 7       Q.   Did Sandy ever say anything to you about
 8       questioning your level of engagement?
 9       A.   No, she never did.
10       Q.   Do you know why she would have wrote that
11       here?
12       A.   I don't know why.
13       Q.   It goes on to say on the top of Page 5 "Need
14       to make sure she doesn't got too focused on just a
15       couple of accounts that it prevents her from developing
16       business across the territory."
17              You see that?
18       A.   Yes, I see that.
19       Q.   Was -- did you have issues in the past
20       getting too focused on just a couple of accounts?
21       MR. WILLIAMS:  Objection to form.
22       THE WITNESS:  No.  I always cover all the accounts
23       that I have, that I -- I was given.
24       BY MR. BARNES:
25       Q.   So you ultimately -- you did not meet your --
```

Page 130

1    we mentioned earlier that Sandy told you the

2    expectation was $1.6 million from each of you in the

3    first half of 2020.

4              You remember talking about that?

5         A.   Yeah, according to her email, yes.

6         Q.   And you did not hit that $1.6 million number,

7    right?

8         A.   No.

9         Q.   I want to make sure that's clear.

10             Is it correct that you did not hit that

11   $1.6 million number?

12        A.   I was an SRAP, so I did not sell $1.6 million

13   of products.

14        Q.   Okay.  And you mentioned earlier one of the

15   reasons was because COVID hit, right?  We talked about

16   that.

17        A.   Yes.

18        Q.   Do you think that your territory was impacted

19   more than any other sellers on your team by COVID?

20   MR. WILLIAMS:  Objection to form.

21   THE WITNESS:  I don't have enough knowledge of my

22   peers' territory to say that.  I know mine was severely

23   impacted.

24   BY MR. BARNES:

25        Q.   Did you talk to your peers about whether

Page 131

1        their territories were impacted by COVID?

2            A.   Oh, to an extent that we say no one was

3        returning our calls or emails.

4            Q.   So your peers told you they were having that

5        experience as well?

6            A.   Well, I -- I did not talk to everyone.  I

7        only talked to a couple of them, yeah.

8            Q.   Who did you talk to?

9            A.   I might have talked to Jack.  I may have

10       talked to Randall because we all had -- had smaller

11       accounts and many of them IBM had no presence in them,

12       so we have -- we -- we were all cold-calling.

13           Q.   So I want to make sure I'm clear about this.

14                You said you might have called Jack and --

15           A.   I might have talked to Jack, right.

16           Q.   And -- and I just want to make sure I

17       understand.

18                Who do you specifically remember talking to

19       about this?  Not who might you have spoken to about

20       this.

21           A.   About -- oh, about people not returning our

22       calls?  Brad Ashbaugh definitely.  He's my system

23       architect.  And also the inside salesperson, because

24       we -- we try to divide up contact names that we find on

25       the internet and try calling everyone, and then we will

                                                    Page 132

1     come back and say, you know, whether we had any

2     success.

3            Q.    Right.

4                  And I'm talking about your peers, the other

5     sellers who were in the same role as you.

6            A.    I -- I cannot tell you for sure who.

7            Q.    Okay.  So other than COVID, were there any

8     other reasons that you were unable to -- or that -- let

9     me restart that.

10                 Other than COVID, were there any other things

11    that impacted or prevented your ability to sell into

12    your territory in 2020?

13           A.    Not that I can think of at this point.  I

14    mean, not that I could remember that there were any

15    other reasons.

16           Q.    Did you lose your mother around that time?

17           A.    Yes, I did.

18           Q.    And I believe she -- did she pass from COVID?

19           A.    Yes, COVID complications.

20           Q.    Okay.  And when was that?

21           A.    Mother's -- May -- May 10, 2020,

22    Mother's Day.

23           Q.    Oh, I'm very sorry to hear that.

24           A.    Me too.

25           Q.    Yeah.  So that would have been towards the

                                              Page 133

```
 1        end of the half, but --
 2             A.   Yes.
 3             Q.   -- did that impact your ability to -- to sell
 4        in your territory in the first half of 2020?
 5             A.   No.
 6             Q.   All right.  Let's -- let me pull up a few
 7        more exhibits here.
 8             A.   Okay.
 9             MR. BARNES:  So this next one will be Exhibit 55.
10             (Whereupon Exhibit 55 was marked for
11        identification, a copy of which is attached hereto.)
12        BY MR. BARNES:
13             Q.   Okay.  Should be up.
14             A.   Okay.
15             Q.   You see it?
16             A.   Yes.
17             Q.   Okay.  So this is an email from Amy to
18        Todd Stacy copying Robert Cortez on
19        February 24th, 2020, right?
20             A.   Yes.
21             Q.   And she's got two categories here.  One says
22        "Active Territories" and one says "On Life Support."
23             You see that?
24             A.   Yes.
25             Q.   And under On Life Support she's got you,
```

Page 134

1    Laura Cook, and Jack Egan listed, right?

2         A.   Yes.

3         Q.   Would you agree that your territory was on

4    life support at that point?

5         A.   Yes.

6         Q.   It also says "750,000 in total pipeline as

7    Savemart is not valid."

8              What does that mean?

9         A.   I had -- I think if I recall correctly, I had

10   Savemart assigned to me as part of my territory, and as

11   I got into role, Savemart actually is owned by some

12   other company that another team has, so it really did

13   not matter.  You know, the work that I put in, I would

14   not get credit, so -- and so that's why she said

15   Savemart is not valid.

16             So even though once a territory assignment

17   goes in the system, you cannot take it out, but then --

18   but then -- because when they purchased, they were

19   purchased through the parent company, so it would not

20   be the right customer number that would flow to me

21   anyway.

22        Q.   Okay.

23        A.   IBM goes by customer, not by name.

24        Q.   Yeah, I got you.

25             All right.  Let's take a look at Exhibit 56.

                                          Page 135

1           A.    Okay.

2                 (Whereupon Exhibit 56 was marked for

3           identification, a copy of which is attached hereto.)

4           BY MR. BARNES:

5           Q.    And this is an email from Amy to Todd,

6           copying Robert on February 25th, 2020, right?

7           A.    Okay.

8           Q.    Is that right?

9           A.    Yes.

10          Q.    She says "Todd, snapshot from -- snapshot

11          from 2/25 daily report," right?

12          A.    Yes.

13          Q.    And then there's a section where she says "1Q

14          pipeline by rep."

15                Do you see that?

16          A.    Yes, I see it.

17          Q.    Your pipeline is listed as $80,000 there,

18          right?

19          A.    Yes.

20          Q.    And do you recall whether that was your

21          pipeline at that point?

22          A.    I don't recall whether that was my pipeline.

23          Q.    This reflects that you had the lowest

24          pipeline on the team, right?

25          A.    According to this, yes.

1    Q.   And do you know whether that was true, that

2    you had the lowest pipeline on the team?

3    A.   I do not know that.

4    Q.   Okay.

5    A.   I did not know that, nor do I know that now.

6    Q.   All right.  Let me pull up the next exhibit.

7    This will be Exhibit 57.

8    (Whereupon Exhibit 57 was marked for

9    identification, a copy of which is attached hereto.)

10   BY MR. BARNES:

11   Q.   Let me know when you have it.

12   A.   Yes.  Let me open.

13   Q.   This is an email from Amy to Todd dated

14   March 31, 2020, right?

15   A.   Yes.

16   Q.   And the subject of the email is "2Q pipeline

17   in Nelly's territory and actions from today," right?

18   A.   Uh-huh, yes.

19   Q.   So there's a couple of accounts listed here

20   that I just want to get some clarification on.  First

21   is Les Schwab.  It says is "Not valid for the quarter.

22   Tape deal is dead."

23   What does that mean?

24   A.   I was working on a tape -- tape deal at

25   Les Schwab to replace some old equipment, and

Page 137

1          Les Schwab is a tire company.  By that time they know

2     that their business is in jeopardy, so they decided not

3     to pursue any re- -- refresh or replacement, so that's

4     what she meant.

5          Q.   Okay.  The next one says it's Fair Isaac.

6          A.   Yes.

7          Q.   It has "She has this key stretch.  We have

8     not had a single conversation with the customer or

9     business partner."

10              You see that?

11         A.   Yes.

12         Q.   Is that true?

13         A.   Not true about the business partner.  I have

14    had many conversations with the business partner, and

15    that was an account that -- IBM has a courtesy with

16    business partners if they have been calling into the

17    account for a while and they have the relationship, we

18    work through them, so I have had discussions with the

19    business partner.

20         Q.   Okay.  Then the next one is Zoox.

21              Is that how you say that?

22         A.   Zoox, yeah.  Zoox, yeah.

23         Q.   It says "Project is off per the business

24    partner," right?

25         A.   Yes.

Page 138

1      Q.   Was that correct?

2      A.   Yes.

3      Q.   Then the next --

4      A.   Yeah.

5      Q.   I'm sorry.  Go ahead.

6      A.   I actually brought the business partner in.

7   It -- it is a start-up, and we worked together on it

8   and -- and it's off because the start-up did not get

9   the funding, the round of funding that they needed.

10      Q.   And then Reliable Parts, it says "I think we

11   sold the small upgrade in 4Q.  It was under 10k."

12           Is that true?

13      A.   I don't -- I wouldn't know.  I did not have

14   that account in 4Q, so I don't know what they sold.

15      Q.   Okay.

16      A.   Yeah.

17      Q.   So after that she says -- Amy says here "Once

18   you take those items out, her territory is around zero

19   in pipeline, zero hardware, zero software."

20           You see that?

21      A.   Yes, I see it was wrote here, yes.

22      Q.   Is that true?

23      A.   I would say probably not true, because my

24   system architect and I, we were hosting a lot of

25   webinar sessions.  We invited potential or possible

Page 139

1    customers based on our research on what their -- what

2    their technology landscape were, and we had put in

3    pipeline for -- you know, stretch pipeline,

4    nonetheless, yeah.

5         Q.   She goes on to say "There's no way in any

6    good faith I can certify her pipeline with the atlas

7    records she has marked as At Risk and Key Stretch as I

8    know they are not valid, nor do I think we should waste

9    any time around another PTMP," right?

10        A.   Okay.  Yes, I -- I read it here too, yeah.

11        Q.   What is a PTMP?

12        A.   Plan to make plan.

13        Q.   Okay.  She says "Instead you should have a

14   conversation with her one-on-one this week," right?

15        A.   Yes.

16        Q.   Do you remember having a one-on-one with Todd

17   around this time?

18        A.   I cannot recall.

19        Q.   Okay.  All right.  Take a look at Exhibit 58.

20        A.   Okay.

21             (Whereupon Exhibit 58 was marked for

22   identification, a copy of which is attached hereto.)

23   BY MR. BARNES:

24        Q.   Let me know when you're there.

25        A.   Yes, I'm here.

                                        Page 140

1      Q.   Okay.  This is an Excel sheet that has two

2   tabs.  The first is a Summary tab, and then the second

3   is the Details tab, and these -- my understanding, this

4   is -- these were all the deals that you closed in the

5   first half of 2020.  And this reflects -- if you're on

6   the Summary tab, reflects that you sold $87,443.31 in

7   the first half of 2020.

8          Does that sound right to you?

9      A.   The deals that are listed here are correct,

10   but I also sold a -- a deal at Zirkle Fruits, which did

11   not flow to me.

12      Q.   How -- how big was that deal?

13      A.   Oh, I think it's $50,000.

14      Q.   Okay.  So that would bring it up to about

15   $135,000, if I'm doing the math -- $137,000 if I'm

16   doing the math right?

17      A.   That sounds about right.

18      Q.   So any other deals that are missing from

19   here?

20      A.   Not that I can think of right now.

21      Q.   Okay.  And the deal you mentioned that was

22   not flowing to you, why did you work -- was it not in

23   your territory?

24      A.   I was assigned the Zirkle, Z-i-r-k-l-e,

25   Zirkle Fruits customer number.  It is a private

Page 141

1        company.  They also have a sales arm, Rainier Fruits.

2        You might have seen Rainier cherries.  And when it came

3        time to issue the purchase order, it was issued out of

4        Rainier Fruits --

5             Q.   Okay.

6             A.   -- letterhead, yeah.

7             Q.   Gotcha.

8             A.   So I -- it was a situation I presented to

9        Amy, who was the interim manager, and I also reached

10       out to Todd about -- before the customer even agreed to

11       purchase that, but the customer did tell me that more

12       than likely they will issue the PO through the sales

13       division.

14            Q.   Okay.  Gotcha.

15                 So -- so ultimately put on a Performance

16       Improvement Plan in June of 2020, right?

17            A.   Yes.

18            Q.   And by that time Robert Cortez was your

19       manager?

20            A.   Yes.

21            Q.   Before you were put on the Performance

22       Improvement Plan, were you having weekly meetings with

23       Robert to talk about your territory and your

24       performance?

25            A.   We had a weekly cadence call to talk about

                                              Page 142

1      our pipeline.

2          Q.   Did you have that the entire path?

3          A.   I don't think -- I can't remember.  I don't

4      think he had weekly calls with everyone, so he -- I --

5      if I recall correctly, he had kind of alternate; a

6      couple of people one week and then a couple of people

7      the following week.  And then sometimes, you know, if

8      they're -- because of how all my accounts are pretty

9      much either filing bankruptcy or going on pause, so

10     there were probably weeks we did not talk knowing that,

11     you know, that's kind of the -- the situation that I

12     was dealing with.

13         Q.   Did he offer to have additional midweek calls

14     with you to talk about your pipeline?

15         A.   I can't remember that we did, yeah.

16         Q.   Well, can you remember whether he offered

17     that?

18         A.   I -- I don't remember that he offered that.

19         Q.   Could it have happened and you just don't

20     remember?

21         A.   Well, we weren't even having weekly calls, so

22     I doubt it very much.

23         Q.   Before you were put on the Performance

24     Improvement Plan, did -- did Robert have a conversation

25     with you about whether you were interested in the job

                                              Page 143

1      and wanted to stay in the job?

2           A.   No, he did not.

3           Q.   You don't remember ever telling Robert that

4      they should just RA you?

5           A.   Never.

6           Q.   What does RA mean?

7           A.   Resource Action.  That's usually a layoff, a

8      big layoff program that IBM has.

9           Q.   So you never told anyone that they should

10     just RA you?

11          A.   No.

12          Q.   How were you told about or given the

13     Performance Improvement Plan?

14          A.   I recall getting a call invitation from

15     Robert, and I believe it was something he sent for the

16     following week.  And then we got on the call, and

17     that's -- that's when he told me that I was put on a

18     PIP.

19          Q.   Did you walk through the PIP in that meeting?

20          A.   At a high level.  I -- I saw, you know, the

21     high-level points, yeah.

22          Q.   What else do you remember about that

23     conversation?

24          A.   I remember saying to him that the objectives

25     that were on the PIP were not reasonable.

                                              Page 144

1    Q.   And was --

2    A.   And --

3    Q.   Go ahead.

4    A.   A PIP is not supposed to be something that

5    you give me two weeks to go do in the market condition

6    that we were in.

7    Q.   What was his response to those two things?

8    A.   At first he said, "Well, look, I've only been

9    here five weeks as your manager," like that.  And then

10   he said, "It's all about the numbers."

11        And I ask him -- I remember asking him,

12   "Robert, what numbers are you referring to?"  And he

13   did not answer me.

14   Q.   What else do you remember about that

15   conversation?

16   A.   I remember telling him that based on how

17   those objectives were set, I said it seems like this

18   PIP is written to guarantee that I'm fired.

19   Q.   And what was his response to that?

20   A.   He didn't have a response.

21   Q.   What else do you remember about that

22   conversation?

23   A.   I remember saying to him -- because he

24   started out as my peer.  So I said to him, "Robert, I

25   don't want to give you any trouble, because if you said

Page 145

1    this is how it came down, I'll -- I'll read it and

2    then -- then we go from there."  That's what I said to

3    him.

4         Q.   And what was his response to that?

5         A.   He didn't have any response to that.

6         Q.   Okay.  Is there anything else about that

7    conversation you remember?

8         A.   The conversation, no.  It was -- it was -- it

9    was very abrupt, how it was delivered.  I guess for the

10   most part, I was just in shock.

11        Q.   Okay.  During the PIP, the -- the period of

12   the PIP, did you have periodic meetings with Robert to

13   talk about your progress?

14        A.   No, he did not have any more meetings with

15   me.  I ended up calling him on June 30th and asking

16   him, "So what does this mean now?"

17             And he told me that, "You're out."

18        Q.   You said that on June 30th?

19        A.   Well, I believe it was on June 30th, yes,

20   because I called.

21        Q.   But then you didn't end up getting fired for

22   a few more weeks, right?

23        A.   Yeah.  So my PIP period was June 30th, but

24   then my departure date was July 31st.

25        Q.   And so you didn't have any meetings -- other

                                        Page 146

1    than that time you called him, you didn't have any

2    meetings with Robert to talk about your progress?

3         A.   No.

4         Q.   Did he offer to have any meetings?

5         A.   No, he didn't.

6         Q.   All right.  Let's take a look at the PIP.

7    It's Exhibit 59.

8         A.   Okay.

9              (Whereupon Exhibit 59 was marked for

10   identification, a copy of which is attached hereto.)

11   BY MR. BARNES:

12        Q.   And can you confirm that this is the

13   Performance Improvement Plan that you were given?

14        A.   It looks about right.

15        Q.   Okay.  And at the top it says "Originator,

16   Robert Cortez," right?

17        A.   Yes.

18        Q.   And it says "Review period, June 18 through

19   July 22," right?

20        A.   Oh, no.  My -- it was through the 30th.  It

21   was not July 22.

22        Q.   This document says June 18 through July 22,

23   right?

24        A.   Yeah, this document says, but the PIP that

25   I -- I reviewed with him, my review period was June 18

                                        Page 147

```
1        through the 30th, but then my last day would be
2        July 31st.
3              Q.   So you're saying that the version that you
4        were -- the version of the PIP that you were given, at
5        the top where it says "Review period" said June 18
6        through June 30?
7              A.   Yes.
8              Q.   You sure about that?
9              A.   That's what I recall.  That -- that's what I
10       recall.
11             Q.   Okay.  So under Areas of Improvement, this
12       has five different entries, right?
13             A.   Yes.
14             Q.   The first one says "Pipeline growth through
15       OI generation," right?
16             A.   Yes.
17             Q.   What does OI mean?
18             A.   Opportunity identification.
19             Q.   Okay.  And so Measurement underneath that
20       says "3x pipeline growth of validated opportunities of
21       4.23 million by July 22nd, 2020," right?
22             A.   Yes, I see that, yes.
23             Q.   And so this was asking you to create a
24       pipeline of 4.23 million by July 22nd; is that right?
25             A.   I -- I actually asked him about that.  I
```

Page 148

1    asked him generally.  We would get our territory

2    account assignment, like, seconds -- like weeks into

3    the half.  So I asked him whether this was -- this --

4    this goal is for second half, and it was for second

5    half.

6            I -- I did not even know what my accounts

7    were or would be, so I would not be able to come up

8    with a pipeline of $4.3 million.  Then he kind of said,

9    "Oh, well, it's for first half."

10       Q.   Okay.  And were you able to achieve that?

11       A.   No, I was not.  I did not have a $4.2 million

12   of terr- -- of territory, even on a good day -- even on

13   a good day.

14       Q.   So do you recall that you produced to us a

15   version of the PIP?

16       A.   I don't remember.

17       Q.   Well, did you have a version of the PIP in

18   your possession?

19       A.    I don't think so.  I try not to keep much of

20   anything -- IBM documents not knowing whether that's

21   considered confidential or not.  Not that -- I can't

22   recall.

23       Q.   Okay.  Well, let me -- because I want to make

24   sure we're looking at the correct version of this, so

25   let me introduce Exhibit 60.

                                        Page 149

1                 A.    Okay.

2                      (Whereupon Exhibit 60 was marked for

3          identification, a copy of which is attached hereto.)

4          BY MR. BARNES:

5                 Q.    Let me know when you're there.

6                 A.    Okay.

7                 Q.    This is the version of the PIP that you

8          produced to us.

9                 A.    Okay.

10                Q.    Do you know where you got this?

11                A.    I believe, if I recall, I might have gotten

12         that as part of the exit package, because I got a

13         package from IBM on, you know, the things I had to

14         sign, you know, things like that.

15                Q.    Okay.

16                A.    It might have been.  I don't remember.

17                Q.    And this Exhibit 60, the review period here

18         says June 18 through July 22, right?

19                A.    That's what it says, yeah.

20                Q.    And then staying on Exhibit 60 here going

21         down to Goal 1.1 that we were just talking about,

22         the -- the version that you were given, did it say this

23         4.23 million by July 22nd?

24                A.    I -- I seem to recall that, yes.

25                Q.    Right, because you had the conversation with

                                              Page 150

1          Robert --
2               A.    Right, right.
3               Q.    -- about whether that applies to first or
4      second half, right?
5               A.    Right, right, yeah.
6               Q.    Okay.  And you did not meet that goal, right?
7               A.    No, because my work is supposed to have been
8      done by the 30th, so I wasn't creating pipeline, right,
9      for -- you know, by July 22nd.
10              Q.    Did you grow your pipeline at all after being
11     given this?
12              A.    I -- yes.  So the way I understood was that
13     my last day of work, right, official last day of work
14     was June 30th, but I would be paid through July 31st.
15     IBM was not going to reclaim my laptop, so I continued
16     to work on another opportunity at Raley's, so I did
17     grow pipeline, but not 4.3 million.
18              Q.    So hold on.
19                    So you were told your last day of employment
20     was June 30th?
21              A.    My last day of work should be June 30th, but
22     I would be paid through July 31st.
23              Q.    Who told you -- told you your last day of
24     work was June 30th?
25              A.    I recall that came from Robert.

                                              Page 151

1      Q.   When?

2      A.   When I got the PIP.

3      Q.   So Robert was telling you that you were fired

4   when you got the PIP?

5      A.   No, no, no.  He gave me the PIP on the 18th.

6   I wasn't fired then, yeah.

7      Q.   But he told you you --

8      A.   If I -- if I did not meet these by the 30th,

9   right, then yeah, my last day would be the 30th.

10     Q.   Right.

11          But he told you -- he didn't tell you that

12   you were absolutely going to be fired on June 30th, did

13   he?

14     A.   When I called him and asked him that I missed

15   some of these measurements, the June 30th measurements,

16   the goals, I called him and I said, "What does this

17   mean," right?

18          He said that, "As soon as you miss one,

19   you're out."

20     Q.   I get that.  I'm talking about when he gave

21   you the PIP.  It sounds like you're saying when he gave

22   you the PIP, he told you your last day was June 30th.

23          Is that what you're telling me?

24     A.   No.  He told me that if I don't meet these

25   goals, my last day would be the 30th, but I would be

                                        Page 152

1      paid through the 31st.

2           Q.   And that's what he told you during the

3      meeting when he gave you the PIP?

4           A.   That's what I recall.

5           Q.   So between that meeting and June 30th, did

6      you increase your pipeline at all?

7           A.   I think I increased it by -- by the Raley's

8      opportunity.

9           Q.   And how much was that one?

10          A.   That was supposed to be -- it might have been

11     like 200,000.

12          Q.   Okay.  So Goal 1.2 on here is Atlas Hygiene.

13               Was Atlas your CRM?

14          A.   Yes.

15          Q.   It says "Maintain best practices of coding,

16     comments and dates are updated weekly."

17               You see that?

18          A.   Yes.

19          Q.   And did you do that?

20          A.   Yes, I did.

21          Q.   So was that a reasonable expectation?

22          A.   Yes.  That's what we are expected to do on a

23     weekly basis.

24          Q.   So Robert says here you did not meet that

25     requirement, but you don't think that's true?

                                        Page 153

1          A.    I don't believe that --

2          MR. WILLIAMS:   Objection.   Objection to the form.

3    BY MR. BARNES:

4          Q.    Oh, wait.

5              He said "Nelly did meet this requirement,"

6    right?  Right?

7          A.    Yes, yeah.

8          Q.    So he noted that that requirement was

9    satisfied, right?

10         A.    Yes.

11         Q.    So Goal 1.3 is the Revenue Growth Target

12   Number 1, and it says "Revenue attainment of 300,000 by

13   June 30, 2020."

14         A.    Uh-huh.

15         Q.    Correct?

16         A.    Yes.

17         Q.    And is this why you thought you only had

18   until June 30th, was this section here?

19         A.    That's what he explained to me.

20         Q.    Even though the rest of these had deadlines

21   after June 30, right?

22         A.    Yes.  Yes.

23         Q.    Okay.  And so this is asking you to attain

24   revenue of $300,000 by June 30th, right?

25         A.    Yes.

Page 154

1        Q.   And so the expectation wasn't even that you

2    would hit the entire 1.6 million, right?

3        MR. WILLIAMS:  Objection to form.

4        THE WITNESS:  Not according to the PIP.

5    BY MR. BARNES:

6        Q.   Was it according to some- -- something else?

7        A.   The 1.67 -- I mean, 1.6 was never a written

8    objective.

9        Q.   Well, we -- we looked -- we saw earlier where

10   it was, right?

11       A.   I -- I think --

12       MR. WILLIAMS:  Objection to the form.

13       THE WITNESS:  If I recall Sandy's language, it

14   was, you know -- so it was not a -- a quota letter that

15   was issued to me that I have a $1.6 million of

16   objective or goal.

17   BY MR. BARNES:

18       Q.   So Sandy told you to use $1.6 million as your

19   1H target for planning purposes, right?

20       A.   For planning purposes, yes.

21       Q.   And so how did you interpret that?

22       A.   You try -- like I said, as a salesperson, you

23   try to make as much money as possible, so you try to

24   hit and sell as much as possible.  My goal was more

25   than 1.6 million, my personal goal.

Page 155

1        Q.   Right.

2             But that's not what Sandy told you, right?

3        A.   Well, Sandy asked us to use a number to plan,

4   right, our pipelines.

5        Q.   And Sandy said to use 1.6 million as your 1H

6   target, right?

7        A.   That's what it says on her email, yes.

8        Q.   And your PIP told you to sell 300,000 by

9   June 30th, right?

10       A.   That's what it says here, yes.

11       Q.   So this PIP was not adding any expectations

12  that were not already there, right?

13       A.   That is if you assume the 1.6 is a written

14  quota objective.  I was never issued an Incentive Plan

15  Letter with a quota objective.  I was a SRAP.

16       Q.   But managers still have expectations that

17  S rep sellers are going to sell, right?

18       A.   Of course.

19       Q.   And Sandy told you that expectation was

20  $1.6 million, right?

21       A.   For planning purpose.

22       Q.   What's the difference?

23       A.   I can buy a lottery ticket and plan to win

24  it, but I don't always win it.  Actually, I never won

25  it.

Page 156

1    Q.   So Sandy said, "Try to hit 1.6, but it's a

2    lottery.  We don't really care"?

3    A.   I wouldn't say that she said, "I don't really

4    care."  I would not put that in her mouth.  But

5    that's -- you know, you should try, like, to target

6    that dollar amount, but as a -- as SRAP we are not

7    bonded by a quota objective, and that's why we --

8    S reps do not have any accounts with an install base.

9    Q.   So what do you think your -- your managers

10   expected of you in the first half of 2020?

11   A.   Expected me to sell.

12   Q.   How much did they expect you to sell?

13   A.   I would not know what they -- besides what --

14   what Sandy said there for planning purpose.

15   Q.   If they said their expectation was that you

16   would sell $1.6 million, would you have any basis for

17   disagreeing with that?

18   A.   Yes, I -- I do.

19   Q.   What's your basis?

20   A.   My basis is until I get a -- a better --

21   until I get some insight into my accounts and my

22   territory, I cannot call what my pipeline is going to

23   be.

24   Q.   Right.  I didn't ask what your expectation

25   was.  I asked what their expectation was.

Page 157

```
 1              Would you have any reason to disagree that
 2      their expectation was that everyone on the team sell
 3      $1.6 million?
 4          A.   I would have an objection on the expectation
 5      on SRAPs -- on -- on -- on reps who have the SRAP plan.
 6          Q.   And so managers should have just no
 7      expectations at all.
 8              Is that what you're saying?
 9          MR. WILLIAMS:  Objection to form.
10          THE WITNESS:  I did not say that.
11      BY MR. BARNES:
12          Q.   But you just said you would object to them
13      having that expectation for sellers who are S reps.
14          A.   No, I -- I said object to that amount.
15          Q.   So what should the amount have been?
16          MR. WILLIAMS:  Object to the form.
17          THE WITNESS:  I -- if I were the manager, it would
18      be territory dependent.
19      BY MR. BARNES:
20          Q.   Okay.  So what should they have expected from
21      your territory in the first half of 2020?
22          A.   I -- I have not thought about that.  I -- I
23      would say I -- I would expect them to expect me to
24      sell, sell all that I can, and work really hard at it.
25      That's what I would have expect them to expect of me.
```

Page 158

1          Q.   So what dollar amount do you think would have

2     been reasonable for them to have expected you to sell

3     in the first half of 2020?

4          A.   I cannot answer that question.

5          Q.   You can't or you won't?

6          A.   I -- I can't.  I mean, because what I know

7     now, I will -- you know, I'll say $50,000, right,

8     because I have lived through the COVID times.  But

9     going in, I have big dreams like all the sellers,

10    right?  I have big dreams like a successful seller that

11    I've always been, so I did not put a ceiling on myself.

12         Q.   And I'm not talking about ceilings.  I'm

13    talking about floors.  And I'm asking what would a

14    reasonable expectation have been going into 2020 for

15    you to sell in that territory.

16         MR. WILLIAMS:  Objection to form.

17         THE WITNESS:  If you're asking my -- if you're

18    asking an answer based on what I know now happened

19    during that period of time?

20    BY MR. BARNES:

21         Q.   That wasn't my question.

22         A.   Okay.

23         Q.   My question was going into 2020, what would

24    have been a reasonable expectation out of that

25    territory?

                                              Page 159

1              MR. WILLIAMS:  Objection to form.

2              THE WITNESS:  I still would have -- going in at

3       the beginning, I still wouldn't have any idea without

4       knowing the accounts.  Generally -- sorry.

5              MR. WILLIAMS:  No.  Go ahead, Nelly.

6              THE WITNESS:  Generally accounts would have

7       baselines because IBM had done business with them, so

8       IBM would have idea of the potentials.  When accounts

9       have no baselines, that means that the expectation is

10      probably zero, and if you get $1, that is, you know,

11      all right, gravy.

12             MR. WILLIAMS:  Justin, I was going to say we've

13      been going over an hour and a half.  When you get to a

14      good spot, if we can stop.

15             MR. BARNES:  Yeah, let me get through a little bit

16      more.

17             MR. WILLIAMS:  That's fine.

18      BY MR. BARNES:

19             Q.   All right.  1.3, the goal was $300,000 by

20      June 30th, and -- and you did not meet that goal,

21      right?

22             A.   Right.

23             Q.   1.4 is Revenue Target Number 2, which was

24      asking you to achieve 760,000 by July 22nd, right?

25             A.   Correct.

                                            Page 160

```
1          Q.   And so did you read this to say if you hit
2     the 300,000 by June 30, then you would have to also hit
3     the 760 by July 22?  Is that how you read it?
4          A.   Yes.  That's how Robert explained it to me.
5          Q.   Okay.  Got it.
6               And so you -- you obviously did not hit that
7     goal, right?
8          A.   Correct.
9          Q.   What was your -- at the time that he gave
10    this to you, which I guess is the meeting where Robert
11    gave this to you on June 18th?
12         A.   Yes.
13         Q.   What was your pipeline on June 18th?  Do you
14    remember?
15         A.   I can't remember.
16         Q.   Was it zero?
17         A.   No, it was not zero.
18         Q.   Okay.  And then Goal 1.5 is "Customer Meeting
19    Attainment, ten meetings per week that focus on the CTS
20    initiatives."
21               You see that?
22         A.   I saw that.  Yes, I see it.
23         Q.   What is CTS?
24         A.   That is Client Technical Specialist.  That's
25    my technical teammate.
```

Page 161

1   Q. Okay. And did you have ten meetings per week

2 that focused on the CTS initiatives?

3   A. No, because no one -- because most of the

4 accounts that I had, they shut down.

5   Q. Did you try to have those meetings?

6   A. Yes, we -- my -- my CTS or my -- my system

7 architect, we have webinars. We called them, we

8 emailed, asking for emails. We -- we asking for

9 meetings. We -- I think we had maybe like one or two

10 meetings a week that people actually talked to us,

11 right, not just -- and then doing the webinars, we may

12 have seven or eight people in those sessions. But --

13 but I don't think that's my understanding of the

14 meetings that -- that I got from Robert. They had to

15 be in person.

16   Q. So under Global Manager's comments --

17   A. Uh-huh.

18   Q. -- just under that on Page 3, it says "Nelly

19 has been a long time IBM employee and has showed

20 extreme professionalism during this PIP process."

21   Do you see that?

22   A. Yes, I see it.

23   Q. And you agree with that?

24   A. Yes, I would agree with that sentence, yeah.

25   Q. It goes on to say "Nelly did not meet a

Page 162

1    majority of the goals outlined in this PIP and will be

2    separated from IBM on 7/22/20," right?

3        A.    Yes.  Yes, that's what it says, yeah.

4        Q.    And then if you go down to the last page, you

5    see signed by Robert and Todd on July 17th, right?

6        A.    Right.

7        Q.    And so is it your understanding that

8    July 17th is when Robert and Todd met and discussed

9    your progress on this?

10       A.    With me?

11       Q.    No, with each other.

12       A.    Oh, that, I don't know.

13       Q.    Okay.

14       A.    Yeah.

15       Q.    Is there anything you could have done between

16   July 17th and July 22nd to meet these PIP requirements?

17       A.    No, I -- not with the accounts that I had.

18       MR. BARNES:  All right.  Let's go off the record.

19           (Brief recess taken.)

20       MR. BARNES:  All right.  We are back on the record

21   after a short break.

22   BY MR. BARNES:

23       Q.    Ms. Leong, you understand you're still under

24   oath?

25       A.    Yes.

Page 163

```
 1              Q.   Great.

 2                   Is there anything you feel like you need to

 3        change or clarify about your testimony so far?

 4              A.   No, I don't think so at this point.

 5              Q.   Okay.  Thank you.

 6                   All right.  Let me pull up the next exhibit.

 7        These are -- were previously marked.  Let me pull up

 8        Exhibit 31 first.

 9              A.   31.  Okay.

10              Q.   Yes.  Okay.  Should be up.

11              A.   Okay.

12              Q.   Let me know when you have it.

13              A.   Okay.

14              Q.   This is an email from Robert Cortez to you

15        dated July 17th, right?

16              A.   Yes.

17              Q.   This says "Nelly, this notice to confirm our

18        conversation last night.  As discussed, your

19        performance did not improve to the level required while

20        you were on the Performance Improvement Plan," right?

21              A.   Yes, I see it.

22              Q.   And so this suggests that you had a

23        conversation with Robert on July 16th; is that right?

24              A.   Possibly.  I can't remember.

25              Q.   Okay.  So you don't remember what would have
```

Page 164

1       been discussed during that July 16th phone call?

2              A.   No, I -- I don't.

3              Q.   Okay.

4              A.   Sorry.

5              Q.   No, that's okay.

6                   It goes on to say "As a result, you are being

7       separated from IBM.  Your last day of work is

8       July 20th.  We will pay you through July 31st" -- I

9       mean "July 22nd.  We will pay you through July 31st,"

10      right?

11             A.   Yes.  I see it, yes.

12             Q.   And is that your understanding of -- of what

13      happened?  Your last day of work was July 22nd, but you

14      were paid through July 31st?

15             A.   Not at -- according to this, yes, but like I

16      said, my earlier understanding from him when -- when I

17      received the PIP was my last day of work is June 30th

18      and I was paid through July 31st.  And I remember

19      thinking to myself, oh, I got paid for a whole month --

20             Q.   Okay.

21             A.   -- and officially I didn't have to work.

22             Q.   So your impression was once you were not able

23      to hit that June 30 revenue target, then you just

24      stopped working?

25             A.   That -- that I would -- that I would be

                                                   Page 165

```
 1        considered failing on my PIP, not stop working, but

 2        failing my PIP; that -- that I was -- I was out, per my

 3        conversation with Robert.

 4             Q.   Did you stop working as of June -- June 30th?

 5             A.   No, I didn't.  No, I did not.

 6             Q.   Okay.  So you kept working until, what,

 7        July 17th?

 8             A.   I think I actually worked past that trying to

 9        help close the Raley's deal.

10             Q.   So this goes on to say "You've been offered

11        the Performance Separation Plan, copy attached.  You

12        should thoroughly review the agreement.  You will have

13        30 calendar days post employment to consider and return

14        the agreement as per the details within the document,"

15        right?

16             A.   Yes.

17             Q.   All right.  So let's take a look at that

18        document, which was previously marked as Exhibit 32.

19        Let me introduce it here.

20                  Okay.  Should be up now.

21             A.   Okay.  Okay.  Yes, I see it.

22             Q.   This is entitled "Performance Separation Plan

23        Summary Plan Description," right?

24             A.   Yes.

25             Q.   And this is what IBM was offering you at the
```

                                                    Page 166

1     time of your termination, right?

2          A.   Yes, I believe so, yeah.

3          Q.   And it included -- if you see Plan Payments,

4     it included one month of pay, right?

5          A.   Through July 31st, yes.

6          Q.   That was your understanding, is that what was

7     being offered under this PSP was just the payments

8     through July 31st?

9          A.   That's my understanding, yes.

10         Q.   Did you ask anyone to clarify that?

11         A.   No, I -- I didn't.

12         Q.   You ultimately did not accept this, right?

13         A.   I did not.

14         Q.   Why not?

15         MR. WILLIAMS:  I'm just going to object to the

16    extent you can answer this without disclosing any

17    attorney-client privileged communications.

18    BY MR. BARNES:

19         Q.   And to be clear, I don't -- I'm not asking

20    you to disclose any attorney-client privileged

21    communications.  I don't want you to tell me anything

22    you've discussed with your attorneys.  I just want to

23    know why you did not accept this PSP.

24         MR. WILLIAMS:  I'm going to state the same

25    objection.

Page 167

```
 1            THE WITNESS:  I did not accept at the time because
 2       it -- it's not a package that offered me much, so I did
 3       not want to be bind by it -- bind by it -- by it.
 4       BY MR. BARNES:
 5            Q.   Had you known that it was an additional month
 6       beyond July 31st, would that have impacted your
 7       decision?
 8            A.   No.
 9            Q.   So is it your understanding that Robert and
10       Todd were the ones who decided to terminate your
11       employment?
12            A.   I was -- I mean, I wouldn't say that's my
13       understanding, but that's my speculation --
14            Q.   Okay.
15            A.   -- that they're the ones, yeah.
16            Q.   And is that just because you don't -- you're
17       not sure who made the decision?
18            A.   Correct, because I -- I couldn't -- you know,
19       even though it's a performance, you know, letter, the
20       fact that I had 12 days to meet -- I have to meet what
21       is that goal, right, in order to stay in, and so yeah.
22            Q.   Let me ask you this way.
23                 Do you know who made the decision to
24       terminate your employment?
25            A.   I don't know that.
```

Page 168

1      Q.   Okay.  Do you know whether -- do you know who

2   was involved in the decision to terminate your

3   employment?

4      A.   I don't know that.

5      Q.   To the extent that it was Robert and Todd who

6   made that decision, do you have any reason to believe

7   they were influenced by the people above them?

8      MR. WILLIAMS:  Object to the form.

9      THE WITNESS:  I -- I -- I won't know that.  I can

10  only say that, right, it was a performance letter.  But

11  Todd was still praising me about the deal that I closed

12  at Jackson, so I -- so I don't know where, you know,

13  this is coming from.

14  BY MR. BARNES:

15     Q.   Okay.  So it sounds like you don't know

16  whether they were influenced by anyone above them?

17     A.   I wouldn't know, yeah.

18     Q.   Okay.  Did anyone ever say anything to you

19  about coming back as a contractor at IBM?

20     A.   No, no one did.

21     Q.   Do you know what happened to your territory

22  or your accounts after you left?

23     A.   I heard -- I heard that someone new joined

24  the team to cover the -- the -- I don't know if it's

25  the same account, the territory, Pacific Northwest.

                                        Page 169

```
 1                Q.   Who's that?

 2                A.   Oh, I don't know the person.  I think it's a

 3      new hire.

 4                Q.   Do you know anything about that person?

 5                A.   Besides that it's a she, that's what I heard,

 6      and a college grad or something like that.

 7                Q.   Who did you hear that from?

 8                A.   I would -- oh, gosh.  It could -- it could be

 9      Ginni.  It could be Randall.  It could be Jack.  Those

10      are the three people I -- I kept in touch.

11                Q.   It -- it could be or you did hear that from

12      them?

13                A.   I -- I heard it from one of them.  I don't

14      remember who said it.

15                Q.   You heard it from one of those three people?

16                A.   That seems to be what I recall, yes.

17                Q.   And you said Ginni, Jack, or who?

18                A.   Randall.

19                Q.   And other than these conversations with

20      Ginni, Jack, and Randall, do you have any other

21      knowledge about who was covering your territory or your

22      accounts after you left?

23                A.   No, I don't.

24                Q.   Do you know someone named Chris Lawrence?

25                A.   Chris Lawrence?
```

Page 170

1     Q.   Right.

2     A.   That name doesn't sound familiar.  I mean,

3   it's -- the name itself is common, so -- but it doesn't

4   sound familiar as someone I know.

5     Q.   Right.

6     A.   Yeah.

7     Q.   Do you know whether you were the oldest

8   person on the team or whether there was anyone on the

9   team older than you?

10     A.   I won't know that.

11     Q.   Okay.

12     A.   Yeah.

13     Q.   Jack and Randall and Ginni, are they still at

14   IBM?

15     A.   I don't think Ginni is.  I don't think

16   Randall is either.  I don't know about Jack.

17     Q.   Do you know why Randall and Ginni left?

18     A.   No, I don't.  That, they did not share.

19     Q.   And how old were you at the time of your

20   termination in 2020?

21     A.   2020.  I have to do my math.  July 2020.

22   50 -- 59, right?  '21 would be 60.  59, yes.

23     Q.   Okay.  How long were you planning on working?

24     A.   For as long as I can.

25     Q.   You had no retirement plan?

Page 171

1        A.   No.  I -- I -- I enjoyed working.  I -- I

2   grew up with a working mom, so -- and I -- I do like

3   working with customers/clients, right, solving

4   problems, so I hadn't planned on retiring any time

5   soon.

6        Q.   And you hadn't even thought about how long

7   you'd want to work?

8        A.   Oh, I was probably -- I would probably say if

9   I were to -- if you were to ask, put a number in the

10  air, at least five, six, seven years.

11       Q.   Past your termination date or from now?

12       A.   Probably from now.  From now.

13       Q.   Okay.

14       A.   Yes.

15       Q.   Got it.

16       A.   You have to be able to collect social

17  security first, right?

18       Q.   Right.

19       A.   That's 67, best-case scenario.

20       Q.   For now.

21       A.   For now.  By the time I get there, it will

22  probably be like 72, and then I'll be working until 72.

23       Q.   Who knows.

24       A.   Yeah.

25       Q.   Did you ever record any conversations with

                                          Page 172

1    any IBM employees?

2         A.    Record?  No, never.

3         Q.    Okay.  So in this case you are contending

4    that you were fired because of your age, right?

5         A.    I cannot think of other reasons, even though

6    it says it in the Performance Plan.  As I say, Todd

7    used me as a model citizen for closing the Jackson deal

8    in the midst of COVID, so I cannot think of other

9    reasons.

10        Q.    What makes you think that it was your age?

11   Is it just because you can't think of another reason?

12        A.    No.  I mean, since I don't know where the

13   decision came from, so it's hard to -- for me to say,

14   right?  But, you know, there were a couple of

15   conversations that I had with Robert Cortez that he

16   gave me the feeling that, you know, you're old and

17   maybe not as creative.

18        Q.    Tell me about those conversations.

19        A.    I think the first one was when he highly

20   suggested for me to talk to his son, who was an inside

21   salesperson, I believe it was, for the software group.

22   And he said that, "Oh, you should really talk to my

23   son."

24             I said, "Oh, what" -- I said, "Oh, you know,

25   what does he do?"

                                        Page 173

```
 1              And he told me he's an inside sales rep for a
 2       software group.
 3              I said, "Oh, what things do they do," you
 4       know.
 5              And he said, "Oh, yeah, you know, they --
 6       they have all these creative ways.  I'm telling you,
 7       Nelly," something along that line, you know, "these
 8       young people, you know, they're just really creative."
 9              So that -- when I first heard it, you know,
10       I -- I just kind of, "Oh, interesting," you know.  I
11       took it as, oh, my fellow, right, teammate suggesting
12       for me to strategize, right, with someone else.
13              But then, you know, when he said that, you
14       know, "these young people," I said, "Okay."  I thought
15       to myself, "How old do you think I am," right?
16              So -- and then -- but then I -- you know,
17       talked more about, you know, how he -- his son would
18       do, you know, what these creative things are, and it
19       was basically using an IBM, you know, sales tool that
20       the storage sales team did not have.
21              So I told him, "Oh, okay."
22              So then I -- you know, I didn't have any
23       conversation with his son, and then I don't know when
24       he brought it up again.  I -- I think -- let me step
25       back.
```

Page 174

1          The first time he said it when I found out

2     that, you know, the software group actually has more

3     tools than storage sales, I said, "Oh, okay."  I know

4     that storage sales division was trying to roll out

5     those some -- same kinds of tools to -- to us.

6          And I said, you know, "I didn't need to talk

7     to your son yet."

8          And he actually got a little upset that I

9     didn't want to talk to his son right away, but then,

10    you know, I didn't think much of that because I just

11    figured maybe he would -- he would -- he was just

12    really passionate about it.

13         And then he brought it up again another time,

14    so it kind of give me a little question in my head

15    that, you know, are people thinking that I'm old,

16    right, because it came from my peer, so...

17    Q.   So was this before Robert was your manager?

18    A.   Yes.  The first conversation was, yes.

19    Q.   When was that?

20    A.   I think it was actually -- this was

21    actually -- I can't remember exactly.  I think --

22    because the first time I met him was at the kickoff the

23    second half of 2019.  I think it might have been, you

24    know, during that trip that he mentioned it.

25    Q.   Okay.

                                        Page 175

1        A.   And that was also the same trip, same

2   meeting, kickoff meeting that Todd announced that I --

3   I had 35 years, right?  That was to the bigger -- you

4   know, the whole team again.  So -- I -- I have 35

5   years, you know, this year -- that -- that year.

6        Q.   And so when did Robert mention this the

7   second time?

8        A.   The second time was -- I cannot remember

9   exactly, but I think it was after Sandy left when we

10   didn't have a manager, so Amy was sitting in as a

11   software sales executive.  And I noticed that Robert

12   started sitting in on my cadence call with Amy, and

13   then that got brought up again, yeah.

14        Q.   Okay.

15        A.   I mean, at that time, the second time he

16   didn't -- he didn't say, you know, "Oh, these young

17   people," right?  He just said, you know, "You should

18   talk to my son."  He didn't use the same description,

19   right?

20        Q.   Got it.

21        A.   Yeah.

22        Q.   So he -- he made the "young people" comment

23   around July of 2019?

24        A.   Yes, yeah.

25        Q.   Okay.  And how old is Robert?

                                              Page 176

1      A.    I don't know.

2      Q.    Do you know whether he's older or younger

3  than you?

4      A.    I -- I -- I'm going to guess that he's

5  younger than me.

6      Q.    Why do you say that?

7      A.    I think at that time his son was 25 and my

8  son was -- at the time was about 25.  But I waited for

9  a long time to get married to have a child, and my -- I

10  seem to recall that, you know, he did not wait 13

11  years, dated the same person for 13 years before he got

12  married.

13      Q.    Okay.

14      A.    Yeah, so I'm -- I'm -- so I'm -- I'm

15  guessing.

16      Q.    Did you ever hear anyone else make comments

17  about age or young people or anything like that?

18      A.    Just it -- it's not specific to storage

19  sales, just that I've heard, you know -- you know,

20  when -- when people got together, right, you know,

21  in -- in meetings or get together, "Oh, IBM's practice

22  is to hire younger people."  And the client executives

23  or client managers whom I supported, they're all pretty

24  much college grads.

25      Q.    So who did you hear say that IBM's practice

Page 177

1       was to hire younger people?

2              A.   It -- it -- you know, it's just like, you

3       know, when people are just chatting, right, in a -- in

4       a -- in a -- in a -- in a conference or in a meeting or

5       things like that, right?  So I cannot tell you who said

6       it.  I can't even tell you who -- who were in those

7       conversations, but --

8              Q.   Can you -- I'm sorry.  Go ahead.

9              A.   No.

10             Q.   Can you tell me when you heard that?

11             A.   Oh, gosh.  I -- a specific time period, no, I

12      cannot, you know.  It had to be within the last, you

13      know, couple of years because --

14             Q.   Why do you say that?

15             A.   Because I never thought of myself as old,

16      right, so, you know, those statements did not, you

17      know -- yeah, so I -- I can't tell you, like, when.  I

18      mean, it's not -- I guess it's also in the news too,

19      right?  Those I did not hear.  I just kind of read.

20             Q.   So sometime within the last couple of years

21      of your employment, someone said something about IBM

22      hiring younger people, but you don't know who?

23             A.   No.  I mean, you know, you know when people

24      are kind of, like, getting together, right, where

25      there's a conference or big meeting and, you know --

                                              Page 178

1      and then you just hear a part of the conversation.

2           Q.   But I want to be clear about this.

3                You -- you cannot name a particular person

4      who said this?

5           A.   No, I cannot.

6           Q.   And you cannot identify a particular time

7      when you heard this?

8           A.   I cannot.

9           Q.   Okay.  Any other comments you heard about

10     age?

11          A.   Not that I can think of at this point.

12          Q.   Did Todd ever say anything inappropriate

13     about age?

14          A.   Not that I can think of at this moment.  I

15     don't have a whole lot of conversations with Todd.  I

16     didn't have, yeah.

17          Q.   Did you ever hear Amy or Sandy say anything

18     about age?

19          A.   I can't think of it right now.

20          Q.   So you mentioned something about it being in

21     the news.

22               What are you talking about?

23          A.   Once in a while you just see it, you know, go

24     through the headlines, oh, you know, IBM is in

25     litigation or something, right?

Page 179

1      Q.   Can you tell me any particular article where
2    you saw?
3      A.   No, I -- I usually don't pay attention to
4    those.  You know, I usually just see the headline and I
5    say, "Oh, okay."
6      Q.   Can you tell -- can you tell me when you saw
7    that?
8      A.   Oh, this is probably, you know -- I -- I have
9    no -- I cannot tell you.
10     Q.   And was it about -- were those articles about
11   age?
12     A.   I -- I -- I didn't read the articles.  I
13   mean, you know, that's what the headline said.
14     Q.   What did the headline say?
15     A.   Something along the line of IBM in a lawsuit
16   for age discrimination.
17     Q.   Do you know if those lawsuits were talking
18   about anything related to storage sales?
19     A.   I don't know.  I did not read the articles.
20     Q.   Okay.  Is there anything else that made you
21   think that your age had something to do with your
22   termination?
23     A.   No, just -- just kind of, right, process of
24   elimination.
25     Q.   Did you ever hear the phrase "early

                                              Page 180

1    professional hire"?

2         A.   Early professional hire, I don't think so.

3         Q.   Did you ever hear about a millennial core?

4         A.   I don't think so.

5         Q.   Did you ever hear anyone talk about

6    millennials?

7         A.   Yes.

8         Q.   Tell me about that.

9         A.   Well, I have one.

10        Q.   I mean, did you ever hear anyone at IBM talk

11   about millennials?

12        A.   Oh, I don't think so.  I mean, not in my

13   conversations.

14        Q.   Have you ever heard the phrase "dino babies"?

15        A.   Dino babies?

16        Q.   Yes.

17        A.   I don't think so.

18        Q.   Did you ever hear about any investigation by

19   the EEOC into age discrimination at IBM?

20        A.   Besides the headline that I saw, but --

21        Q.   Right.

22        A.   Yeah, no.  Oh, sorry.

23        Q.   Okay.  I want to make sure I understand your

24   answer because you just said, "Yeah, no."

25             So did you ever hear anything about an EEOC

                                         Page 181

1          investigation into age discrimination at IBM?

2                A.    Yes, I have read the headlines.

3                Q.    When?

4                A.    Oh, I think different points in time.  I

5          mean, they -- I cannot tell you when.  I think there --

6          I think there was one, like, just -- just a few months

7          ago.  I cannot tell you for sure.  I -- I subscribe to

8          Apple News, so I get headlines coming from so many

9          sources.

10               Q.    Did you ever get interviewed by the EEOC as

11         part of that investigation?

12               A.    No.

13               Q.    Do you know whether that investigation had

14         anything to do with storage sales?

15               A.    I have no idea.

16               Q.    Who do you think was the bad guy at IBM?

17               MR. WILLIAMS:  Objection to form.

18               THE WITNESS:  I -- how do you define "bad"?

19         BY MR. BARNES:

20               Q.    Let me ask it this way.

21                     Do you think Todd wanted to fire you because

22         of your age?

23               A.    I won't know that.  I don't -- you know, I --

24         I can't read his mind.

25               Q.    What about Robert?  Do you think he wanted to

                                              Page 182

1   fire you because of your age?

2     A. Again, I don't know that.

3     Q. All right.  Let's take a look at Exhibit 61.

4     (Whereupon Exhibit 61 was marked for

5   identification, a copy of which is attached hereto.)

6   BY MR. BARNES:

7     Q. Let me know when you have it.

8     A. Yes, I have it.

9     Q. I believe this is an offer letter from KPMG

10   to you, right?

11     A. Yes.

12     Q. And you're currently still working for KPMG?

13     A. Yes.

14     Q. This offer letter says that they offered you

15   the position of Manager, Transformation Delivery,

16   right?

17     A. Yes.

18     Q. Is that the position you still hold?

19     A. Yes.

20     Q. What do you do in that role?

21     A. I consult clients who are going through a

22   transformation project, whether it's business processes

23   or technology transformation, you know, different

24   things like that, and I specifically -- my role is a

25   project manager.

Page 183

1          Q.    Okay.  And this suggests a start date of

2     March 15, 2021.

3                Is that when you started?

4          A.    Yes.

5          Q.    And it says you had an annual salary of

6     $165,000, right?

7          A.    Yes.

8          Q.    And I think at some point it went up to

9     $168,000; is that right?

10         A.    Yes.

11         Q.    What is it now?

12         A.    What is it now?  Oh, I don't remember.  I --

13     yeah.  I know I got -- I -- I remember I -- that I have

14     gotten two raises already, so -- since I started.

15         Q.    Do you like working at KPMG?

16         A.    Yes, I do.

17         Q.    Is -- and so it sounds like that's more of a

18     consulting role than a sales role?

19         A.    Yes.

20         Q.    Do you make commissions?

21         A.    No, I don't.

22         Q.    What about bonuses?

23         A.    Yes.

24         Q.    What type of bonuses are you eligible for?

25         A.    Generally that's based on performance, and

                                               Page 184

1      your performance is tied to your utilization.

2           Q.    Utilization being how much you bill?

3           A.    Exactly.

4           Q.    I'm familiar with that.

5           A.    Okay.  Yeah.

6           Q.    Have you been -- have you been paid bonuses

7      from KPMG?

8           A.    Yes, I have.

9           Q.    Do you know how much?

10          A.    So the bonus is annual, annual according to

11     their fiscal year.  So I got one.  I think it was

12     September when it close.  It was -- it might have been

13     $5,000, 7,000.  I can't remember.

14          Q.    Okay.  And you also get benefits?

15          A.    Yes, I do.

16          Q.    How do the benefits at KPMG compare to IBM's

17     benefits?

18          MR. WILLIAMS:  Objection to the form.

19          THE WITNESS:  It's -- it's not apple to apples.

20     KPMG, they have no stock options, right, because they

21     don't have stocks, so -- so -- so it's hard to compare

22     one to one.

23     BY MR. BARNES:

24          Q.    What about the medical insurance?  How does

25     that compare?

                                        Page 185

1    A.   So I cannot remember what the -- I can tell

2    you, compared to my COBRA, KPMG's medical is lower.

3    The benefits is better.

4    Q.   But compared to pre-COBRA when you were still

5    at IBM?  You don't know?

6    A.   I can't remember how -- yeah, I cannot

7    remember how much I was paying.

8    Q.   And you got stock at IBM; is that right?

9    A.   Stock options, yeah.  You can -- like a

10   certain percentage of your -- I think only salary or

11   maybe bonus or commission too, you can buy stocks at

12   15 percent off.

13   Q.   Did you do that?

14   A.   Yes, I did.

15   Q.   How much stock did you buy?

16   A.   Oh, I -- I generally maxed it out every pay

17   period, along with the commissions.

18   Q.   And was that stock or a 401(k)?

19   A.   Stock.

20   Q.   Okay.  Was everyone eligible to buy stock?

21   A.   I don't know whether it was changed for,

22   like, new hires, whether they'd have to go through a

23   certain period, but yes, everyone is eligible.

24   Q.   And that was every pay period you were

25   eligible to --

Page 186

1       A.   Yes.

2       Q.   Okay.  Since getting your job at KPMG, have

3   you applied for -- for any other jobs?

4       A.   Not since, yeah.  I mean, before KPMG, yes, I

5   had.  I did, yes.

6       Q.   But since March 15, 2021 when you got that

7   job, you haven't applied for any other jobs?

8       A.   No, I have not.

9       Q.   You're satisfied with where you're at now?

10      MR. WILLIAMS:  Objection to the form.

11      THE WITNESS:  Right now there's no reason for me

12  to look for another job because, you know, I'm

13  contributing and I'm also growing, right, with the

14  company, so...

15  BY MR. BARNES:

16      Q.   So after your termination, do you recall when

17  you applied for your first job?

18      A.   Oh, I think my first was trying to become a

19  contract tracer -- a contact tracer for COVID because

20  there were not a whole lot of openings around because

21  of the shutdown.  So I -- I pretty much immediately did

22  that, right?  I signed up to be a -- a contact tracer.

23          The other thing was when kids was -- well, I

24  should say when school districts were debating whether

25  kids were going back to school and teachers were saying

Page 187

1    they didn't want to go back to school, so I applied to

2    be a sub, substitute teacher.  So just whatever --

3    whatever opportunities that I thought would open up at

4    that time due to the shutdown.

5        Q.   You applied for the contact tracer position

6    before your termination, right?

7        A.   I -- before my -- before -- after -- after I

8    know that I did not meet my June 30th goal, that I knew

9    that I was going to be laid off, but I think it was

10   sometime in, like, late July that I applied.

11       Q.   Take a look at Exhibit 62.

12       A.   Okay.

13            (Whereupon Exhibit 62 was marked for

14   identification, a copy of which is attached hereto.)

15   BY MR. BARNES:

16       Q.   Is this the contact tracer position?

17       A.   Hold on one second.  Excuse me.  Yeah, that's

18   the contact tracer.

19       Q.   It looks like you applied on June 22nd.

20       A.   Okay.  I don't remember that, but yeah,

21   that -- yeah.  I did not -- I did not remember that I

22   applied that early.

23       Q.   Did you get that job?

24       A.   No.

25       Q.   If you would have gotten it, would you have

                                        Page 188

1    still tried to meet the goals in the PIP?

2         A.   Oh, yes.

3         Q.   You would have just done that at the same

4    time?

5         A.   So my understanding of contact tracer at that

6    time, right, you know, you call people in the evening.

7    Then, yeah, possibly I would do that in the evening,

8    yes.

9         Q.   Do you also have a -- have a job selling

10   insurance?

11        A.   I don't have a job selling insurance.  I have

12   an insurance license.

13        Q.   Do you sell insurance with that license?

14        A.   I sold I think -- I can't even say sold.  I

15   bought one for my son and I bought one for my daughter,

16   and that's it.  So I don't have a business with my

17   insurance license, if that's what you're asking.

18        Q.   You're licensed in California, New Jersey,

19   and New York?

20        A.   Yes.

21        Q.   And you -- do you do anything other than life

22   insurance?

23        A.   No, I don't.  Oh, no, with the insurance

24   license I can do annuity too, but I don't have a

25   business of that either.

                                        Page 189

1          Q.    Are you affiliated with any sort of insurance

2     company?

3          A.    Yeah, I'm affiliated with -- affiliated with

4     Wealth Financial Group, so they only have independent

5     agents, and -- and I can -- I -- the reason I got the

6     license is that's the only way that I can get training

7     to learn how to -- it's all about wealth protection,

8     right?  So in order for me to get training, you have to

9     be a licensed agent and you have to be affiliated with

10    them, so that's why I signed up.

11         Q.    When did you sign up with WFG?

12         A.    Oh, probably 2017 or '18, yeah, but I did not

13    do anything for a long time with them because I just

14    wanted to listen to their, you know, training

15    materials.

16         Q.    When did you start the training?

17         A.    Well, the training is -- is -- so to get the

18    license, it's just a online -- you know, online program

19    that you sign up.  Their training is they have rolling

20    training every Monday, Wednesday night at 7:00 p.m. and

21    Saturday at 10:00 a.m.  It's still the same schedule,

22    never changes.

23         Q.    And how often do you attend that?

24         A.    I have not attended for probably like --

25    well, I attended some after I left IBM because I

                                        Page 190

1    thought, oh, since I have a license, couldn't get any

2    jobs at that time, so I said maybe I can, you know, go

3    into insurance.

4           So I attended more trainings at that time,

5    like probably from, like, August through January,

6    right?  But then once I start -- once more technology

7    jobs opened up, so I focused more on applying for those

8    instead.

9           And -- and the training, because it happens

10   three times a week, after about six weeks, it's the

11   same thing.  So you -- you know, you pretty much don't

12   need to go back and listen to it.

13       Q.   When did you get your license?

14       A.   I want to say either -- I think maybe early

15   2018 -- I -- I can't remember -- or 2017.  I got it --

16   I -- I -- we got it because we were working with them

17   on our own life insurance policies.

18       Q.   How long did it take you to get your

19   insurance license?

20       A.   What do you mean by "how long"?

21       Q.   Well, did you have to take classes?

22       A.    It -- it's just one online class; that once

23   you sign up, I believe they give you three months to --

24   you know, they start the clock.  Once three months is

25   over, you -- you know, you have to pay again if you

                                            Page 191

1    don't finish.  And then -- so I did that, but I didn't

2    take the test right away because you have to pass a

3    test, so that went on for a few more months before I

4    finally took a test.

5        Q.   And -- and you said that you have only sold

6    policies to your son and your daughter; is that right?

7        MR. WILLIAMS:  Objection to the form.

8        THE WITNESS:  I -- I wouldn't even say I sold.  I

9    paid for it.  I bought it for them so I could help them

10   get started on how to save money.

11   BY MR. BARNES:

12       Q.   Okay.  Have you sold insurance to anyone

13   else?

14       A.   No, I have not.

15       Q.   Have you tried?

16       A.   Have I tried?  I have mentioned it to my

17   brothers about, you know, IUL.

18       Q.   Anyone else?

19       A.   No.

20       Q.   Did you try to sell any between your

21   termination from IBM and starting at KPMG?

22       A.   Did I try?  I -- so the company that -- that

23   my license is affiliated with, right, their model is --

24   is -- is to try to get more people to join your team

25   rather than, like, selling.  So I wasn't active.  No, I

                                           Page 192

```
 1     wouldn't say that.  I -- that I tried to sell.  I mean,
 2     I -- I tried to sell, but more importantly tried to see
 3     if people might be interested in the business during
 4     the time that I was laid off.
 5          Q.   Were you able to recruit anyone under your
 6     hierarchy during that time period?
 7          A.   I recruited one, and then she never renewed
 8     again.  She dropped out.
 9          Q.   All right.  Take a look at Exhibit 63.
10          A.   Sure.
11               (Whereupon Exhibit 63 was marked for
12     identification, a copy of which is attached hereto.)
13     BY MR. BARNES:
14          Q.   Is this the application to be a substitute
15     teacher?
16          A.   Yes, it was.
17          Q.   So this is dated August 17, right?
18          A.   Yes.  Yes.
19          Q.   And do you remember whether you applied for
20     any other jobs before this other than the contact
21     tracer job?
22          A.   I can't recall that I did, because a lot of
23     the places was shut down, so -- and not hiring.
24          Q.   All right.  Let me show you Exhibit 64.
25          A.   Okay.
```

Page 193

```
 1                  (Whereupon Exhibit 64 was marked for

 2       identification, a copy of which is attached hereto.)

 3       BY MR. BARNES:

 4            Q.   This is an email dated January 14, 2021 --

 5            A.   Yes.

 6            Q.   -- related to an Amazon position, right?

 7            A.   Yes.

 8            Q.   So I take it you applied for this Glob- -

 9       Global Segment Lead Storage position at Amazon?

10            A.   Yes.  I applied to multiple positions at

11       Amazon.

12            Q.   When is the first time you submitted an

13       application to Amazon?

14            A.   I would probably say might have been like

15       October/November time frame or maybe later.  I -- I

16       can't remember.

17            Q.   Okay.

18            A.   I was sending in, you know, to job sites,

19       right, so different companies, job sites.

20            Q.   What is -- did you apply for any sales

21       positions between being fired from IBM and joining

22       KPMG?

23            A.   Not specifically.  The reason for that is at

24       that time my skills are mostly around storage, and

25       because of my loyalty towards IBM, I wasn't going to go
```

Page  194

1      work for a competitor, so I did not go apply for a

2      storage sales position with EMC or Dell or anyone like

3      that.

4              Q.   Did anyone at IBM tell you not to do that?

5              A.   Not that I recall.

6              Q.   So you didn't look for any positions that

7      were comparable to the position you had at IBM.

8                   Is that fair?

9              MR. WILLIAMS:  Objection to the form.

10             THE WITNESS:  How -- how do you define

11     "comparable"?

12     BY MR. BARNES:

13             Q.   I guess sales position with a technology

14     company.

15             A.   Sales position with a technology company.  I

16     did not apply specifically for a sales position with a

17     technology company, not that I recall I did, but I'd

18     consider it.

19             Q.   What -- what do you mean?

20             A.   Well, as I mentioned, my skills at that time

21     was storage, right?  I have a lot of experience in --

22     in storage, and -- and -- and a lot of the technology

23     companies' openings more software centric.  So unless I

24     want to take my experience and skills to a competitor,

25     then, you know, I wanted to, you know, expand myself

                                              Page 195

1    and try something, you know, totally different from

2    sales.

3         Q.    Okay.  So you made the decision after you

4    left IBM that you were looking for something completely

5    different than sales?

6         MR. WILLIAMS:  Objection to form.

7         THE WITNESS:  I -- I wouldn't say that.  It's just

8    that, you know, I did not want to go work for a

9    competitor, period, right, so definitely not a storage

10   competitor.  And it took me a while to apply to Amazon,

11   right, knowing that they also compete against IBM.  But

12   the positions that I applied, yeah, is -- it wasn't the

13   Cloud business, per se, and still has storage -- like,

14   for instance, this one still has a lot of storage

15   content.

16   BY MR. BARNES:

17        Q.    "This one," you're referring to Amazon?

18        A.    Yeah, yeah, Global Segment Lead Storage.

19        Q.    I'm not trying to put words in your mouth.  I

20   thought you just said you decided you wanted to try

21   something different other than sales.

22              Is that not what you said?

23        A.    Well, not -- not so much that different from

24   sales, but -- what's the best way to explain my mindset

25   back then, right?  I was trying to look for something

                                          Page 196

1       that will allow me to expand on my skills, not just a

2       job that my -- my skill would fit for, meaning a --

3       a -- a position that have more requirements than just

4       storage sales.

5                It's almost like instead of just a, you

6       know -- yeah, I don't know how to explain it, you know,

7       my mindset at the time.  You know, I cannot explain it

8       to you.  I just knew that I didn't want to work for a

9       competitor.

10               Q.    Because you felt loyalty to IBM?

11               A.    Yes.

12               Q.    Even though you were suing IBM at the same

13      time?

14               A.    Yes.  I still have good friends at IBM.

15               Q.    So other than Amazon, what other companies do

16      you remember applying to, other than Amazon and the

17      contact tracer and the substitute teacher position?

18               A.    Because I applied to, I think, at least three

19      positions at Amazon, and then -- you know, and then

20      subsequently the KPMG, everything happened so fast and

21      so condensed, I did not apply to anything else.

22               Q.    Got it.

23               So you had the contact tracer, the substitute

24      teacher, the three positions at Amazon, and then KPMG.

25               Those are the applications you submitted?

                                              Page 197

1          A.   Yes.

2          Q.   Okay.  Got it.

3               Between your termination from IBM and

4     starting work at KPMG, did you go on any vacations?

5          A.   No.

6          Q.   Did you purchase any vehicles?

7          A.   No.

8          Q.   Or any real estate or anything like that?

9          A.   No.

10         Q.   So IBM has procedures for employees to report

11    suspected age discrimination, right?

12         A.   I was not aware of that.

13         Q.   You didn't know whether you could report

14    internally allegations of age discrimination?

15         A.   No, I did not know that.

16         Q.   Are you familiar with the Business Conduct

17    Guidelines?

18         A.   Yes, I'm familiar with that.

19         Q.   What are those?

20         A.   That's basically how we're supposed to

21    conduct ourselves either with each other or with

22    others, right, our clients and customers.

23         Q.   And you had to do training every year on the

24    Business Conduct Guidelines, right?

25         A.   Yes.

Page 198

```
 1           Q.   Take a look at Exhibit 65, please.
 2                (Whereupon Exhibit 65 was marked for
 3      identification, a copy of which is attached hereto.)
 4           THE WITNESS:  I have it open.
 5      BY MR. BARNES:
 6           Q.   This is a copy of the Business Conduct
 7      Guidelines, right?
 8           A.   I don't know what year this is from.  Do
 9      you -- do you know?
10           Q.   If you go to the very last page --
11           A.   Okay.  It's 2018, I think this says.
12           Q.   The copyright is 2018, right?
13           A.   Okay.
14           Q.   Is that right?
15           A.   That's what it says, yes.
16           Q.   And -- and you're familiar with this
17      document?
18           A.   I'm fam- -- familiar with this document, but
19      we also have, like, interactive modules that we go
20      through.  That's -- that one is more -- yeah.
21           Q.   Does the interactive modules say anything
22      about reporting potential wrongdoing?
23           A.   Yes, potential wrongdoing, yes.
24           Q.   So go to Page 8 of the BCG, please.
25                You see Section 1.3?
```

Page 199

1        A.   Yes.

2        Q.   It says "IBM expects IBMers like you to

3   report potential wrongdoing whether a violation of the

4   BCGs or other unethical or unlawful conduct involving

5   IBM," right?

6        A.   Yes.

7        Q.   It says "If you are aware of or suspect a

8   violation of the BCGs or other unethical or unlawful

9   conduct, immediately report it through any of IBM's

10  communication channels," and then it lists a variety of

11  channels you can report through, right?

12       A.   Yes.

13       Q.   What -- did you not think that suspected

14  discrimination would be a violation of the BCG or

15  unethical or unlawful conduct?

16       MR. WILLIAMS:  Object to the form.

17       THE WITNESS:  So in -- in the interactive training

18  modules, if I recall correctly, you know, it's always

19  about sexual misconduct, you know, bullying, you know,

20  things like that.  I don't recall anything that talked

21  about age discrimination.

22  BY MR. BARNES:

23       Q.   Did you feel like you were being

24  discriminated on account of your age before your

25  termination?

                                        Page 200

1      A.   I don't know how to answer that.

2      Q.   Let me ask it this way.

3           When is the first time you felt like you were

4    being discriminated against on the basis of your age?

5      A.   I -- I suppose the day that I got the PIP,

6    because then -- then you -- you know, I went back and

7    go, oh, maybe that's why, you know, accounts -- right,

8    the accounts that I have had and I have had success and

9    terrific relationship with customers got taken away

10   from me because I'm not as valued anymore.

11          So, you know, so it's -- it's just kind of --

12   I don't -- I don't know how to, like, give you specific

13   examples, because I don't understand why, right, I got

14   the PIP besides what it says on the letter while, you

15   know, the -- throughout the year the reviews that I

16   got, you know, the comments, right, it was more

17   encouraging and supportive than "you're not

18   performing," so I don't know what other reasons I have.

19   I don't know what to say to you on that.

20     Q.   You never reported internally any complaints

21   of age discrimination, right?

22     A.   No, I -- like I said, I didn't think that

23   that was one that is -- that you report on.

24     Q.   The BCGs prohibit age discrimination, right?

25     A.   I don't --

                                          Page 201

```
1              MR. WILLIAMS:  Objection to form.

2              THE WITNESS:  I -- I don't know.  Like I said, the

3       training I recall did not cover age discrimination.

4       BY MR. BARNES:

5              Q.   Did you ever read the Business Conduct

6       Guidelines?

7              A.   Yes, I did.

8              Q.   Take a look at Page 12.

9              A.   Whoops, sorry.  Okay.

10             Q.   So this says that IBM prohibits age

11      discrimination, right?

12             A.   Yes, that's there, yeah.

13             Q.   Okay.  Was there any sort of party or

14      celebration or anything like that to celebrate your

15      35th anniversary?

16             A.   No, there wasn't.

17             Q.   Just the announcement by Todd?

18             A.   And -- and -- and circulating, you know, via

19      email.

20             Q.   Are you contending in this lawsuit that your

21      termination from IBM caused you to suffer emotional

22      distress?

23             A.   Yes.

24             Q.   Tell me about the emotional distress that you

25      suffered.
```

Page 202

1          A.    I was hoping that we don't have to go there.

2                I have become so self-conscious of my age to

3     a point that I don't want people to know that I have

4     three kids, definitely not one who's 27 years old.  So

5     it -- professionally, outside my friends, I don't share

6     anything about my family, about my kids, because I

7     don't want people to, once again, mathematically ask,

8     "Oh," you know, "you're this age?"

9                And, you know, there was an incident, right?

10    One of my peer managers left a project, and I called

11    her to say, you know, "Hope everything's okay," and she

12    told me that, oh, she had to find an internal job so

13    that she won't have to travel, because as consultants

14    you're expected to travel and she has a young kid.

15               And we started talking about kids, and she

16    asked me, "Oh, do you have any kids?"

17               And I took a few seconds to answer, and I

18    said, "I have two," because I didn't want her to ask

19    me, "Oh, how old are they" and to say that I have a

20    27-year-old.

21               So I can't -- I can't even be proud of my

22    kids.  I cannot have a personal relationship with

23    people I work with because I don't want to share

24    anything.

25               I -- I -- I run the -- excuse me.  I run

Page 203

1          quite a few meetings, you know, with partners, and one

2          of them is Monday morning at 8:30, and I always ask

3          people, "How was your weekend?"  You know, "What did

4          you do?"

5                    And then occasionally people will turn the

6          question on me and say, "Oh, how was your weekend?

7          What did you do?"

8                    Even though I have spent, like, the greatest

9          weekend going to my daughter's volleyball tournament,

10         or there was one weekend that my son got engaged and we

11         spent a whole weekend with him and his fiancée, I

12         basically just said, "Oh, I didn't do anything.  I just

13         kind of lounged around.  Yeah, those are the best

14         weekends because I didn't do anything."

15                    And I find that to be -- I'm so ashamed that

16         I have to go through that and feel guilty of having

17         kids, grown kids, when I should be proud of them for

18         what they have accomplished.  That's how I feel from

19         this event from IBM.  I'm sorry.

20              Q.    Have you sought treatment or spoken to a

21         therapist about it?

22              A.    No, I have not.

23              Q.    Have you considered doing that?

24              A.    I don't know.  I mean, I don't know.

25              Q.    So I take it then you haven't been prescribed

                                                  Page 204

1    any medication for the emotional distress you're

2    suffering?

3        A.   No.  I mean, I -- I have not because I

4    haven't seen a doctor for -- for that.  I mean, I have

5    seen two different -- I have seen a doctor for shoulder

6    pain, right?  That was nothing physical.  I went to

7    acupuncturist.  I went to acupuncturist to relieve my

8    shoulder pain due to -- you know, due to, like, knots,

9    stress that I -- but that -- but I didn't go to see --

10   talk to a therapist.

11        And I -- you know, I -- I am trying to -- I'm

12   trying to put the IBM incident behind me, but at the

13   same time, it is hanging over my head while I interact

14   at KPMG with anyone professionally.

15       Q.   Before your termination, previously in your

16   life have you ever experienced any emotional distress,

17   any anxiety or depression?

18       A.   No.  Even when I was -- oh, sorry.

19       Q.   No, go ahead.

20       A.   Even when I was at IBM, I was so proud to

21   share my kids' accomplishments, my kids, what they're

22   up to, what we're up to.  And now people -- a lot of

23   the professionals in a professional setting, probably

24   they may not even know that I'm even married.

25       Q.   You haven't had any traumatic experiences in

                                              Page 205

1       your life that caused you to suffer emotional distress?

2           A.   No.

3           Q.   Never seen a therapist or psychiatrist or

4       psychologist previously?

5           A.   No.  I didn't cry this much when my mom died.

6           Q.   So you think that the termination from IBM

7       caused you more emotional distress than your mother's

8       death?

9           A.   Yes.

10          Q.   Were you close with your mom?

11          A.   Very much so, but she was living in a nursing

12      home in New York City during COVID, and she hated

13      living in a nursing home.  She was there like three

14      years before that, and she often spoke of that, "I'm

15      ready to go."  So the day she died, I know that she

16      probably would think that she's in a better place.

17          Q.   Have you spoken with anyone else who is

18      bringing any sort of age discrimination claim against

19      IBM?

20          A.   No.

21          Q.   Who is -- let me make sure I get the name

22      right -- Deanna Trenham -- Trenham?

23          A.   She was a customer when I was with McKesson,

24      and we became friends.

25          Q.   You still friends with her?

Page 206

1      A.    Yes, I am.  We are, yes.

2      Q.    And you've spoken with Deanna about your

3  claims against IBM?

4      A.    No.  Well, no.

5      Q.    Okay.  So what would she know about the

6  impact of IBM's mistreatment on you?

7      A.    She -- she would know that I'm -- I'm -- I

8  was -- I was very upset about it.  I -- that I was --

9  you know, that I'm, you know, trying to do the best I

10 can to move on.

11     Q.    Do you know -- do you know any other sales

12 representatives at IBM who had been placed on

13 Performance Improvement Plans?

14     A.    A friend of mine probably -- my gosh, this

15 has got to be at least six, seven years ago maybe,

16 maybe five, six years ago -- I can't remember -- she

17 was placed on a Performance Plan for like six months.

18     Q.    What type of job did she have?

19     A.    She was a power server specialist, so the --

20 the server side.

21     Q.    Okay.  How old is she?

22     A.    Oh, I -- I don't know.  I have -- I don't

23 know.

24     Q.    Around the same age as you?

25     A.    Probably, because she has kids my age.

Page 207

1      Q.   Do you know anyone else at IBM who's been put

2   on a PIP?

3      A.   Not that I can think of, because usually you

4   just hear that someone is gone, right, since I'm

5   usually with customers.  So we don't have an office to

6   go to that you can talk about things, you know, next to

7   the water cooler, so I don't hear a lot of things.

8   I -- I did not hear a lot of things.

9      Q.   So do you know how long PIPs typically would

10  last at IBM?

11     A.   My understanding is it is supposed to help

12  you actually improve, right, and then it could be three

13  to six months to demonstrate that, you know, hey, we

14  tried everything.

15     Q.   What's that understanding based on?

16     A.   Just based on, like, my friend who was -- was

17  put on PIP.  She was put on PIP because she did not

18  make her numbers the previous half.  And then she was

19  put on PIP, I think, might have been like halfway

20  through the first quarter when her pipeline wasn't that

21  strong, and then -- and then her PIP ended, like, in

22  either June or July.

23     Q.   And -- and she completed the PIP?

24     A.   She completed the PIP, meaning she went

25  through the whole time?

```
1                Q.   Did she get fired?

2                A.   She -- she -- yeah, she was let go.

3                Q.   And was it because she did not complete the

4       PIP?

5                A.   That was my understanding.  She missed it by

6       like $10,000 or $15,000, at least that's what she told

7       me.

8                Q.   Did she report to different managers?

9                A.   Yeah, she did.

10               Q.   Okay.  So any other basis for your

11      understanding that PIPs usually last three to six

12      months?

13               A.   It's just based on, you know, what I've

14      heard, yeah.

15               Q.   From who?

16               A.   It's not from a particular person.  I mean,

17      I -- I think, you know, sometimes at these big, like,

18      meetings they may say, you know, IBM has such a thing

19      as PIP.  I -- I cannot remember where I might have

20      heard it, and I -- frankly, I never thought of it

21      because I never thought that I would be put on a PIP

22      ever.

23               Q.   Okay.  So you can't -- you can't think of who

24      would have said that PIPs last three to six months or

25      when you would have heard that?
```

                                              Page 209

```
1              A.    Yeah, I cannot say, you know.

2              Q.    Okay.  Any other basis for your belief that

3      PIPs typically last three to six months?

4              A.    I -- I guess really just based on the --

5      the -- the name, right?  Performance improvement is,

6      you know, having a way to improve.

7              Q.    Okay.  Let's take a look at Exhibit

8      Number 66.

9              A.    Okay.

10             (Whereupon Exhibit 66 was marked for

11     identification, a copy of which is attached hereto.)

12     BY MR. BARNES:

13             Q.    So you recently produced a number of journal

14     entries, or your counsel recently produced --

15             A.    Yes.

16             Q.    -- last night a number of journal entries to

17     us.

18             A.    Yes.

19             Q.    So -- and I've -- I've got some excerpts from

20     those journals.  I think there's about 500 pages or so,

21     but I'm not going to go through all of those.  Trust

22     me.

23             A.    Okay.

24             Q.    My -- my first question, though, is just sort

25     of the context for these journals.
```

Page 210

1          Why did you keep them?

2          A.   Oh, they are notes.  So when I -- when I go

3     to meetings, depending on the setting, right, I don't

4     want to be heads down typing, right, while I'm supposed

5     to be having eye contact with my customers.  So I write

6     down notes, and then I'll write down, you know, things

7     that I need to follow up on immediately and still

8     maintain the eye contact.

9          So I take notes, and then I make sure that,

10    you know, I -- yeah, so that's basically what I do.

11    And sometimes if the setting is appropriate, you know,

12    then I will use a computer.  Like if everyone is doing

13    collaborating on a computer, then that's okay.

14          So sometimes I may have less or more for a

15    certain meeting, but for the most part when I'm in

16    meetings, I like to maintain the eye contact and, you

17    know, the dialogue with customers rather than busy

18    typing and correcting or something.  I just, you know,

19    write it and then sort it out later.

20          Q.   So would you -- would you take the notes

21    contemporaneously, like, in the meeting or did you

22    recreate the notes later?

23          A.   No, no.  I take it right -- right there.

24          Q.   Okay.

25          A.   And then if it's something -- a point that I

                                              Page 211

1      need to share, then I would put it on my computer and

2      disseminate it to the right people or put it in a --

3      you know, keep a more permanent copy on my -- on my

4      laptop.  So my handwritten notes are the first, right,

5      notes taken that I do.

6          Q.   Okay.  So looking at Exhibit 66 here, the

7      first page is kind of black.

8               Is that just the cover of the journal?

9          A.   Yeah, it's the -- it's -- it's a hard cover

10     journal.

11         Q.   Okay.  And it looks like if you look on

12     Page 2, January 8, 2019 is the earliest entry I think

13     we had.

14              Is that when you started taking notes?

15         A.   No.  This is -- so I take notes when I

16     usually have meetings with other people when I'm

17     working on -- like, for instance, working on my actness

18     (sic), right, working on research, right?  I don't take

19     notes on my notepad because I can just put that into my

20     computer.  This is a meeting actually with the client.

21         Q.   Right.  Maybe I didn't ask my question

22     clearly.

23              Do you have notes which predate

24     January 8th, 2019?

25         A.   Predate, like --

Page 212

1      Q.    From earlier than January 18, 20- --

2    January 8, 2019?

3      A.    I have a lot more notebooks, yes.

4      Q.    You still have them?

5      A.    Probably, yeah, some -- somewhere maybe,

6    yeah.

7      Q.    Have you looked at those to see whether

8    there's any entries in there about meetings or your

9    performance in 2018?

10     A.    No, I have not, but I would have remembered

11   those meetings.

12     Q.    Did you take notes every meeting you had?

13     A.    It depends on what's discussed in the

14   meeting.  If I, you know, feel that these are important

15   notes and I need to make sure that I keep track of or

16   follow items that I need to keep track of, then yes.

17     Q.    Have you misplaced any of those notebooks

18   that you used to have?

19     A.    I wouldn't say misplace.  I used to -- what I

20   would do with IBM, I had a couple of file cabinets in

21   the Forest City office that I had kept some older

22   notebooks there.  And when IBM decided to consolidate

23   office, they packed them up for me in boxes.

24          I -- apparently I did not go there to pick

25   them up in time, so they just tossed out the whole box.

Page 213

1    So I don't know -- I don't even know what I lost from

2    those file cabinets.

3         Q.   Got it.

4         A.   Yeah.

5         Q.   And when was that?

6         A.   This was -- the IBM Forest City

7    consolidation, probably -- I would say probably three

8    or four years ago.  Definitely three or four years ago.

9         Q.   Okay.  Are there any journals or notebooks

10   that you have with you that you misplaced or don't have

11   anymore?

12        A.   Well, I wouldn't know that until I go search

13   to see whether -- what -- what I have.  These two

14   happened to be underneath my desk, so I was trying to

15   look back, you know, on what I -- what was said, what

16   was done, yeah.

17        Q.   You haven't gone to look to see what other

18   notebooks you might have?

19        A.   No, I -- I have not.

20        Q.   Do you think you might have other notebooks

21   related to -- from the 2019/2020 time period?

22        A.    No, because these are all dated.  So this one

23   is from 2019, right?  And then I think the -- and then

24   it goes into beginning of the next one, I think, right,

25   2019, and then -- and then 2020 is part of the second

                                        Page 214

```
1        notebook.

2               Q.    Okay.

3               A.    Yeah.

4               Q.    Okay.   Okay.   Let me ask you to go to Page 7

5        of this exhibit.   It's the number 150 in the lower

6        right-hand.

7               A.    Okay.

8               Q.    I think it's dated April 4, 2019.

9                     You see that?

10              A.    Yes, uh-huh.

11              Q.    It says "QBR."

12                    So would this have been notes from one of

13       your Quarter Business Reviews?

14              A.    Yes.

15              Q.    Got it.

16                    Down under Target it says "Help needed/date."

17                    Do you know what that means?

18              A.    I don't -- I don't remember specifically.

19       Usually, you know, it's -- if I -- if I -- I don't

20       remember specifically at that time what that meant.

21              Q.    Okay.   That's fine.

22              A.    Yeah.

23              Q.    All right.   Go to page -- let's say two pages

24       later, Page 9 of the document --

25              A.    Uh-huh.
```

Page 215

```
 1              Q.   -- dated 4/12/19.

 2                   You see that?

 3              A.   Yes.

 4              Q.   It says -- I think it says "Weekly call with

 5        Amy," right?

 6              A.   Uh-huh.

 7              Q.   And it says "300,000 per week."

 8                   You see that?

 9              A.   Yes.

10              Q.   What is that referring to?

11              A.   I can't say I remember.  It's -- it's -- I'm

12        going to guess it's pipeline.  I don't know.  I

13        don't --

14              Q.   Okay.  All right.  Let me ask you to go to

15        Page 16 --

16              A.   Okay.

17              Q.   -- of this exhibit.

18              A.   16, yes.

19              Q.   This is dated July 17, 2019, right?

20              A.   Yes.

21              Q.   It looks like you had a one-on-one with Todd;

22        is that right?

23              A.   Yes.

24              Q.   How often would you have one-on-ones with

25        Todd?
```

                                              Page 216

```
 1          A.    Not often.   This is the one where he asked me
 2     to become a DES.
 3          Q.    A DES Hunter?
 4          A.    Yes.
 5          Q.    Got it.
 6                And he explained the -- the program to you in
 7     this meeting?
 8          A.    Yeah.   So he explained that, you know, the
 9     portfolio, the project set, the DES rep, right, and
10     on -- on here he said there are 30 accounts, but I
11     don't think that's the normal program.   And he -- I
12     wrote down, I think that's "Ginni."   So she wrote
13     down that -- go up.   I guess he said that Ginni brought
14     in on the program of the CEO.   And then --
15          THE REPORTER:   I'm sorry.   Excuse me.   Excuse me.
16          THE WITNESS:   I mean, he told me Nicki Rich was a
17     software technical specialist, but then he didn't have
18     a software rep's name for me.
19                That's all I can make out of this.   So it was
20     a very high-level introduction of he would like me to
21     become a DES Hunter, and this is the -- yeah.
22     BY MR. BARNES:
23          Q.    And then if you look at the next page, it
24     looks like those are notes from a one-on-one with
25     Amy --
```

                                                    Page 217

```
1              A.    Uh-huh.

2              Q.    -- two days later on July 19, right?

3              A.    Right.

4              Q.    And there's a number of accounts listed here

5       with question marks next to them.

6                    Do you know what that means?

7              A.    Because I don't think they assigned a primary

8       storage rep yet.

9              Q.    Okay.

10             A.    Like American Express, Pepsico, Penney,

11      Dan -- Dan Nielson.  So he had -- he had those accounts

12      for a couple years already, so then he knew that those

13      were his accounts.

14             Q.    Got it.

15             A.    Yeah.

16             Q.    Okay.  That makes sense.

17             A.    Yeah.

18             Q.    And sorry, this is kind of tedious.  I just

19      wanted to make sure --

20             A.    I know.

21             Q.    -- I understand --

22             A.    No, no problem.

23             Q.    -- what this says.

24                   All right.  If you could go to Page 23.

25             A.    Uh-huh.  23.
```

Page 218

1        Q.    It says "4QQBR."

2              You see that?

3        A.    Yes.

4        Q.    And then "Todd," his name is underlined.

5    Next to that it says "What works, what doesn't work."

6              What is that referring to, if you remember?

7        A.    What -- what -- I think he was referring to

8    some of -- IBM has a lot of different promotion

9    programs, right, like where there's zero percent

10   financing, you know, injection (sic).  If you buy

11   something -- one thing, you know, we'll give you free

12   something else, right, you know.

13             So if I recall correctly, he was asking us,

14   you know, what some of these programs are, what --

15   which one works, which one doesn't work.  That --

16   that's the only thing that I can remember that he would

17   ask, you know.

18       Q.    Okay.

19       A.    Yeah.

20       Q.    And then let me ask you to go back to

21   Page 13.

22       A.    Sure.

23       Q.    Sorry, I skipped one.

24       A.    No, that's okay.

25             It says "2Q Recovery Plan" at the top.

                                              Page 219

```
1          A.    Uh-huh.

2          Q.    Right?

3          A.    Yes.

4          Q.    What is that referring to?

5          A.    So you know how we talked about if we kind of

6    divide the half, right, you know, first --

7          Q.    Right.  I think --

8          A.    You see the 40 percent/60 or 45/55?  Depends

9    on the year and the pay period, right?

10         Q.    Right.

11         A.    So -- so if you didn't meet that first

12   quarter, then they tried to create a plan to recover,

13   so that's what it is, 2Q recovery plan.

14         Q.    Got it.

15               So this is a plan to talk about how to hit

16   your --

17         A.    Right.

18         Q.    -- your first half goal by the end of the --

19         A.    Right.

20         Q.    -- second quarter --

21         A.    Yeah, yes.

22         Q.    -- right?

23         A.    Yes.

24         Q.    Okay.

25         A.    Yeah.
```

Page 220

1       Q.   And then if you look at the -- the last page

2   of this exhibit, I assume that's just the back cover?

3       A.   Let me go there.  Sorry.

4       Q.   Similar to the front?

5       A.   Yes, that's just the back cover.  It's a --

6   it's a black cover hard -- hard cover notebook.

7       Q.   Got it.

8       A.   And then I don't know whether the rubber

9   band -- that black line you see up there could be the

10   rubber band that you tie it up.

11       Q.   Got it.

12       A.   Yeah.

13       Q.   All right.  So take a look at Exhibit 67,

14   please.

15               (Whereupon Exhibit 67 was marked for

16   identification, a copy of which is attached hereto.)

17       THE WITNESS:  Excuse me.  Do you mind if I go get

18   a headset?  Because the noise is pretty loud -- loud

19   behind me, unless you don't -- you don't hear it.

20       MR. BARNES:  No, go ahead.  I -- I can't hear it.

21       THE WITNESS:  Oh, you can't?

22       MR. BARNES:  But if you --

23       THE WITNESS:  Okay.  That's fine.  I just don't

24   want it to be a distraction.

25       MR. BARNES:  No, I can't hear anything other than

Page 221

1     you, so...

2         THE WITNESS:  Okay.  That's fine then.

3    BY MR. BARNES:

4         Q.   Okay.  Exhibit 67 --

5         A.   Okay.

6         Q.   -- which I believe is another notebook you

7    produced to us or excerpts from that.

8         A.   Yes.  Yes.

9         Q.   I like your smiley faces, by the way.  Well,

10   I guess one of them's a frowny face, actually.  I just

11   noticed that.

12        A.   Well, I -- I -- I put this, so that's --

13   that's a straight face.  I put all the ones.  It comes

14   with the notebook, all those little, like, stickers.

15        Q.   Yeah.

16        A.   That's how I put my name there.  I put my

17   name, pick one of each.

18        Q.   Got it.

19        A.   Yeah.

20        Q.   All right.  So on the second page of this

21   exhibit there's an entry from 10/31/19.

22        You see that?

23        A.   Uh-huh.

24        Q.   It -- and it's titled "DES

25   Role/Responsibilities."

```
1                    You see that?
2         A.    Yes.
3         Q.    And over under the date you've got "Sandy,"
4    "Don Custardo" and "Phil Weed," right?
5         A.    Yes.
6         Q.    So does that refresh your recollection about
7    whether Don Custardo was also in the DES role?
8         A.    Yes.
9         Q.    And you think he was?
10        A.    Now I do.  I -- I -- yeah.  I mean, I think
11   even earlier when you showed me the email that he was
12   attached to, but yeah.
13        Q.    Okay.  Got it.
14                    And so do you remember what you were talking
15   about at this point?  Since by now you had been a
16   couple months into the program.
17        A.    This is the call that Sandy set up for me to
18   introduce me to Phil Weed, who is DES Hunter program
19   manager.
20        Q.    Okay.
21        A.    Yeah.  So I did not even know that Phil --
22   Phil -- I -- I take it back.  I know Phil because he
23   used to do power sales when I was a power rep.  So I
24   know who he was, but I did not know that he was a
25   DES Hunter program manager until around this time when
```

Page 223

1      Sandy asked me, "Have you been participating in these

2      weekly calls?"

3              I said, "No one even told me that there was

4      Phil and there were weekly calls."

5              So Sandy set up this call and just brought in

6      me, right, to make sure that I am introduced to Phil,

7      and then she also brought in Don, you know, just

8      because -- so that Phil knows both of these people on

9      her team.

10          Q.    Do you know whether this was the first time

11     Don was being introduced to Phil?

12          A.    That, I don't know, yeah.

13          Q.    Okay.  All right.  Scroll down to Page 5.

14          A.    Okay.

15          Q.    And middle of the page, it looks like there's

16     an entry for 2/19/20.

17              You see that?

18          A.    Yes.

19          Q.    And to the left of that, I think that says

20     "1Q effort."

21              You see that?

22          A.    Yes.

23          Q.    Was there a discussion about your effort in

24     the first quarter?

25          A.    No.  This is still on first quarter, so this

                                              Page  224

1        is a call that I had with my system architect,

2        Brad Ashbaugh, right, trying to outline what our, you

3        know, strategies are, what some of our, you know, plan

4        of attacks are, right, and then we kind of segment out

5        the different accounts on -- on how to go about them.

6            Q.    Got it.

7            A.    So I just call it, like, that's our call for

8        1Q effort, right?  That's the call that he and I had.

9            Q.    Okay.  Understood.

10           A.    Yeah.

11           Q.    I'm just looking at my notes to see here.

12           A.    Yeah.

13                 And -- and Brad was assigned to team up with

14       me around that time.  That's why we immediately got on

15       a strategy call.

16           Q.    All right.  Let's take a look at Page 17.

17           A.    Okay.

18           Q.    It looks like this was a June 1st, 2020

19       meeting with Robert; is that right?

20           A.    That's the -- yeah, the cadence.  Yeah, that

21       looks like it, yes.

22           Q.    Your weekly cadence with Robert?

23           A.    Yes.  So there are actually three meetings on

24       here, right?  So the -- so if you look at the little

25       dot, I have weekly cadence with Robert, software call

                                              Page 225

1   with Amy, and then the Raley's opportunity call.

2     Q. Got it.

3     A. Yeah.

4     Q. Okay.  So looking up at the weekly cadence

5   with Robert, it says "Forecast 3Q 240k."

6     You see that?

7     A. Yes.

8     Q. Versus, is that 690k or 640k?

9     A. I think 640 maybe, yeah.

10     Q. Okay.  So you were talking with Robert about

11   your third quarter forecast?

12     A. No.  This is -- this is the first half -- I

13   mean third -- forecast 3Q.  Yes, forecast 3Q, yeah.

14   Yes, I guess so.

15     Q. And under that it says "2H," originally said

16   "960k."  Then that's crossed out and "1.6 million" is

17   written in there, right?

18     A. Yes.

19     Q. Do you know what that's referring to?

20     A. No, I don't remember that.

21     Q. Do you remember Robert telling you that the

22   expectation was 1.6 million for the second half?

23     A. No.  I -- I -- no, I don't remember that

24   because I won't even know whether I have these accounts

25   in second half.  So these are what I'm just loading up

Page 226

1      for whoever's going to pick up these accounts.

2             Q.   Did anyone tell you one way or the other

3      whether you were going to have these accounts?

4             A.   No.  You won't know until the account

5      assigner comes out in second or third week into the --

6      into the half.

7             Q.   But in this meeting you were still talking

8      with Robert about your forecast for 3Q and 4Q?

9             A.   It's not forecast -- well, let me put it this

10     way.  As -- as far as putting into the Atlas tool.

11            Q.   Okay.  And so y'all were discussing what you

12     should put into the Atlas tool in terms of forecast for

13     Q3 and Q4.

14                 Is that what you're saying?

15            A.   In terms of, yeah, the pipeline, yeah.  Yes.

16            Q.   Okay.  Okay.  All right.  Let me ask you to

17     go to Page 19 of this exhibit.

18            A.   Okay.

19            Q.   June 18, 2020, "Checkpoint call with Robert."

20                 You see that?

21            A.   Yeah.  That's the one that -- yeah.

22            Q.   Is that where you were given the PIP?

23            A.   Yes.

24            Q.   Okay.  And then I think you said after that

25     you didn't have any meetings with Robert until

                                                    Page 227

1      June 30th; is that right?

2         A.  I might have one or two calls with him, but,

3      you know, we didn't have the cadence call regularly

4      anymore.

5         Q.  Okay.  So you go to the next page.  See

6      "6/22/2020"?

7         A.  Yeah.

8         Q.  It looks like you had a weekly cadence with

9      Robert, right?

10        A.  No.  So what I usually do is I would write

11     down the date and then the topic, and then I don't -- I

12     don't think this one we had.  Otherwise, if I -- if I

13     had anything that we talked about, I would have notes

14     on it.  We didn't have that call.  So I was ready for

15     the call, but we didn't have the call.

16        Q.  Well, if you go back to the previous page,

17     6/18/2020, you know you had that meeting, right?

18        A.  I know we had the meeting because all we

19     talked about was the PIP.  He just, you know, sent me

20     the PIP, you know, so everything is on the PIP.

21        Q.  And you didn't write anything in your

22     notebook on --

23        A.  I didn't write anything down in my notebook,

24     yeah.

25        Q.  Okay.  And then if you go to Page 22.

Page 228

1       A.   22.  Okay.

2       Q.  At the top it says "IBM checking in."

3       A.  That -- that -- I started writing a script

4  when I cold-calling to his customers.  This call was

5  like a telemarketer.  I want to have a script so I

6  don't forget mentioning the points.  So I started

7  writing it down on my notebook.

8          And then Brad, my system architect, said,

9  "Okay, let's have the same script," so I think we

10  transferred it into, like, a document that we share.

11       Q.  Got it.

12       A.  Yeah.  Yeah, it's a script.

13       Q.  Okay.  If you go to the next page, this looks

14  like a different notebook; is that right?

15       A.  Yeah, it was, because I explained to you the

16  person who was helping to scan is -- I ran out of pages

17  on my hard cover book, so -- and I didn't -- so I

18  started just taking, like, little notepads from home

19  and use that.  I said, you know, you can go ahead and

20  copy the individual pages, so they're just a little

21  notepad that I was using after I used up all the pages

22  on -- on the black notebook.

23       Q.  Okay.

24       A.  Yeah.

25       Q.  And this entry, this first entry is

Veritext Legal Solutions
866 299-5127

```
 1      7/14/2020, right?
 2           A.   Uh-huh.
 3           Q.   Is that right?
 4           A.   Yes, yeah.
 5           Q.   Okay.  And it says "West bimonthly call"?
 6           A.   Yes.
 7           Q.   "Robert's quota 14 million."
 8                Who's Robert?
 9           A.   Oh, Robert.  Robert Cortez, I think.  He
10      shared with us his quota's 14 million.
11           Q.   Okay.  Got it.
12           A.   Yeah.
13           Q.   Next page, it says "Bob Cocchiola"?
14           A.   Oh, I'm trying to remember --
15           Q.   Do you know who that is?
16           A.   -- who that is.
17                That is probably someone that -- oh, that
18      doesn't even look familiar anymore.
19           Q.   Okay.
20           A.   I don't know who that is anymore.
21           Q.   Then under that there's an entry for
22      7/20/2020.
23           A.   Yes.
24           Q.   "Call with Brian Wilke"?
25           A.   Milkes, yeah.
```

Page 230

1    Q. Milke?

2    A. M-i-l-k-e-s, Milkes.

3    Q. Who's that?

4    A. He is the new V.P. of System Sales.  He

5 basically took over Todd's position.

6    Q. Okay.

7    A. So this is at the beginning of second half.

8    Q. Where did Todd go?

9    A. I have no idea.  The -- the owner says he

10 is -- he is no longer in that position.

11    Q. Okay.  Under that you say "Not sure how my

12 PIP could have happened this way."

13    What does that mean?

14    A. That's what -- what Brian said to me, because

15 I explained to him, you know, that I got a PIP and this

16 is how.  So -- and then he said that, "I don't know how

17 your -- your PIP could have happened this way."

18    Q. Did he say anything other than that?

19    A. He said that -- what did he say?  He said

20 that something along the line that, "I -- I wouldn't

21 have done it this way," so -- but then he wanted to go

22 find out, right?  Yeah, so...

23    Q. Okay.

24    A. Yeah.

25    Q. Do you remember anything else about that

                 Page 231

1     conversation?

2         A.   Oh, what else did he say?  No, he just

3     sounded kind of surprised, right?  And -- and it was a

4     very short conversation because I think I only set up

5     maybe 15, you know, 30 minutes because he had just

6     gotten on board to become the V.P. of System Sales, so

7     he was, you know, in place for maybe two weeks at most,

8     yeah, two weeks.

9              And then -- but because I knew him from my

10    service sales days, right, and also pondering with him

11    when storage -- when I tried to partner with the power

12    server -- power server rep so that I -- I knew him -- I

13    knew of him, I should say.  I didn't really know him

14    that well, but he knew of me.  So I set up a call with

15    him, and that was it.

16        Q.   Okay.

17        A.   Yeah.

18        Q.   And if you go --

19        A.   Yeah.

20        Q.   I'm sorry.  Go ahead.

21        A.   No, no.  That's okay.  I think he had to

22    reschedule once before we had this call on this day.

23        Q.   Okay.  If you look at the next page, there's

24    some notes here.

25             Do you know what notes those are from or what

                                          Page 232

1   meeting those notes are from?

2       A.   That was from -- so what happened was after I

3   talked to him the first time, he said, "I'm going to go

4   talk to, you know, some people, go find out what

5   happened, what went on."

6           And then he came back, and I can't even --

7   I -- I didn't have -- I'm surprised I didn't put a date

8   on it.  And he -- you know, he -- I -- we connected

9   again after he -- he supposedly talked to people, and

10  that's when he said, you know -- I kind of jot down

11  the -- the words he used.  "I don't know how he got

12  here," but he can -- nothing he can do now because the

13  PIP is already in the system, and then that he got

14  involved too late because I guess I didn't inform him

15  until too late.

16          And he did say that if I felt the PIP was

17  mishandled or not justified, report to H.R. and -- but

18  then he also told me that he didn't talk to

19  Stacie Mason, Todd, or Robert.  Those are the three

20  people in my management chain when I got the PIP.  He

21  talked to, I think, another V.P., John Rafferty, and

22  some other people, some other executives.

23      Q.   Okay.

24      A.   Yeah.

25      Q.   And so you -- but you did -- you did not

Page 233

1    report it to H.R., right?

2        A.   I did not report it to H.R. because my -- my

3    understanding from Robert, right, because he and I

4    connected on the 30th and he said that, "Well, because

5    you missed the 30th goal, that means you -- you know,

6    you -- you are out." And he -- once again, he said,

7    "It's all about the numbers," right? So I missed that

8    number, so I was out.

9        Q.   And -- but Brian told you if you thought the

10   PIP was not justified, you should report it to H.R.,

11   right?

12       A.   He did say that, yeah, but that's -- this is

13   already in July, right, late July. This is when I'm

14   about to be -- about to hand in my badge.

15       Q.   Okay. All right. Can you think of any --

16   any emails or other documents that you had related to

17   the PIP, your performance, your termination that --

18   that you have misplaced since that time period?

19       A.   No, I -- I didn't. I base -- I -- I just

20   look at the PIP as an official document, so I just went

21   with whatever was sent to me. I -- I don't have any

22   other emails because Robert and I didn't talk about the

23   PIP after -- after it was issued to me.

24       Q.   Okay. And you've given your attorneys all

25   the documents related to your performance and the PIP

                                        Page 234

1      and your termination?

2           A.   All that I have, yeah.  I mean, I -- I

3      didn't -- I didn't, like, save a copy or print a copy

4      of everything, right, when -- before I turned in my

5      laptop, so...

6           Q.   Right, I understand that.  I understand that.

7      I'm just -- I want to make sure that --

8           A.   Yeah.

9           Q.   -- after you left IBM, you kept everything

10     and you've given it all to your attorneys?

11          A.   The -- the -- yeah, that is, I guess like you

12     said, pertains to this PIP, right?

13          Q.   Right.

14          A.   But -- yeah, I -- I didn't even think that

15     these notebooks have any consequence because they're

16     just my own notes taking.

17          Q.   Do you think there would be other --

18          A.   No, I -- no, I don't have any other

19     notebooks, yeah.

20          MR. WILLIAMS:  Nelly, let him just finish his

21     question.

22          THE WITNESS:  Oh, sorry.

23          MR. WILLIAMS:  That's okay.  That's okay.

24          THE WITNESS:  Sorry.

25     BY MR. BARNES:

                                            Page 235

```
 1              Q.   You know where I'm going.
 2                   Any other notes that you had, you don't think
 3         you would have mentioned the PIP or your termination in
 4         those?
 5              A.   I'm sorry.  Say that again.
 6              Q.   Any other notebooks you have --
 7              A.   Uh-huh.
 8              Q.   -- would the PIP or your termination be
 9         referenced in those?
10              A.   No, I won't have anything.
11              Q.   Okay.  So in addition -- I don't want to
12         rehash what we've already talked about, but is there
13         any -- anything -- any other reason why you think that
14         you were fired because of your age other than what
15         we've already talked about today?  Anything else that
16         came to mind?
17              A.   Anything else that came to mind?
18                   Nothing that I can think of right now.
19              Q.   Okay.  Do you believe your testimony today
20         has been truthful?
21              A.   Yes.
22              Q.   Is there anything you feel like we need to
23         change or clarify or you feel like you need to change
24         or clarify about your testimony so far?
25              A.   Not that I can think of right now, yeah.
```

Page 236

1          MR. BARNES:  Okay.  I don't have any further

2     questions.

3          MR. WILLIAMS:  I have just a couple.  I can be

4     pretty quick.

5

6                         EXAMINATION

7     BY MR. WILLIAMS:

8          Q.   Now, you spoke a little bit with Justin about

9     the weekly DES calls.

10          Do -- do you remember those, that

11     conversation?

12          A.   Yes.

13          Q.   I just want to make sure the record's clear.

14          When did you first become aware that those

15     calls were happening?

16          A.   In around mid-October.

17          Q.   After then did you learn about any other

18     trainings or resources for DES Hunters that you had not

19     been provided prior to that?

20          A.   I heard that there was a -- a one-week

21     training before the half started for the DES Hunters,

22     but I -- I -- I didn't go validate that.  So that would

23     have been, like, you know, either early July or late

24     June.

25          MR. WILLIAMS:  That's all the questions I have for

Page 237

```
 1        you.

 2             THE WITNESS:  Okay.

 3

 4                      FURTHER EXAMINATION

 5        BY MR. BARNES:

 6             Q.   Let me just -- I just want to follow up on

 7        that last point.

 8                  Where did you -- who told you about this

 9        DES Hunter training?

10             A.   Sandy.  So when she found out that there was

11        such a team, like Phil Weed, right, then she said, "Oh,

12        I heard that" -- you know, I -- I remember this, you

13        know, clearly that she said, "I heard that they even

14        got together for a whole week.  I don't know whether

15        it's training or just kind of like a kickoff to -- so

16        that everyone understands what their roles and

17        responsibilities are before this even kick into gear in

18        July," yeah.

19             Q.   Okay.  Did you ask anyone for any of the

20        training materials that may have been disseminated at

21        that?

22             A.   So as soon as I -- I got connected with Phil,

23        I asked him for everything that, you know, he has

24        shared with the team, and he did, yeah.

25             Q.   He did give that to you?
```

                                                    Page 238

1      A.    He -- well, you know, it's like our place,

2    place meaning, you know, our solutions, right, what --

3    what solutions we're going to use to go target, you

4    know, the competitive install base, right, materials

5    like that.  He did share that.

6      Q.    Did you ask him about this week of -- this

7    week-long meeting?

8      A.    No, I didn't.  No, I didn't.

9      MR. BARNES:  All right.  That's all I have.

10     MR. WILLIAMS:  Nothing further from me.

11     THE WITNESS:  Okay.

12     MR. BARNES:  All right.  We can go off the record.

13

14          (Whereupon the videoconference deposition

15    concluded at 4:22 p.m.  Signature under penalty of

16    perjury.)

17

18

19

20

21

22

23

24

25

Page 239

1                          DECLARATION

2                              OF

3                      PENALTY OF PERJURY

4

5

6

7          I declare under penalty of perjury, under the laws

8     of the State of California, that I have read the

9     foregoing transcript, I have made any corrections,

10    additions or deletions that I was desirous of making in

11    order to render the within transcript true and correct,

12    and

13          IN WITNESS WHEREOF, I have hereunto subscribed my

14    name this _____ day of _____, _____.

15

16

17

18

19

20          _____

21                      NELLY LEONG

22

23

24

25

                                              Page 240